Deposition of:
# Juliette Scantlebury, M.D.

Susan Barnhart

-vs-

The Village of Buckner, Illinois

13-772-SMY-DGW

January 28, 2015

Reporter: Lynn C. Allard, CSR

Keefe Reporting Company
618-277-0190 or 800-244-0190
Reporter@KeefeReporting.com

```
 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2
 3
 4   SUSAN BARNHART, as            )
     Administrator of the Estate   )
 5   of Roy D. Barnhart,           )
     Deceased,                     )
 6                                 )
                      Plaintiff,   )
 7                                 )
        vs.                        )  No. 13-772-SMY-DGW
 8                                 )
     THE VILLAGE OF BUCKNER,       )
 9   ILLINOIS; PATROLMAN WILLIAM   )
     McKINNEY, Individually and    )
10   in his Official Capacity as   )
     an Officer for the Buckner    )
11   Police Department, THE CITY   )
     OF CHRISTOPHER, ILLINOIS;     )
12   and OFFICER RICHARD DALE,     )
     Individually and in his       )
13   Official Capacity as an       )
     Officer for the Village of    )
14   Christopher Police            )
     Department,                   )
15                                 )
                      Defendants.  )
16
17                  Deposition of
                JULIETTE SCANTLEBURY, M.D.
18                 January 28, 2015
19
20
            REPORTER:  Lynn C. Allard, CSR, CCR
21              IL License #084-002828
                   MO License #507
22
23           Keefe Reporting Company
              11 North 44th Street
24           Belleville, Illinois  62226
```

<pre>
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2

 3

 4   SUSAN BARNHART, as           )
     Administrator of the Estate  )
 5   of Roy D. Barnhart,          )
     Deceased,                    )
 6                                )
                      Plaintiff,  )
 7                                )
          vs.                     )  No. 13-772-SMY-DGW
 8                                )
                                  )
 9   THE VILLAGE OF BUCKNER,      )
     ILLINOIS; PATROLMAN WILLIAM  )
10   McKINNEY, Individually and   )
     in his Official Capacity as  )
11   an Officer for the Buckner   )
     Police Department, THE CITY  )
12   OF CHRISTOPHER, ILLINOIS;    )
     and OFFICER RICHARD DALE,    )
13   Individually and in his      )
     Official Capacity as an      )
14   Officer for the Village of   )
     Christopher Police           )
15   Department,                  )
                                  )
16                    Defendants. )
17

18

19

     APPEARANCES:
20

21   For Plaintiff: KUEHN, BEASLEY & YOUNG, P.C.
                    By Jarrod P. Beasley, Esq.
22                  23 Public Square
                    Suite 450
23                  Belleville, IL 62220

24
</pre>

```
 1    APPEARANCES, cont.:
 2    For Defendant (The Village of Buckner, IL):
                      BLEYER & BLEYER
 3                    By Joseph A. Bleyer, Esq.
                      601 West Jackson Street
 4                    Marion, IL 62959
 5    For Defendant (William McKinney):
                      PIERCE LAW FIRM, P.C.
 6                    By Charles A. Pierce, Esq.
                      #3 Executive Woods Court
 7                    Suite 200
                      Belleville, IL 62226
 8
      For Defendant (Richard Dale):
 9                    BLACK, HEDIN, BALLARD, MCDONALD
                      By Jerome E. McDonald, Esq.
10                    108 South 9th Street
                      Mount Vernon, IL 62864
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Keefe Reporting Company

```
 1                    I N D E X

 2                                              Page

 3   Examination by Mr. Pierce                    6

 4   Examination by Mr. McDonald                 19

 5   Examination by Mr. Beasley                  22

 6   Examination by Mr. Bleyer                   30

 7   Further Examination by Mr. Pierce           32

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Keefe Reporting Company

```
 1              IT IS STIPULATED AND AGREED by and between

 2      counsel for Plaintiff and counsel for Defendant that

 3      the deposition of JULIETTE SCANTLEBURY, M.D., may be

 4      taken pursuant to the Federal Rules of Civil Procedure

 5      by and on behalf of the Defendant on January 28, 2015,

 6      at the Office of the Medical Examiner, 1300 Clark

 7      Avenue, St. Louis, Missouri, before Lynn C. Allard, a

 8      Certified Court Reporter; that the issuance of notice

 9      is waived, and that this deposition may be taken with

10      the same force and effect as if all Federal Rules had

11      been complied with.

12              IT IS FURTHER STIPULATED AND AGREED that the

13      signature of the deponent is not waived.

14

15

16

17

18

19

20

21

22

23

24
```

1          JULIETTE SCANTLEBURY, M.D., produced, sworn and

         2     examined as a witness on behalf of the Defendant,

         3     testified and deposed as follows:

         4

         5                         EXAMINATION

         6                       By Mr. Pierce

         7           (The deposition began at 11:25 a.m.)

         8          **Q.    Good morning, Doctor.  We're here today**

         9     **to talk about a postmortem exam that you participated**

        10     **in with Roy D. Barnhart, Sr.  It appears that you**

        11     **brought a copy of your report with you; is that**

        12     **correct?**

        13          A.    Yes.

        14          **Q.    All right.  This is an open book test.**

        15     **Feel free to refer to it at any time.**

        16          A.    Thank you.

        17          **Q.    First of all, do you know why -- just**

        18     **tell me a little bit about the hierarchy here.  I see**

        19     **that you and a Dr. Turner were involved.  Why were**

        20     **there two physicians involved in this post-mortem?**

        21          A.    At that particular time, I was doing my

        22     forensic pathology fellowship, so the attending

        23     reviews all of my activities to aid in sorting out the

        24     case.

```
 1        Q.    Okay.  So you actually performed the

 2   post-mortem, and then Dr. Turner simply reviewed it

 3   essentially?

 4        A.    She was in the room for parts of the

 5   autopsy that I did, and she reviewed everything else

 6   after that, the microscopic examination and medical

 7   records.

 8              MR. BLEYER:  You'll have to speak up a

 9   little bit.

10              THE WITNESS:  Okay.  Sorry.

11        Q.    (By Mr. Pierce)  Have you ever given a

12   deposition before, Doctor?

13        A.    Once.

14        Q.    Okay.  Just -- I always go in assuming

15   that doctors have, and since you haven't done it very

16   often, you have to make sure that we're not talking at

17   the same time --

18        A.    Okay.

19        Q.    -- because she's taking down everything

20   we say.  If I interrupt you, I'll try to stop and

21   vice versa.  We need you to answer audibly.  You can't

22   just nod your head or shake your head or things like

23   that because those don't translate well on paper,

24   okay?
```

1          A.      Okay.

         2          Q.      **Prior to performing Mr. Barnhart's**

         3  **autopsy, what information, if any, were you provided?**

         4          A.      At the time of the autopsy, I was just

         5  getting an oral presentation about what possibly

         6  happened, and it was just the tasing incident at that

         7  point in time.  A couple weeks later I had more

         8  information about what could have happened at the

         9  scene.

        10          Q.      **Okay.  What information did you get a**

        11  **couple of weeks later?**

        12          A.      The -- I guess the possible -- he being

        13  possibly struck by a police officer.

        14          Q.      **And first of all, where did you obtain**

        15  **that information?**

        16          A.      I'm not for sure.  I can't remember his

        17  name right now, but an Illinois police officer or

        18  investigator, something like that.

        19          Q.      **And did they give you any further**

        20  **information about who may have struck Mr. Barnhart,**

        21  **where, how violently, anything like that?**

        22          A.      It kind of varied, but I heard about

        23  being struck in the jaw.  The story changed from

        24  open-handed to a closed fist.  It wasn't a consistent

1    story.

 2         Q.    Okay.  Now, just the primary reason we're

 3    here today is to talk about your findings and the

 4    cause of death.

 5         A.    Uh-huh.

 6         Q.    And it's my understanding that you

 7    believe that there was a closed head injury that

 8    Mr. Barnhart experienced which was the primary cause

 9    of death; is that correct?

10         A.    Yes.

11         Q.    With regard to closed head injuries --

12    and I believe part of the closed head injury was he

13    had a subdural hemorrhage; is that correct?

14         A.    Yes.

15         Q.    There's two primary mechanisms for that,

16    one being a direct blow to a particular part of the

17    head and the other being the brain moving around

18    within the skull; is that -- am I correct so far?

19         A.    Mostly correct, yes.

20         Q.    Okay.  What's incorrect about that?

21         A.    There's something hitting the head or the

22    head hitting something.  So it may be the head moving

23    and then hitting a structure like the ground or a hard

24    object hitting the head like a hand or some kind of

1   hard object instead of moving around.

2       **Q.   Is there any way to differentiate either**

3   **radiographically or via autopsy the difference between**

4   **an injury which was caused by a direct blow as in a**

5   **head striking something or something striking the head**

6   **versus the brain moving around within the skull in --**

7   **I guess is that coup contrecoup fashion?**

8       A.   Uh-huh.  If there's coup contrecoup --

9   not exactly because it would have to be -- coup

10   contrecoup can occur if you do hit something as well,

11   so it just depends on what bruising you find on the

12   brain, but it's very variable, but not definitively

13   would you be able to distinguish all the time.

14       **Q.   With the information you've been provided**

15   **both prior to the autopsy and then subsequent when you**

16   **talked to the Illinois police officer, did you form an**

17   **opinion which blow, if any, was cause of**

18   **Mr. Barnhart's death?**

19       A.   No.

20       **Q.   Is there any way that you feel you can**

21   **make that determination?  Any additional information**

22   **which you would need to be able to make that**

23   **determination?**

24       A.   From examining the original CT

1   examination that was done at the Herrin Hospital, I

2   could say that the fall that he had after being tased

3   could have played a role in his developing subdural

4   hematoma, but whether -- if he was struck by someone

5   else, if that exacerbated or also caused it, I

6   wouldn't be able to tell.

7          **Q.     Okay.  In general, would it be fair to**

8   **say that the more violent or significant the blow, the**

9   **more likely it would be to cause a subdural hematoma?**

10         A.     Not in this particular case.

11         **Q.     Okay.  And why not?**

12         A.     Because he's an older gentleman, and he

13  had some cerebral atrophy, so that would make you more

14  likely -- not more likely, but it would be easier for

15  you to get a subdural hematoma with the last violent

16  hit, and also he was also on Coumadin, so that would

17  make him more susceptible to bleeding, so that also

18  compounded the issue.

19         **Q.     Is there any significance about the**

20  **location or locations of the hematomas that you found**

21  **which points you towards one or the other of the blows**

22  **which you've mentioned, one being the fall after being**

23  **tased versus a blow to the face subsequent to that?**

24         A.     I'm sorry, can you repeat the question?

1          Q.    Sure.  The evidence, we believe, is going

2    to be, as you know, is going to be conflicting about

3    the nature and severity of the impacts which

4    Mr. Barnhart experienced.  We believe that, first of

5    all, that he was -- we know he was tased and he went

6    to the ground.  Hypothetically assume this for the

7    purpose of my next question:  That when he fell, he

8    did not brace himself and instead landed face forward,

9    okay?

10         A.    Yes.

11         Q.    And then there's evidence that he was

12   struck subsequently by a police officer.

13         A.    Uh-huh.

14         Q.    The evidence on that is disputed as to

15   whether it's open-handed or closed-handed, whether

16   it's in the jaw or up on the head.  First of all, did

17   you find any evidence which would allow you to

18   determine where he had been struck by the police

19   officer, whether it was in the jaw, the head, the

20   forehead?  Did you find anything that would lead to

21   that conclusion?

22         A.    Not after so many medical interventions,

23   because there was a lot of subgaleal hematoma, but

24   that could have been from the reflection of the scalp

1    when they did the procedures to do the craniotomy.  So

2    there was blood there already.  If there wasn't any

3    medical intervention, maybe I would say that he was

4    hit somewhere else besides the fall that he had on his

5    right forehead, and if I had been given -- usually

6    when we do the autopsy, you try not to disturb the

7    face too much because they may want to have an open

8    casket funeral.  So we try not to disturb the face too

9    much.  So if I had that information at the time of the

10   autopsy, maybe I would have done a different approach

11   to reflect more, but I didn't see any -- I reflected

12   out to here (indicating), and I didn't see any

13   additional hemorrhage in that area, but that doesn't

14   mean it didn't occur, because sometimes you may not

15   bruise with every hit you receive.

16        Q.    Okay.  And with the blow to the face, we

17   believe the evidence is going to show that it would

18   have been to Mr. Barnhart's left side of his face

19   administered by a right-handed person.  Did you see

20   anything consistent with a left-sided impact which

21   would have contributed to Mr. Barnhart's death?

22        A.    Not from my report, no.

23        Q.    Okay.  You mentioned a moment ago a

24   right-sided impact or hemorrhage.  I forget which word

1    you were using.  Describe for me what you found on the

2    right side of Mr. Barnhart's anatomy.

3           A.    From the external injuries of the

4    injuries that he reported, the four by four speckled

5    contusion on the right, mid forehead, it was kind of a

6    pattern that kind of looked like if he had fell on

7    gravel or something.  It could be consistent with

8    that.

9           Q.    Okay.  And the locations of the subgaleal

10   hematomas you found, were they consistent with the

11   presentation of the hematoma on the forehead that you

12   just described?

13          A.    There was an associated subgaleal

14   hematoma on the right forehead area and also on the

15   right side of the skull, so it was kind of wrapping

16   around to the back.

17          Q.    Okay.  Were all of the findings at least

18   with regard to the skull that you made, were they all

19   right-sided?

20          A.    Yes.

21          Q.    Were they all consistent with

22   presentations of somebody having fallen from their own

23   height unguarded onto ground?

24          A.    It's possible, yes.

1    Q.    Anything else about those presentations

2 which would have led you to look elsewhere towards a

3 left-sided facial strike?

4    A.    Pardon me?

5    Q.    You told me that the findings you had

6 were all right-sided on the cranium, correct?

7    A.    Yes.

8    Q.    Anything about those which led you to

9 believe that the subsequent left-sided facial strike

10 would have played any part in causing these hematomas

11 and hemorrhages?

12    A.    I don't think I would be able to know

13 that, no.

14    Q.    Is it fair to say as you sit here today

15 that in your opinion, the fall after being tased is

16 the more likely cause of the gentleman's death than

17 the subsequent blow?

18    A.    No.

19    Q.    Okay.  Why not?

20    A.    Because there's a lot of overlapping

21 things that occurred with him, because he has -- he

22 already had a preexisting condition where he was on

23 Coumadin.  He also fell, so the fall had some role in

24 it.  But then he also had the medical interventions,

1    so there are a lot of things that kind of obscured

2    my -- not obscured my findings, but made it hard to

3    tease what happened apart.  So I wouldn't -- it's not

4    like whether I could or could not do it, but with this

5    case, I wouldn't speak so definitively.  I understand

6    there are several things that I can't separate.

7         **Q.    Would it be fair to say that you can't**

8    **rule out the facial strike, but the findings are more**

9    **consistent with the history of having fallen from his**

10   **own height onto the ground?**

11        A.    Not entirely.

12        **Q.    Okay.  Why not?**

13        A.    Because, well, I guess from the

14   statement, it sounds like you -- I think I would only

15   be able to say that the fall did contribute, but

16   whether it was the only contributor, I would not be

17   able to say.

18        **Q.    Okay.  That's fair.  So we can agree that**

19   **the fall after being tased was one of the contributing**

20   **factors to his death, correct?**

21        A.    Yes.

22        **Q.    Okay.  As to whether or not the blow to**

23   **the face which we've described contributed, you simply**

24   **don't have enough information to say one way or the**

1    other as to whether it contributed; is that fair?

2         A.    Yes.

3         Q.    Would there be anything about any

4    preintervention radiograph which might be able to

5    assist you in making that determination if things were

6    taken before the craniotomy or some of the other

7    interventions?

8         A.    Well, the subdural hematoma when he was

9    admitted to Herrin Hospital was more right frontal,

10   but it started spreading to the parietal side of the

11   brain.

12        Q.    And you brought up a good point.  When

13   you were doing your examination, I guess you had the

14   Herrin Hospital records available to you?

15        A.    Not at that time, but --

16        Q.    Before you did your report?

17        A.    Yes.

18        Q.    Okay.  And then did you also have the

19   records from, I guess it was, St. Louis University?

20        A.    A couple of days after.

21        Q.    Okay.  So you had all of those and then

22   reviewed those after doing the autopsy and before

23   drafting your report of examination?

24        A.    Yes.

1          Q.     Okay.

2          A.     Before the report was finalized, yes.

3          Q.     I'm looking at the report date on here if

4    there was --

5          A.     What do you mean?

6          Q.     I just didn't know if there was a date it

7    was actually finalized is what I was looking for,

8    which I don't see.

9          A.     We may have to go into the system, but I

10   can't remember.  It was a little while afterwards,

11   though.

12         Q.     Okay.  These may be outside your area of

13   expertise, and if so, just please tell me so.  You

14   mentioned that this gentleman had had significant --

15   you didn't say significant.  I'll strike that.  That

16   he had some other conditions going on.  In fact, I

17   know he had a pacemaker implanted.  He was on

18   Coumadin.  He had some other issues that you had found

19   through your autopsy.  Are you able to say whether the

20   conditions other than the cranial injuries would have

21   shortened this man's expected life span?

22                MR. BEASLEY:  I would object that it's

23   clearly outside the scope of her area of expertise and

24   also calls for vast speculation.  Subject to that, you

1    may answer.

2         Q.    (By Mr. Pierce)  He's made an objection

3    that the judge will rule on later, so you can go ahead

4    and answer the best you can if you have an answer.  If

5    it's outside of your area, please just say so, but if

6    you have an opinion on that, please tell us.

7         A.    My opinion is that it would be

8    speculative at this point.

9              MR. PIERCE:  Okay.  I prefaced it by

10   saying that it might be outside your area, so that's

11   fine.

12             Gentleman, I'll pass it.

13

14                        EXAMINATION

15                   By Mr. McDonald

16        Q.    You've heard of one fall and one blow to

17   the head, one striking of the head, correct?

18        A.    Yes.

19        Q.    All right.  Have you ever heard that

20   there was a second fall before the striking of the

21   head?

22        A.    Not from my recollection, no.

23        Q.    Assuming that this gentleman fell twice

24   before he was struck, is there any way for you to say

1    which of those two falls was causative in the ultimate

2    subdural hematoma?

3          A.    The only external injury I could verify

4    on the head was the right forehead, the speckled

5    contusion.  The others may not have external damage,

6    so I wouldn't be able to say if he fell again, because

7    sometimes, especially the head, sometimes you don't

8    have external bruise, but unless you could tell me he

9    fell on his left side of his head, then I could say

10   that that wasn't true, but on the right side,

11   everything was kind of -- after the craniotomy, what

12   was on the galea was a lot of old and new hemorrhage.

13   Well, older.

14         Q.    And the speckled appearance that you've

15   made mention of, is there any way for you to know if

16   that occurred in the first fall or the second fall?

17         A.    No.

18         Q.    We've heard, of course, that this

19   gentleman had a pacemaker and he was tased.  In fact,

20   he was tased twice; you understand that?

21         A.    Uh-huh.

22         Q.    Do you have any opinion as to whether or

23   not that tasing somehow affected the pacemaker?

24         A.    According to -- well, according to the

1    patient's Herrin Hospital -- I can't remember which

2    record it was, but he stated that after he was tased

3    twice, he felt the defibrillator go off.

4         Q.    Assuming that's correct, and obviously

5    you just -- there's nothing that you looked at that

6    could tell you whether that was true or not, correct?

7         A.    Yeah.

8         Q.    But assuming it's correct, did that have

9    anything to do with the death of this gentleman in

10   terms of causation?

11        A.    Sequela, yes, but not causation.

12        Q.    What do you mean by that?

13        A.    Because he had some cardiac issues

14   afterwards, and he had some respiratory issues that he

15   required being intubated, but what started it was

16   because of the subdural and the cranial trauma.

17        Q.    Do you have an opinion as to whether or

18   not that tasing had anything to do with that

19   subsequent sequela?

20        A.    Beyond it causing the unprotected fall,

21   no.

22             MR. MCDONALD:  Okay.  Well, that's the

23   other issue.  Okay.  Thank you.

24

```
 1                    EXAMINATION

 2                  By Mr. Beasley

 3       Q.    Ma'am, I'm looking at your report here,

 4  and there's also, looks like, a narrative report of

 5  investigation, and at the bottom of that page it says,

 6  "Tara Rick"?

 7       A.    Yes.

 8       Q.    Who is that?

 9       A.    She is an investigator for the City of

10  St. Louis Medical Examiner's Office.

11       Q.    Okay.  So she works here in the building?

12       A.    Yes.

13       Q.    All right.  Did she -- did you have a

14  copy of this, I guess, her narrative report of

15  investigation -- there you go -- before you did the

16  examination?

17       A.    I know I read it very early on, but I

18  can't remember if it was the day of.  I know I got an

19  oral from our investigator, and also the Illinois

20  people were here as well, so I did get an oral

21  presentation, but I can't remember if I read it at the

22  time.  It might have been a couple of days afterwards

23  or something on Monday since this is a Saturday.

24       Q.    If you look at page 2 there, it notes
```

1    that Chief Barnfield contacted her from the Buckner

2    Police Department.  Were you aware -- did she make you

3    aware of that, that she had spoken with Chief

4    Barnfield?

5         A.   I mean, I am only aware when I read it.

6    Sometimes she doesn't always tell me everything that

7    happens until later on we get everything back.

8         Q.   Okay.  Did you ever talk to Chief

9    Barnfield?

10        A.   That name doesn't sound familiar, no.

11        Q.   Now, it says that he faxed over copies of

12   the officers' reports.  Did you get a copy of the

13   officers' reports?

14        A.   Yes.

15        Q.   Did either of the reports indicate to you

16   just by reading them that one of the officers hit

17   Mr. Barnhart while he was handcuffed?

18        A.   There is a scanned copy of a police

19   report that I reviewed some time ago stating that.  I

20   think I also talked to somebody over the phone about

21   the conflicting story of what he said, and also I read

22   some scanned documents where I think it was the

23   defendant in this case was giving his statement, like

24   it was a written statement, and I read that.  That is

```
 1    all I read.

 2         Q.    Okay.  So the written statement of Bill

 3    McKinney, Officer McKinney?

 4         A.    I think so.  I don't remember, but I was

 5    aware of it.

 6         Q.    The Illinois State Police officer that

 7    came here and spoke to you, was he present during the

 8    examination?

 9         A.    Yes, the entire time.

10         Q.    And he also told you before the

11    examination that according to the information he had

12    uncovered, that McKinney hit Barnhart while he was

13    handcuffed?

14         A.    From what I remember, not at that time.

15    I spoke to him on the phone after, like maybe a couple

16    of weeks afterwards.  It wasn't at the time of the

17    autopsy.  At the time of the autopsy, it was just the

18    story of the tasing I had gotten.

19         Q.    When we're dealing with -- the cause of

20    death is blunt head trauma, right?

21         A.    Closed head trauma.

22         Q.    Closed head trauma.  And so any trauma to

23    the head would be noteworthy to try and determine the

24    cause of death, right?
```

```
 1          A.    Like how it occurred?

 2          Q.    Yes.

 3          A.    Yes.

 4          Q.    I mean, if he got hit 20 times with a

 5    baseball bat, you'd want to know that?

 6          A.    Yes.

 7          Q.    If he fell once onto a pillow, you'd want

 8    to know that, right?

 9          A.    Yes.

10          Q.    And so I'm wondering if you've ever seen

11    any of the Illinois State Police reports or interviews

12    of witnesses following this.

13          A.    I saw those after I had the case back,

14    after the histology and my report was typed up, when I

15    was reviewing after the fact, but not at the time of

16    the autopsy, no.

17          Q.    Did anyone ever tell you that, and this

18    is from Ralph Reed, who is a neighbor, "Reed stated

19    Officer McKinney and Officer Dale then picked up the

20    victim to his feet and started walking him back to the

21    road.  Reed stated the victim was handcuffed at the

22    time.  Reed stated that it appeared as the officers

23    were walking the victim back to the road, the victim

24    was tripped to the ground.  Reed stated that it
```

1    appeared the victim was rendered unconscious at that

2    time because there was no movement"?  Did anybody ever

3    tell you that?

4         A.    I don't remember ever reading anything

5    like that.  I remember hearing something maybe another

6    fall while he was being taken somewhere and he fell or

7    he was dropped or something.  I remember reading that.

8         Q.    There you go.  Okay.  Maybe that's from

9    McKinney when it says, "This RA asked McKinney if it

10   was fair to say that when McKinney got Barnhart Sr. to

11   the grassy area, McKinney was upset and dropped

12   Barnhart Sr. to the ground as a way to basically say,

13   'Piss on you.'  McKinney agreed with the statement."

14   Is that what you were referring to when you said

15   "dropped"?

16              MR. PIERCE:  I'm going to object because

17   that statement doesn't say anything about the nature

18   or extent of the blow or how he was dropped;

19   therefore, it's an improper hypothetical, so subject

20   to that.

21        A.    I don't remember reading that.  That

22   whole statement I don't remember reading before.  I

23   remember reading something about being taken somewhere

24   and dropped.  I remember reading that, but that

1    doesn't jog my memory hearing that statement.

2         **Q.    If the evidence is that they picked him**

3    **up, took him over, and threw him on the ground while**

4    **he was handcuffed, he had wouldn't have anything to**

5    **break his fall, right?**

6              MR. PIERCE:  Object to speculation.

7         **Q.    (By Mr. Beasley)  If he's handcuffed,**

8    **does he have anything to break his fall?**

9         A.    No.

10        **Q.    And if he has nothing to break his fall,**

11   **presumably, at least we can infer, that he would hit**

12   **his head, right?**

13             MR. BLEYER:  Show my objection.

14   Speculation.

15        A.    I don't know if he would only hit his

16   head.  Depending on how he was released, he could have

17   fallen on his body as opposed to his head.  I don't

18   know.

19        **Q.    (By Mr. Beasley)  Well, that's something**

20   **you would want to know about when you're trying to**

21   **make a determination.  I mean, the whole point of your**

22   **investigation is to determine how and why this man is**

23   **dead, right?**

24        A.    Yes.

1    Q.    You'd want to know if he was thrown to
2    the ground while handcuffed, wouldn't you?
3        A.    Yes.
4        Q.    But nobody ever shared that information
5    with you that you're aware of?  At least it doesn't
6    appear in your report?
7        A.    I don't put those kind of information in
8    my report, but I do use it in consideration of the
9    manner of death.
10       Q.    Okay.  So we've got, at least that you're
11   aware of -- the trauma to his head, to Mr. Barnhart's
12   head, that you're aware of are two falls and a punch
13   or a hit?
14       A.    Yes.
15       Q.    Okay.  And as you sit here right now, you
16   can't tell us whether one --
17             (Inaudible speaking)
18             MR. BLEYER:  I'm talking to Jerry, not
19   you.
20             MR. BEASLEY:  Brother, I'm sitting here
21   asking questions.
22             MR. BLEYER:  I'm talking to Jerry, not
23   you.
24       Q.    (By Mr. Beasley)  As you sit here right

1  now, out of those three, you can't say this was the

2  cause -- any one of the three is the cause, right?

3       A.    Yes.

4       Q.    You can simply say that he died as a

5  result of trauma caused by a closed head injury?

6       A.    Yes.

7       Q.    Now, the injuries that you found in your

8  examination, they would be consistent with any one of

9  those three incidents, right?

10      A.    It's possible.

11      Q.    As far as the -- I think we called it --

12 or you called it a speckled contusion?

13      A.    Yes.

14      Q.    You relate that to some type of fall on

15 gravel, right?

16      A.    Well, gravel or irregular surface, yes.

17      Q.    Now, I think based on all the interviews

18 I've seen, I don't know that it's entirely clear when

19 he was tased, where he fell.  Was it your

20 understanding -- do you have a better understanding as

21 to where he fell or on what surface he fell?

22      A.    They had asked him about where -- the

23 neighborhood he was in.  I remember asking someone or

24 reading somewhere.  I think I spoke to the

1    investigator at the time from Illinois, and he was

2    describing some part was grass and another part was

3    gravel.  So when I saw the speckled contusion, I was

4    like, okay, that kind of started matching up with what

5    was on his body.

6        Q.    Obviously a fist is not gravel, right?

7        A.    Right.

8        Q.    And a hand is not gravel.  So is it your

9    opinion that at least one of the two falls caused that

10   speckled contusion?

11       A.    Yes.

12       Q.    But you don't know which fall it was,

13   whether it was the fall as a result of a taser or a

14   fall as a result of being either dropped or thrown to

15   the ground?

16       A.    Yes.

17             (A discussion was held off the record.)

18             MR. BEASLEY:  I think that's all the

19   questions I have, ma'am.  Thank you.

20

21                        EXAMINATION

22                    By Mr. Bleyer

23       Q.    Doctor, you mentioned that you talked to

24   an investigator.  As far as persons from Illinois that

1    you actually spoke with, is the only person you spoke

2    to was this investigator from the Illinois State

3    Police as far as --

4         A.    I know I spoke to the guy that showed up.

5    I think I talked to him again, but I'm not entirely

6    sure.  I'm horrible with names.

7         Q.    I'm not worried about the names because

8    Mr. Beasley asked you about some report about Chief

9    Barnhart [sic] sending something, and then they went

10   through what you saw or what was written, which then

11   concerned me.  I just want to know, the only person

12   you spoke to from Illinois would be whoever showed up

13   at the time of the autopsy?

14        A.    Yes.  I spoke to someone over the phone a

15   few weeks later.  I think it was the same person, but

16   that was two years ago.

17        Q.    Did you speak to anyone that you know of

18   that was actually at the scene when the events took

19   place?

20        A.    No.

21        Q.    Did you speak with anyone from the

22   Village of Buckner, Illinois?

23        A.    No.

24             MR. BLEYER:  Just remember, if you lived

1    there, you'd be home.  That's all the questions I

2    have.

3

4                       FURTHER EXAMINATION

5                       By Mr. Pierce

6         Q.    Doctor, I just want to follow up on a

7    couple of questions Mr. Beasley asked you.  With

8    regard to the nature and locations of the injuries

9    which you found, assume hypothetically that the blow

10   to the face, the punch, was an open -- described as an

11   open-handed slap up under the jaw as opposed to a

12   punch on anywhere else on the face or head.  Would

13   that type of blow be consistent or inconsistent with

14   the right-sided hematoma and hemorrhage which you

15   found?

16                   MR. BEASLEY:  I would object that it

17   mischaracterizes the evidence and also assumes fact

18   not in evidence.  Subject to that.

19        Q.    (By Mr. Pierce)  You can go ahead and

20   answer.  Doctor, it's a hypothetical question assuming

21   those facts.

22                   MR. BLEYER:  She can read it back.

23                   (The requested portion of the record was

24   read back by the reporter.)

```
 1        A.    I wouldn't be able to say definitively,
 2   but with this man's previous medical history, it is
 3   possible.
 4        Q.    (By Mr. Pierce)  Possible but not
 5   probable?
 6              MR. BEASLEY:  Objection.  Asked and
 7   answered.
 8        A.    I wouldn't go that far.
 9        Q.    You can't say it's probable?
10        A.    Not with the information I have.  I can't
11   say one way or the other.
12        Q.    I think the only fact -- the same
13   question with the additional fact that the slap was to
14   the left side up under the jaw as opposed to the right
15   side.  Would that additional fact make any difference?
16              MR. BEASLEY:  Same objection.
17        A.    No.
18        Q.    (By Mr. Pierce)  Okay.  Just
19   logistically, I'm looking at your report on the second
20   page under "injuries."  You described that speckled
21   contusion.  Am I correct that in that paragraph, that
22   the only external injury you are documenting is the
23   contusion on the right and mid forehead and the rest
24   of those findings are internal?
```

1      A.    Yes.

2            MR. PIERCE:  Okay.  That's all I've got.

3   Thank you.

4            MR. BLEYER:  Waive?

5            MR. PIERCE:  Doctor, since you're fairly

6   new at depositions, you have a right to read through

7   the transcript after the court reporter types it up

8   into booklet form to make sure she took down

9   everything you said accurately.  You can also just

10  rely on her to have done her job appropriately and

11  waive signature so you don't have to be bothered with

12  it again.  None of us represent you.  I can't tell you

13  what you should do.  I don't know what the city's

14  practice is on that.  Most witnesses do simply waive

15  signature so they don't have to be bothered with it

16  again, but that is your choice.

17           THE WITNESS:  I think I want to review it

18  for myself just for edification.

19           MR. PIERCE:  Okay.

20           THE WITNESS:  I trust you.

21           MR. PIERCE:  Sounds great.  She'll make

22  arrangements with you on that.  Thank you, Doctor.

23        (The deposition ended at 12:02 p.m.)

24                  ***************

```
 1

 2

 3

 4                    _____

                      JULIETTE SCANTLEBURY, M.D.

 5

 6

     STATE OF _____      )

 7                                       )

     COUNTY OF _____       )

 8

 9

            Subscribed and sworn to before me this _____ day

10   of _____, 2015.

11

12

13                    _____

                      NOTARY PUBLIC

14

15   My Commission Expires:

16                    * * * * * * * * * * * * * * *

17

18

19

20

21

22

23

                                                  (LCA)

24
```

```
1                 I, Lynn C. Allard, a Certified Court

2       Reporter for the State of Missouri, DO HEREBY CERTIFY

3       that pursuant to agreement between counsel, there

4       appeared before me on January 28, 2015, at the Office

5       of the Medical Examiner, 1300 Clark Avenue, St. Louis,

6       Missouri, JULIETTE SCANTLEBURY, M.D., who was first

7       duly sworn by me to tell the whole truth of all

8       knowledge, touching upon the matter in controversy

9       aforesaid so far as the witness should be interrogated

10      concerning the same; that the witness was examined and

11      said examination was taken down in shorthand by me and

12      afterwards transcribed upon the computer, then being

13      signed by the deponent, signature not having been

14      waived by agreement of counsel, and said deposition is

15      herewith returned this 29th day of January 2015.

16

                        _____

17                        Lynn C. Allard, CSR, CCR

                           IL License #084-002828

18                           MO License #507

19

20

21

22

23

24
```

```
1
    Keefe Reporting Company
2   11 North 44th Street
    Belleville, Illinois 62226
3
    January 30, 2015
4
5   Office of Medical Examiner
    Attn:  Juliette Scantlebury, M.D.
6   1300 Clark Avenue
    St. Louis, MO 63013
7
8   IN RE: Susan Barnhart, as Administrator of the Estate
    of Roy D. Barnhart, Deceased V. The Village of
9   Buckner, Illinois, et al.; No. 13-772-SMY-DGW
10  Dear Dr. Scantlebury:
11  Enclosed herewith, please find a copy of your
    deposition transcript taken in the above-captioned
12  matter on January 28, 2015, along with the original
    signature page of same.
13
    Please read the deposition, note any corrections to be
14  made on the provided sheets, sign the original
    signature page, and have your signature notarized
15  where indicated.  Following this, please return the
    original executed signature page and correction sheets
16  to me within 30 days, and I will forward same to all
    counsel of record.  Thank you.
17
    Yours very truly,
18
    KEEFE REPORTING COMPANY
19
20
    Lynn C. Allard, CSR, CCR
21  IL License #084-002828
    MO License #507
22
    CC w/Enc: Mr. Charles A. Pierce, Esq.
23           Mr. Jarrod P. Beasley, Esq.
             Mr. Jerome E. McDonald, Esq.
24           Mr. Joseph A. Bleyer, Esq.
```