```
 1            IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF ILLINOIS
 2

    SUSAN BARNHART, as          )
 3  Administrator of the Estate )
    of Roy D. Barnhart, Sr.,    )
 4  Deceased,                    )
                                 )
 5           Plaintiff,          )
                                 )
 6  vs.                         )   No. 13-CV-00772-SMY-DGW
                                 )
 7  THE VILLAGE OF BUCKNER,     )
    ILLINOIS, and PATROLMAN     )
 8  WILLIAM MCKINNEY,           )
    Individually and in his     )
 9  Official Capacity as an     )
    Officer for the Buckner     )
10  Police Department, and THE  )
    CITY OF CHRISTOPHER,        )
11  ILLINOIS, and OFFICER RICHIE)
    DALE, Individually and in   )
12  his Official Capacity as an )
    Officer for the Christopher )
13  Police Department,          )
                                 )
14           Defendants.         )
15
                      Deposition of
16                  WILLIAM P. MCKINNEY
             taken on behalf of the Plaintiff
17                on February 12, 2015.
18
19
20      REPORTER:  ERIN M. BRUCE, C.S.R., C.C.R.
    IL CSR No. 084-004263          MO CCR No. 850(G)
21
                   Mueller Reporting, P.C.
22                     P. O. Box 509
                  Edwardsville, Illinois 62025
23        (618) 692-9890   Fax:  (618) 692-9891
                       mrpc@att.net
24
```

```
 1              A P P E A R A N C E S
 2    On Behalf of the Plaintiff:
 3              Kuehn, Beasley & Young, P.C.
              By:  Mr. Jarrod P. Beasley
 4            23 Public Square, Ste. 450
              Belleville, Illinois 62220
 5            (618) 277-7260
 6
      On Behalf of the Defendant the Village of Buckner,
 7    Illinois:
 8            Bleyer & Bleyer
              By:  Mr. Joseph A. Bleyer
 9            P.O. Box 487
              Marion, Illinois 62959
10            (618) 997-1331
              jableyer@bleyerlaw.com
11
12    On Behalf of the Defendant William McKinney:
13            Pierce Law Firm, P.C.
              By:  Mr. Charles A. Pierce
14            #3 Executive Woods Court, Suite 200
              Belleville, Illinois 62226
15            (618) 277-5599
16
      On Behalf of the Defendants the City of Christopher,
17    Illinois, and Officer Richie Dale:
18            Black, Hedin, Ballard, McDonald, P.C.
              By:  Mr. Jerome E. McDonald
19            108 S. Ninth Street
              P.O. Box 4007
20            Mt. Vernon, Illinois 62864
              jmcdonald@illinoisfirm.com
21
22
23
24
```

1                           I N D E X

2     Examination by Mr. Beasley . . . . . . . . Page 4

3

4                    E X H I B I T S   I N D E X

5     Plaintiff's                                    Page

6      Exhibit                                       1st Ref.

7       C     July 7, 2013, Buckner Police
              Department Report                        29

8

9     (Exhibit attached to transcript.)

10

11

12                * * * * * * * * * * * *

13           IT IS STIPULATED AND AGREED by and between

14    counsel for Plaintiff and counsel for Defendants that

15    the deposition of WILLIAM P. MCKINNEY may be taken

16    pursuant to the Federal Rules of Civil Procedure by

17    and on behalf of the Plaintiff on February 12, 2015,

18    at Bleyer & Bleyer, 601 W. Jackson Street, in the City

19    of Marion, State of Illinois, before Erin M. Bruce,

20    RPR, a Notary Public and Certified Shorthand Reporter

21    within and for the County of Madison, State of

22    Illinois, and Certified Court Reporter within and for

23    the State of Missouri; that the issuance of notice is

24    waived and that this deposition may be taken with the

1   same force and effect as if all Federal Rules had been

2   complied with.

3        IT IS FURTHER STIPULATED AND AGREED that any

4   and all objections to all or any part of this

5   deposition are hereby reserved, except as to form of

6   the question, and may be raised on the trial of this

7   cause; and that the signature of the deponent is

8   waived.

9         * * * * * * * * * * * *

10  (On the record at 11:24 a.m.)

11          WILLIAM P. MCKINNEY,

12  produced, sworn and examined on behalf of the

13  Plaintiff, deposes and says as follows:

14          EXAMINATION

15     BY MR. BEASLEY:

16    **Q.  Can you please state your name for the**

17  **record.**

18    A.  William P. McKinney.

19    **Q.  Mr. McKinney, I know you have had your**

20  **deposition taken before because I took it.  Do you**

21  **remember that?**

22    A.  Yes, sir.

23    **Q.  Do you remember the rules?**

24    A.  Yes, sir.

1  Q. All right. So if I ask a question and you

2 don't understand it, just ask me to rephrase it, and

3 I'll do the best I can, okay? If you answer a

4 question, then I'll assume that you understood it. Is

5 that fair?

6  A. Yes, sir.

7  Q. Mr. McKinney, you working now?

8  A. Self-employed now.

9  Q. What do you do?

10  A. Heating and air conditioning.

11  Q. Is there a company that you own?

12  A. Yes.

13  Q. What's the name of it?

14  A. Just Bill's Heating & Air.

15  Q. Where's it out of?

16  A. Zeigler.

17  Q. You live in Zeigler?

18  A. Yes.

19  Q. We might cover some things that we've

20 already covered in the prior deposition, Mr. McKinney,

21 and I apologize in advance, but certain reasons we

22 need to do that.

23    Highest level of education?

24  A. Formally just as far as high school

1  education and a few college credit classes.

2      Q.   **Did you graduate high school?**

3      A.   Yes.

4      Q.   **Where did you graduate?**

5      A.   Zeigler-Royalton.

6      Q.   **Now, we went through -- the last time you**

7  **were here, we went through a bunch of your prior**

8  **employment in the law enforcement field.  If you can,**

9  **just best you can recall, take us back through it and**

10  **tell us where you worked for the last 15 years.**

11     A.   For the last 15?  Well, I've carried a badge

12  in Zeigler for twenty now.

13     Q.   **Are you still employed there?**

14     A.   No.

15     Q.   **When did you stop working for Zeigler?**

16     A.   After the conviction.

17     Q.   **Okay.  During the pendency of the criminal**

18  **charges, did you work there?**

19     A.   Not actively.

20     Q.   **All right.  Where else?**

21     A.   For Buckner, both at the same time.

22     Q.   **Now, in Zeigler you were a patrolman?**

23          MR. BLEYER:  Zeigler.

24          MR. MCDONALD:  He's actually trying to help

1    you.

2              MR. PIERCE:  You're kind of soft-spoken.  So

3    make sure you keep your voice up loud enough so she

4    can hear you, okay.

5              BY MR. BEASLEY:

6         Q.   **In Zeigler you were a patrolman --**

7         A.   Yes.

8         Q.   **-- the entire time?**

9         A.   Yes.

10        Q.   **In Buckner you were a patrolman the entire**

11   **time?**

12        A.   Yes.

13        Q.   **How long did you work there?**

14        A.   Actually, I was listed as an investigator in

15   Buckner too.

16        Q.   **How long did you work there?**

17        A.   Three years.

18        Q.   **Up until when?**

19        A.   This incident here.

20        Q.   **And this incident was July 7, 2013.  Does**

21   **that sound right?**

22        A.   Yes, sir.

23        Q.   **Following that incident, did you work**

24   **another day?**

1      A.   I think I was paid for one more day.

2      **Q.   And then you were suspended?**

3      A.   Yeah.

4      **Q.   Without pay?**

5      A.   Yes.

6      **Q.   Who suspended you?**

7      A.   Chief Barnfield.

8      **Q.   Did he tell you why you were suspended?**

9      A.   Pending the end of this investigation.

10     **Q.   And were you ultimately terminated from that**

11 **position?**

12     A.   I guess I was.

13     **Q.   Did you ever get a letter saying you're**

14 **terminated?**

15     A.   No.

16     **Q.   Did you ever have a conversation with**

17 **anybody where they said you're terminated?**

18     A.   No.

19     **Q.   As it stands right now -- is there a**

20 **licensure or a certificate that comes with law**

21 **enforcement?**

22     A.   I don't understand that particular

23 question.

24     **Q.   When you go to the police academy -- you**

1    went to the police academy, right?

2        A.    Yes.

3        Q.    When you go to the police academy, did you

4    get some sort of certificate that says you are

5    eligible to be a policeman in the State of Illinois?

6        A.    Oh, yes.

7        Q.    Has that been revoked?

8        A.    No.

9        Q.    When you -- well, strike that.

10             Zeigler, let's talk about your

11    employment at Zeigler, and we talked about it last

12    time as well.  You were disciplined for macing a cat;

13    is that right?

14        A.    Yes, sir.

15        Q.    You recall that incident?

16        A.    Yes.

17        Q.    When was that?

18        A.    You mean yearwise or what?

19        Q.    Sure.

20        A.    I can't remember it.  Ten, twelve years

21    ago.

22        Q.    Were you also disciplined in that same time

23    frame for shooting a dog?

24        A.    Yes, sir.

1     Q.   And as a result of that discipline, you were

2  ordered to attend anger management classes at SIU

3  Carbondale?

4     A.   Yes, sir.

5     Q.   And did you attend those classes?

6     A.   Yes, sir.

7     Q.   Do you remember how long those classes

8  were?

9     A.   A week.

10    Q.   A week?

11    A.   Yeah.

12    Q.   And when you say a week, eight hours a day

13  for a week?

14    A.   Yes.

15    Q.   And you had to drive to Carbondale to do

16  them?

17    A.   Yes, sir.

18    Q.   Did you receive a certificate of

19  completion?

20    A.   No.

21    Q.   Do you remember what agency or school put

22  that class on?

23    A.   No, it was -- I'm going to say a

24  psychologist or psychiatrist, watchmadoodle, clinical

1  thing, not an agency thing.

2     Q.  And were there other people in the class?

3     A.  No, it's one-on-one.

4     Q.  One-on-one.  Do you remember where they took

5  place?

6     A.  In Carbondale along the main drag where the

7  hospital is at.

8     Q.  Do you remember the name of the psychiatrist

9  or psychologist?

10    A.  No, I don't.

11    Q.  What I'm trying to figure out -- and maybe

12  that will help.  Is there any -- can you think of how

13  I would contact these people to try and get your

14  either records or completion certificate from that

15  class?

16    A.  Well, you might ask Zeigler if -- Richie

17  especially -- if they've got some kind of piece of

18  paperwork in the file on it.

19    Q.  And if they don't, can you think of any

20  other way?

21    A.  I don't -- no, I don't.

22    Q.  Have you ever been ordered to attend anger

23  management classes other than that 40-hour, one-on-one

24  class in Carbondale?

1    A.   No, sir.

2    Q.   **Have you ever attended voluntarily anger**

3    **management class other than the class we've been**

4    **discussing?**

5    A.   No.

6    Q.   **As a result of this incident, you were**

7    **charged with a couple of crimes; is that right?**

8    A.   Which incident?

9    Q.   **Not the dog/cat incident.  I'm talking about**

10   **the incident involving Roy Barnhart.**

11   A.   Yes, sir, I was.

12   Q.   **What were you charged with?**

13   A.   Well, I was actually charged with

14   involuntary manslaughter, official misconduct in

15   office and aggravated battery to a senior citizen.

16   Q.   **That case is resolved?**

17   A.   Yes, sir.

18   Q.   **And all three of those counts against you**

19   **were felonies?**

20   A.   They dropped two of them.

21   Q.   **I'm asking --**

22   A.   But initially, yes.  I'm sorry.

23   Q.   **And you pled guilty to official**

24   **misconduct?**

1     A.   Yes.

2        Q.   And as a result of that, you've got 18

3   months periodic imprisonment; is that right?

4     A.   Yes, sir.

5        Q.   Is it your understanding that this felony

6   conviction precludes you from being hired to be a

7   police officer again?

8     A.   Yes, I would say so.

9        Q.   How long have you been operating your own

10  business?

11    A.   Well, on and off for probably twenty,

12  twenty-five years.

13       Q.   Now, when you pled guilty to official

14  misconduct, was there a -- well, when did you

15  officially plead guilty; do you know?

16    A.   January -- no, excuse me.  I'm sorry.

17  December the 15th or 17th.

18       Q.   And was there a stipulation of facts that

19  you had to agree to to plead; do you know?

20    A.   What's in the court record.

21       Q.   I'm just asking if you know if there was a

22  stipulation of facts that were entered along with the

23  plea of guilt?

24    A.   Yes, sir, what's in the court record.

1      Q.   And whatever those stipulated facts are, you

2   agreed to those facts?

3      A.   Yes, I did.

4      Q.   Have you reviewed the Illinois State Police

5   investigation of this incident?

6      A.   Yes, I have.

7      Q.   You watched the videotapes?

8      A.   No, I didn't watch videos.

9      Q.   You just read the synopsis of the

10  interviews?

11     A.   And mostly just the grand jury.

12     Q.   Let's talk about July 7th, 2013.  What was

13  your shift that day?

14     A.   Well, approximately three to eleven or four

15  to twelve.  It was second shift.  Sorry.

16     Q.   Okay.  Well, do you know if it was three to

17  eleven or four to twelve?

18     A.   Yeah, I had a floating schedule.  I could --

19     Q.   Do you remember what time you showed up to

20  work that day?

21     A.   I think it was right at three that

22  particular day.

23     Q.   What did you do before you reported to work

24  for -- and you were reporting to work in Buckner,

1    right?

2        A.   Yes, sir.

3        Q.   As a Buckner police officer?

4        A.   Yes, sir.

5        Q.   And you'd been working there for about three

6    years at the time?

7        A.   Yes, sir.

8        Q.   And you were hired by Alan Barnfield?

9        A.   Yes, sir.

10       Q.   Alan Barnfield do any, to your knowledge,

11   investigation into your background before he hired

12   you?

13       A.   Formally, I don't know.  That I don't -- we

14   had known each other for twenty years and worked as

15   police officers together for ten or twelve.

16       Q.   And where did you work together at?

17       A.   Zeigler, Royalton.

18       Q.   Was he employed at Zeigler at the same time

19   you were when you were ordered to attend additional --

20   or anger management classes?

21       A.   No, I don't believe.

22       Q.   Did you ever share with him that you had

23   been ordered by Zeigler, the chief at Zeigler, to

24   attend anger management classes?

1     A.   He knew it.

2     **Q.   How did he know it?**

3     A.   Either just, you know, rumor, and we might

4  have even talked about it.

5     **Q.   Do you remember talking about it?**

6     A.   No.

7     **Q.   Now, you say he knew it, and it's important**

8  **that I find out if, in fact, he -- if you're just, you**

9  **know, saying that conversationally --**

10    A.   Speculating.

11    **Q.   -- or you knew it?**

12    A.   Yes, he did know.

13    **Q.   He knew it?**

14    A.   He knew it.

15    **Q.   How did he know it?**

16    A.   Like I said, I don't remember whether it was

17  just rumor mill or we'd talked about it together.

18    **Q.   Do you ever remember him bringing it up to**

19  **you?**

20    A.   No.

21    **Q.   Do you know if he ever requested your**

22  **personnel file at any of the departments that you worked at before**

    **hiring you at Buckner?**

23    A.   That, I don't know.

24    **Q.   Did he ever, to your knowledge, run your**

1    name through LEADS?

2        A.   Oh, yes, sir.

3        Q.   You know that he did?

4        A.   Yes.

5        Q.   How do you know that?

6        A.   That's common practice for any police

7    department.

8        Q.   I understand it's common practice.  I'm

9    asking if you know if Alan Barnfield did it before

10   hiring you at Buckner?

11       A.   If I knew Alan Barnfield as well as I did,

12   yes, he did.

13       Q.   He never told you he did?

14       A.   No.

15       Q.   You didn't see him do it?

16       A.   No.

17       Q.   You're just assuming he did it because

18   that's police practice?

19       A.   Yes.

20       Q.   Do you know if he talked to anybody you ever

21   worked with at any of these other agencies before

22   hiring you?

23       A.   Almost all of us together knew everybody

24   together.  You know what I mean?

1      Q.   I do know what you mean.

2      A.   I'm sorry.

3      Q.   But I'm asking you very specifically if you

4    know if Alan Barnfield ever had any discussions or

5    interviews with any people that had ever worked with

6    you before, before hiring you at Buckner?

7      A.   I do not know that.

8      Q.   When he called you and said, hey, Bill,

9    we're looking for a guy in Buckner, how long after

10   that telephone call did you begin work at Buckner?

11     A.   The next weekend, I believe.

12     Q.   And if I recall correctly, you guys met at

13   Larry's Pit Barbecue?

14     A.   Yes, sir.

15     Q.   And at that point was your hiring

16   formalized?

17     A.   I'd say it was.

18     Q.   You guys talk about money?

19     A.   No.

20     Q.   Did you ever fill out a formal application

21   even to be hired at Buckner?

22     A.   No.

23     Q.   Did you submit any letters of recommendation

24   or references?

1    A.   Full personnel file from everywhere I'd

2  worked.

3    **Q.   You brought those with you?**

4    A.   Yes.

5    **Q.   You keep those?**

6    A.   Yes.

7    **Q.   All right.  So at your house is your**

8  **personnel file from every job you've ever had?**

9    A.   Well, it probably aren't now.

10    **Q.   All right.  When would those have been**

11  **misplaced?**

12    A.   They weren't misplaced.  My wife destroyed

13  some of that stuff after this melee.

14    **Q.   When were you -- you were hired in 2010 at**

15  **Buckner?**

16    A.   Sounds about right, yes.

17    **Q.   Did you give Barnfield your personnel files**

18  **from all these places?**

19    A.   Yes.

20    **Q.   When did you give them to him?**

21    A.   Within the week that we were talking about

22  the initial conversation.

23    **Q.   Did you drop them off at the station?  Did**

24  **you bring them with you to Larry's Pit Barbecue?**

1    A.   I probably brought them to the station or to

2  Barney personally.

3    **Q.   All right.  So you took them to him.  Did he**

4  **look through them?**

5    A.   Yeah.

6    **Q.   Did he keep them?**

7    A.   Yes.

8    **Q.   You brought him a copy and he kept them?**

9    A.   Or that and he made a copy and give me back

10  the originals.

11    **Q.   All right.  Do you remember --**

12    A.   I'm sorry.

13    **Q.   Do you remember him making a copy?**

14    A.   Yes.

15    **Q.   So you had to -- obviously, it takes a**

16  **little time.  You had to sit there and wait.  Did you**

17  **wait in his office while he made a copy?**

18    A.   Yes.

19    **Q.   Did he make a copy, or does he have a person**

20  **that makes the copies?**

21    A.   No, I think he made the copies.

22    **Q.   And he would have done that at Buckner**

23  **police station?**

24    A.   Yes.

1      Q.    How many other police officers worked in

2   Buckner at the time, July 2013?

3      A.    Just me and Barnfield as far as -- except

4   for borrowed help.

5      Q.    From surrounding communities --

6      A.    Yes.

7      Q.    -- that would respond if you guys needed

8   them?

9      A.    Yes, sir.

10           MR. PIERCE:  Make sure you let him finish,

11  Bill.  You're starting to talk over him and --

12           THE WITNESS:  I'm sorry.

13           MR. PIERCE:  -- she's going to get mad.

14           BY MR. BEASLEY:

15     Q.    Barnfield also had a full-time job, right?

16     A.    Yes, sir.

17     Q.    What was his job?

18     A.    Sheriff's office, Franklin County sheriff's

19  office.

20     Q.    What did he do for them?

21     A.    He was a bailiff at the courthouse.

22     Q.    All right.  July 7, 2013, that's -- was that

23  a Sunday?

24     A.    Yes, sir.

1      Q.   All right.  You wake up in the morning.

2  What time did you wake up that morning; do you

3  remember?

4      A.   9:30, 10:00 in the mornings usually.

5      Q.   What do you do?  What'd you do that

6  morning?

7      A.   Have coffee for an hour.  Just regular home

8  time day.

9      Q.   Did you drink?

10     A.   No.

11     Q.   Were you on any prescription medication?

12     A.   No.

13     Q.   Do you use recreational drugs?

14     A.   No.

15     Q.   So that day before you report to work, no

16  alcohol?

17     A.   No.

18     Q.   No drugs?

19     A.   No.

20     Q.   Not even prescription?

21     A.   I take a thyroid pill.  I do take a thyroid

22  pill.

23     Q.   What do you take for your thyroid?

24     A.   I don't remember -- Synthroid.

1    Q.   How long have you been taking Synthroid?

2    A.   Ten years.

3    Q.   And where did you live in July of 2013?

4    A.   Royalton.

5    Q.   How far is that from Buckner?

6    A.   Approximately 14, 15 miles.

7    Q.   The car that you drive on patrol in Buckner,

8  is that also your personal vehicle?

9    A.   No.

10    Q.   Did you take it home with you every night?

11    A.   I'm trying to remember.  Excuse me for a

12  minute because, like I said, some of this is all

13  running together on me.  I had a take-home squad car

14  for a while until we got our new one; so at that

15  particular time, I couldn't tell you.

16    Q.   What squad car were you driving at the

17  time?

18    A.   White unmarked Ford.

19    Q.   Was the new one that you got, was it a red

20  truck?

21    A.   No.

22    Q.   All right.  Somebody mentioned that there

23  was a red police vehicle at the scene.

24    A.   Okay, yeah, we did have a secondary vehicle

1    at the time.

2         Q.   All right.  Were you driving that that

3    day?

4         A.   Yes, yes.

5         Q.   But that's not one you would take home?

6         A.   No.

7         Q.   So you would drive to work and then switch

8    into that other vehicle?

9         A.   If I wanted to.

10        Q.   And did you that day?

11        A.   I just don't remember to tell you the truth

12   or whether I brought a private vehicle to work.  Like

13   I said --

14        Q.   What were you wearing that day?

15        A.   Polo tee shirt, polo watchmadoodle shirt,

16   pair of khaki uniform pants, and regular shoes.

17        Q.   When you say regular shoes, what do you

18   mean?

19        A.   Just regular oxfords.

20        Q.   Like slip-on shoes?

21        A.   Well, this type shoe.

22        Q.   Okay.

23        A.   I just call --

24             MR. PIERCE:  Let the record reflect he is

1    showing a standard black shoe with lace-up.

2              BY MR. BEASLEY:

3        Q.   **So they were lace-up shoes?**

4        A.   Yes.

5        Q.   **You show up to the -- to Buckner in that**

6    **outfit?**

7        A.   Yes, sir.

8        Q.   **And when you say polo shirt, are you talking**

9    **about a golf shirt basically?**

10       A.   Yes, sir.

11       Q.   **Short-sleeved?**

12       A.   Yes, sir.

13       Q.   **Does the shirt say anything?**

14       A.   Yes, marked police.

15       Q.   **What does it say?**

16       A.   Marked police.

17       Q.   **The pants, anything distinctive about the**

18   **pants?**

19       A.   Well, they're a -- they are a dress-down

20   utility uniform for police.

21       Q.   **You also have a utility belt?**

22       A.   Yes, sir.

23       Q.   **What's the utility belt got on it?**

24       A.   That particular day I had nothing but a gun

1   and set of handcuffs.

2       Q.   **Normally you carry a Taser, right?**

3       A.   At times.  It wasn't constant.

4       Q.   **Buckner had a Taser, right?**

5       A.   Yes, sir.

6       Q.   **Just had one Taser?**

7       A.   Yes, sir.

8       Q.   **Okay.  And you didn't have that Taser with**

9  **you that day?**

10      A.   No.

11      Q.   **Is there a reason you didn't take it?**

12      A.   If I was doing a day shift or a weekend

13  shift, sometimes I just wear a dress-down uniform.

14      Q.   **And when you wear a dress-down uniform, is**

15  **there no place on the utility belt for a Taser?**

16      A.   Yes, there's room for it.  I just didn't

17  take it.

18      Q.   **What about -- you also had pepper spray,**

19  **right?**

20      A.   Yes, I'm sorry, I did forget to mention

21  that.  Yes, I did.

22      Q.   **And pepper spray fits on the utility belt?**

23      A.   Yes.

24      Q.   **Were you certified in the use of pepper**

1    spray or OC spray?

2         A.   Yes, sir.

3         Q.   When were you last certified in that?

4         A.   That I couldn't tell you.

5         Q.   Do you know how often you have to be

6    recertified to carry that with you?

7         A.   I don't believe you do.

8         Q.   What about your Taser?

9         A.   Taser recertification is once a year.

10        Q.   And was your Taser certification up to date

11   at the time of this incident?

12        A.   Yes, it was just about time for

13   recertification.

14        Q.   Now, the Taser from Buckner was taken and

15   tested, downloaded.  Did you know that?

16        A.   I knew that they had asked Barney for it.  I

17   didn't know what the outcome was, didn't ever ask.

18        Q.   According to the report that these folks

19   did, said that the Taser had last been fired on

20   December 31, 2007.  We know that's not right, right?

21        A.   No, it don't seem right.

22        Q.   Well, you tased Kevin Kondoudis on April 7,

23   2013, right?

24        A.   Okay, yes, sir.

1      Q.    So we know at least according -- the

2   information contained within the Taser is incorrect?

3      A.    Yes, sir.

4      Q.    We know it was fired after the date that

5   they say?

6      A.    With that knowledge, yes, it would have

7   been.

8      Q.    Where was the Taser kept at the police

9   station?

10     A.    It was either kept in a regular office

11   drawer if it was kept there, but most of the time, I'd

12   take it home.

13     Q.    And where was it that day?

14     A.    Probably at home on my dresser.

15     Q.    Do you know how to reset the Taser's, I

16   guess, brain?

17     A.    No, sir.

18     Q.    Have you ever attempted to tamper with

19   the --

20     A.    Mechanism or anything on it, no, sir.

21     Q.    So you show up to work about three o'clock,

22   right?

23     A.    Yes, sir.

24     Q.    We don't know what car you took, but we know

1    you don't have your Taser with you?

2        A.   Right.

3        Q.   What do you do?

4        A.   Well, the first couple of hours, it was just

5    normal patrol.

6        Q.   Okay.  Anything stand out?

7        A.   No.

8        Q.   Ultimately, you get a call regarding Amanda

9    Barnhart?

10       A.   Yes, sir.

11       Q.   About what time did you get that call?

12       A.   That I don't remember.  I would have to look

13   at the report myself.

14       Q.   Your report?

15       A.   Well, one of the Central logs.

16            MR. BEASLEY:  Let's mark this.

17   (Plaintiff's Exhibit C marked for

18                        identification.)

19            BY MR. BEASLEY:

20       Q.   I'm going to show you what's been marked

21   Plaintiff's Exhibit C.  That is -- well, what is

22   that?

23       A.   This is my handwritten police report on the

24   incident.

1    Q.    All right.  Now, you said if you looked at

2    the report, you might be able to help us tell you what

3    time the call came in.  Look at that report and tell

4    me what time the call came in.

5    A.    I didn't write down the initial call.  I

6    would have to go by the Central tapes.

7    Q.    So there's no time on that -- in that

8    report?

9    A.    On this report, that's right.

10    Q.    You've been trained in report writing,

11    correct?

12    A.    Yes, sir.

13    Q.    You've worked for -- at least five police

14    agencies that I can think of off the top of my head,

15    right?

16    A.    Yes, sir.

17    Q.    You've written a lot of reports over twenty

18    years of law enforcement, right?

19    A.    Yes, sir.

20    Q.    Richie Dale was just in here, and we had a

21    talk about this.  You want to get in your police

22    report -- is it also your opinion that you get the

23    who, what, where, why and when?

24    A.    It should have had when in it probably, but

1  like I said, I didn't.

2      Q.   I'm not -- you can put the report down.  I'm

3  not asking any, questions specifically, to the report.

4  I'm just talking generally speaking with regard to

5  report writing, you would agree that the who, what,

6  where, when, how and why?  I guess that's six W's?

7      A.   Not why.

8      Q.   Not why.  All right.  Ignore why then.  The

9  who, what, where, when and how?

10     A.   Should have been in the first line, yes,

11  sir.

12     Q.   Should be in the police report?

13     A.   Should have been in the first line, yes,

14  sir.

15     Q.   And police reports are important, and

16  they're important because you're trying to take down

17  all the relevant information so that maybe a day like

18  this comes and you'll be able to help you jog your

19  memory, right?

20     A.   Yes, sir.  And at one time, if this was an

21  original, I probably had the Central tapes stapled

22  along with it.

23     Q.   Okay.  When did you write this report?

24     A.   At the time or -- this was same day or same

1    night.

2         Q.    Okay.  About what time; do you know?

3         A.    10 p.m.

4         Q.    Where'd you write it?

5         A.    Central dispatch in Christopher.

6         Q.    Who was there when you wrote it?

7         A.    Two or three other of the policemen.

8         Q.    Who?

9         A.    Richie was one of them.

10        Q.    Who else?  Cole Smillie?

11        A.    Yeah, I was going to have to ask Chuck the

12   kid's name myself.

13        Q.    What about Burkhamer?

14        A.    Yes.

15        Q.    All right.  Anybody else?

16        A.    No, unless -- you mean as far as just police

17   officers?

18        Q.    I'm talking about anybody, any human.

19        A.    Anybody I can remember?

20        Q.    Yeah.

21        A.    A couple of the EMTs, I believe, showed

22   up.

23        Q.    While you were writing your report?

24        A.    Yes.

1    Q.   Did they come into the room with you?

2    A.   Yes, they were still -- I'm sorry.  We're

3    talking over each other again and I'm sorry.

4    Q.   That's all right.  She's a big girl.  She

5    can handle it.

6    A.   They were concerned that I was still

7    bleeding over the incident.

8    Q.   What about Lacy Jones, do you know her?

9    A.   No.

10   Q.   She was the dispatcher that night?

11   A.   Okay.

12   Q.   Do you remember her?

13   A.   Well, I didn't even know her name.

14   Q.   But you do remember there was a dispatcher

15   there?

16   A.   Yeah, in the front room.

17   Q.   It was a woman?

18   A.   Yeah, in the front room.

19   Q.   And what room were you guys in?

20   A.   I was in the back room, conference room of

21   Central.

22   Q.   And what about the other folks, were they

23   back there with you?

24   A.   All except Richie.

1     Q.   Where was Richie?

2     A.   Up on one of the front computers doing his

3  report because I sent him up there to do his

4  independent of mine.

5     Q.   All right.  Now, when you're writing your

6  report -- well, who finishes first?

7     A.   I think I finished first.

8     Q.   So when you were writing your report, you

9  did not have a copy of Richie's report in front of

10  you?

11     A.   Absolutely not.

12     Q.   And when you got done with your report, what

13  did you do with it?

14     A.   Like I said, I think the original had a set

15  of the Central tapes stapled to it.  It was all

16  prepared to send to the State's Attorney's Office.

17     Q.   But physically what did you do with it?

18     A.   Took it back to Alan Barnfield at the

19  time.

20     Q.   Back to the -- back to Buckner to the

21  station?

22     A.   Yes.

23     Q.   Did you show it to anybody before you took

24  it to Alan Barnfield?

1     A.   No.

2     Q.   **Officer Dale never saw it before?**

3     A.   Not that I know of, he didn't.

4     Q.   **Well, you didn't show it to him, right?**

5     A.   No.

6     Q.   **And you had the only copy?**

7     A.   Right.

8     Q.   **And you never saw his report?**

9     A.   No.

10    Q.   **Did you guys talk about it before you wrote**

11 **the report?**

12    A.   Not before, no.  Absolutely not.

13    Q.   **You talked after?**

14    A.   Yes.

15    Q.   **And when you say you talked after, did you**

16 **talk after you turned in your report or before?**

17    A.   Before, I guess.

18    Q.   **And after that conversation, did you change**

19 **anything --**

20    A.   Absolutely not.

21    Q.   **-- in your report?**

22        MR. PIERCE:  Let him finish the question,

23 Bill.

24        THE WITNESS:  I'm sorry.

1          BY MR. BEASLEY:

2      Q.   I know you can anticipate the end of the

3   questions, but --

4               And after you talked to Richie -- or

5   when you talked to Richie, Richie Dale, Officer

6   Dale --

7      A.   Yeah.

8      Q.   -- was his report completed?

9      A.   Yes.

10     Q.   All right.  And after you spoke, did Officer

11  Dale tell you that he was going to change his

12  report?

13     A.   No.

14     Q.   To your knowledge, has he ever changed his

15  report?

16     A.   No.  Let me stop you and just add on.  I'm

17  talking about a whole room full of people, you know

18  what I mean, and not even really talking about this

19  incident at the time.  Now, like I said, I had two or

20  three EMTs in there, they're trying to get me to stop

21  bleeding.

22     Q.   Okay.  Lacy Jones told the Illinois State

23  Police that she overheard some of the conversation

24  that went on in that room and that she heard one of

1   the officers state that Barnhart was tased once but

2   stupid enough to get up so he was tased again.  Do you

3   recall hearing that that night?

4        A.   No, I don't.

5        Q.   Do you recall saying that that night?

6        A.   No.

7        Q.   Is it possible that was said that night and

8   you just don't remember it as you sit here right

9   now?

10       A.   Yes.

11       Q.   Another officer stated that McKinney took

12  care of the situation and drug Barnhart across the

13  lawn.  Do you recall that being said that night?

14       A.   No.

15       Q.   Do you recall making that statement?

16       A.   No.

17       Q.   Is it possible that that statement was made

18  and that you just don't recall it as you sit here

19  right now?

20       A.   It is possible.

21       Q.   Let's talk about this room, this back room

22  conference room.  Table in there?

23       A.   Yes, sir.

24       Q.   Computer?

1    A.    Computer over on another desk.

2    Q.    **But you didn't use the computer?**

3    A.    No.

4    Q.    **Is there a reason why you handwrote it**

5    **instead --**

6    A.    I always did.

7    Q.    **Handwrote all your reports?**

8    A.    Yes, sir.

9    Q.    **Did Smillie have any input into your**

10   **report?**

11   A.    Into my report?

12   Q.    **Uh-huh.**

13   A.    No, I don't think he was -- like I said,

14   without asking Chuck, I can't even remember his

15   name.

16   Q.    **That's right.  I forgot about that.**

17         **How about Burkhamer, did you ask him**

18   **for input into your report?**

19   A.    No.

20   Q.    **Do you know if those guys did reports?**

21   A.    That I don't know.

22   Q.    **You haven't seen them if they have?**

23   A.    No.

24   Q.    **While you were on the -- I'm sorry.  Jumping**

1     around here.

2                    Richie Dale did a report that night.

3     When's the first time you saw Richie Dale's report?

4          A.    I don't think I've ever even read it to tell

5     you the truth.

6          Q.    Did you know that he also did a supplement

7     to the report?

8          A.    No, I did not.

9          Q.    You didn't have any input into either one of

10    those?

11         A.    Is that Richie's?

12         Q.    Yeah, that's Richie's.  Did you have any

13    input into it?

14         A.    No, I don't think I've ever seen it

15    before.

16         Q.    You don't need to read it.  I'm not going to

17    ask you any questions about it.

18              MR. PIERCE:  He's asking if you had any

19    input into the creation of Richie's report.

20              THE WITNESS:  No, absolutely not.  I always

21    tried to make sure everybody was independent and done

22    their own report.

23              BY MR. BEASLEY:

24         Q.    So if Richie would have tried to show you

1   his report, you would have been like I don't want to

2   see that?

3      A.   Yes.

4      Q.   Because that was your personal practice was

5   to make sure yours was independent?

6      A.   Yes, sir, and everybody else's.

7      Q.   So you left the Central Dispatch and took

8   your report to Barnfield?

9      A.   Yes, sir.

10      Q.   What time did you leave Central Dispatch?

11      A.   Ten or eleven maybe.  Maybe as long as

12   midnight.  I don't remember.  I can't put a time frame

13   on it.

14      Q.   Do you know how long you were at dispatch?

15      A.   Oh, probably 30 minutes to an hour.

16      Q.   Where did you -- you said you took the

17   report to Barnfield.  Where would that have been?

18      A.   I think I took it directly to his house that

19   night.

20      Q.   Now, at that point, was Barnfield aware of

21   the allegation of you hitting Barnhart while he was

22   handcuffed?

23      A.   Yes, sir.

24      Q.   Who told him that?