1    A.    I did.

2    Q.    **When did you tell him?**

3    A.    On scene.

4    Q.    **How did you tell him?  What did you say to**

5    **him?**

6    A.    Exactly?  That I can't tell you.

7    Q.    **Give me the gist of what you told him.**

8    A.    Okay.  First of all, I admitted to slapping

9    the man, I did not hit him, and I did tell Barney

10   right off the bat that, yes, I did slap the man.

11   Q.    **Do you know David Dolderer?**

12   A.    Not by name.

13   Q.    **I think he's the fire chief.**

14   A.    Okay.

15   Q.    **Does that sound right?**

16   A.    A brand-new one, so I hadn't even got his

17   name yet.

18   Q.    **Well, do you have any history with him that**

19   **would lead him to be less than honest about**

20   **allegations against you?**

21   A.    No, as far as good history, bad history.

22   Q.    **No history?**

23   A.    No, nothing.

24   Q.    **He says McKinney came from behind and over**

1    the top of me and struck the victim in the head with a

2    closed fist; is that accurate?

3       A.   No.

4       MR. PIERCE:  I'm going to object because

5    that's a mischaracterization of the statement and an

6    incomplete hypothetical; so, therefore, I'll object to

7    the form and foundation.  Go ahead and answer.  I

8    think he already did.

9       BY MR. BEASLEY:

10      Q.   Did you answer?  I'm sorry.

11      A.   No, I didn't answer.

12      Q.   Okay.  Go ahead.

13      A.   I've never seen the statement.

14      Q.   I'm not asking if you've seen the statement.

15    I'm asking you if it's true?

16      A.   No.

17      Q.   Have you seen your police -- Illinois State

18    Police interviews?

19      A.   Not all of them.

20      Q.   How would you characterize the force with

21    which you hit Barnhart?

22      A.   How would I characterize it?

23      Q.   Uh-huh.

24      A.   I would characterize it as a stunning

1     slap.

2          Q.     Did you characterize -- have you ever -- do

3     you ever recall saying I box slapped him pretty

4     hard?

5          A.     I might have used those words.

6          Q.     Okay.  Did you demonstrate for the Illinois

7     State Police how you hit Mr. Barnhart?

8          A.     Yes, I did.

9          Q.     And did you take a step into it to hit

10    him?

11         A.     Yes, sir.

12         Q.     Where did you hit him?

13         A.     Up underneath this jaw.

14         Q.     That's your left -- you're touching your

15    left jaw?

16         A.     Yeah.

17         Q.     What hand did you use?

18         A.     Right hand.

19         Q.     Are you right-handed?

20         A.     Yes, sir.

21         Q.     And when you hit him, did you knock him

22    over?

23         A.     No.

24         Q.     He didn't fall?

1    A.   No.

2    Q.   Do you know Alan Minton?

3    A.   Uh-huh, yes, sir.

4    Q.   Does he have any -- do you have any history

5    with him that would give him -- do you have any

6    history with him that would -- strike that.

7              Do you have any problems with Alan

8    Minton?

9    A.   No.

10   Q.   As far as you know, does he have any reason

11   to lie about your activities that evening?

12   A.   No, not lie.

13   Q.   What's that?

14   A.   No, not lie.

15   Q.   And so if he and Dolderer testify that you

16   knocked him down when you hit him, that's not true?

17   A.   That don't necessarily mean it's true.

18   Q.   No, I'm asking you if it's true.  If they

19   testify that you knocked him over when you hit him,

20   would you say that that's not true?

21   A.   No.

22   Q.   You wouldn't --

23   A.   It does not necessarily mean that it's true.

24   Everybody perceives something differently.

1      Q.   Okay.  So it's possible that they're being

2  honest when they say you knocked him over when you hit

3  him?

4      A.   Yes.

5      Q.   Do you know how he fell when you hit him?

6      A.   He didn't fall.

7      Q.   Your police report that was completed about

8  an hour after the incident, is there anything in there

9  about you striking Mr. Barnhart?

10     A.   No.

11     Q.   You would agree with me that that's

12  something that should be in your police report,

13  right?

14     A.   I can't agree with that.

15     Q.   You don't think it should be in your police

16  report?

17     A.   No, because I told the chief on scene that I

18  did.

19     Q.   Because you told the chief something, you

20  don't think -- you think that that means it shouldn't

21  be in your police report?

22     A.   Is it in Richie's police report?

23     Q.   I'm asking you if you believe that it should

24  be in your police report?

1      A.    Now I believe it should have been.

2      Q.    **Okay.  It was important enough to tell the**

3    **chief on scene, right?**

4      A.    Yes.

5      Q.    **If it's important enough to tell the chief**

6    **personally to his face, you would think it would be**

7    **important enough to be in the police report, right?**

8      A.    Okay.  I'll stipulate to that.

9      Q.    **Why isn't it in your police report?**

10     A.    I guess I didn't excel at police report

11   writing.

12     Q.    **Okay.**

13     A.    I'll stipulate to that one too.

14     Q.    **When these police reports are written, they**

15   **go to the State's Attorney's Office, don't they?**

16     A.    Yes, sir.

17     Q.    **And they're ultimately the person that**

18   **charges people with crimes, right?**

19     A.    Yes, sir.

20     Q.    **You knew this would be read by the State's**

21   **Attorney's Office when you wrote it?**

22     A.    Yes, sir.

23     Q.    **All your police reports that you forward to**

24   **the State's Attorney's Office are read by them in**

1  order to issue charges?

2     A.  Normally.

3     Q.  Is that why you didn't put it in there,

4  because you didn't want the State's Attorney's Office

5  to see that you hit a man that was handcuffed?

6     A.  No.

7     Q.  Is there any other explanation?

8     A.  Kind of an oversight thing on the time.

9     Q.  So your testimony is it was simply an

10  oversight?  You weren't trying to hide it?

11    A.  Right.

12        MR. BLEYER:  Jarrod, I need to pee whenever

13  you get to a stopping point.

14        MR. BEASLEY:  Well, well, well.  I was sort

15  of finding a groove, but I knew you would screw it up

16  eventually.  I don't know why I bother.

17  (Brief recess in the proceedings.)

18        BY MR. BEASLEY:

19    Q.  Let's talk about you got the call -- I think

20  we left off where you got the call from dispatch about

21  Amanda Barnhart.  Is that how you got the call?

22    A.  Yes, sir.

23    Q.  All right.  What do you do when you get that

24  call?

1      A.   I went to that scene.

2      **Q.   What scene is that?**

3      A.   Well, Central gave it to me as originally a

4    theft call, and that was -- the address was 405 Oak if

5    I remember right.

6      **Q.   In Buckner?**

7      A.   Yes, sir.

8      **Q.   And you responded there?**

9      A.   Yes.

10     **Q.   What do you do when you get there?**

11     A.   I spoke with Amanda Barnhart, Dale (sic)

12   Barnhart, Jr.'s ex, who had told me that -- we'll just

13   call him Junior -- Junior had stolen a bunch of stuff

14   of theirs while on 4th of July holiday.

15     **Q.   Stole a bunch of stuff?**

16     A.   Yes, sir.

17     **Q.   Including a trailer?**

18     A.   Eight-by-10 lawn mower trailer and a bunch

19   of fishing supplies.

20     **Q.   Okay.  Do you know Amanda Barnhart before**

21   **you get there?**

22     A.   Yes.

23     **Q.   Do you know Richard Curry?**

24     A.   Yes.

1     Q.   How do you know Richard Curry?

2     A.   I'd arrested him two or three different

3  times.

4     Q.   For what?

5     A.   Mostly on warrants, I believe.

6     Q.   Was it your understanding that he had just

7  fairly recently got out of prison?

8     A.   Yes, sir.

9     Q.   Do you remember what he went to prison

10  for?

11     A.   No.

12     Q.   Was it drugs?

13     A.   Might have been.

14     Q.   I don't know.  I'm just asking.

15     A.   Talking about it, yes, I think it was.

16  (Discussion off the record.)

17       BY MR. BEASLEY:

18     Q.   All right.  So you know the parties when you

19  get there?

20     A.   Yes.

21     Q.   You know Richard Curry has just gotten out

22  of jail.  What do you know about Amanda Barnhart?

23     A.   Just the prior calls I'd had on Junior and

24  her in the last year with the divorce.

1     Q.   They haven't gotten along?

2     A.   Oh, to say it mildly.

3     Q.   Did she -- didn't she hit him with her car

4 or something?  Do you remember that?

5     A.   Supposedly.

6     Q.   Now, when you know the people that you're

7 taking the information from, does that help you assess

8 its credibility?

9     A.   Yes.

10     Q.   And based on the fact that Richard Curry

11 just got out of prison and you know you've arrested

12 him a few times, does that impact his credibility with

13 you?

14     A.   Yes, it did.

15     Q.   And Amanda Barnhart, you knew this

16 back-and-forth regarding this divorce with her

17 ex-husband, did that impact her credibility with

18 you?

19     A.   That along with the agitation that both were

20 displaying at the time.

21     Q.   All right.  So you take their information,

22 and what do you do with it?

23     A.   Well, I hadn't even got to leave yet,

24 because I was going to confront Roy, Jr., with this

1    information.  They'd already took off to make the

2    confrontation, but Roy, Jr.'s sister stopped me,

3    whatever her name is, to tell me that he, Roy, Jr.,

4    had stolen this stuff.

5        Q.    **Is it Tammy Miller?**

6        A.    Tammy, there you go.

7        Q.    **She says Roy took this stuff?**

8        A.    Yeah.

9        Q.    **All right.  Do you know Tammy?**

10       A.    No.

11       Q.    **And you take that information?**

12       A.    Yes.

13       Q.    **And what do you do?**

14       A.    Then I went to the Main Street scene.

15       Q.    **Why is Curry and Barnfield -- or why are**

16   **Curry and Amanda Barnhart going over there before you**

17   **go?**

18       A.    Spontaneity of the situation.

19       Q.    **Didn't you tell them -- did you tell them do**

20   **not go over there?**

21       A.    Tried to, yes.

22       Q.    **Did they tell you we're going over there?**

23       A.    Yeah.

24       Q.    **And what did you tell them?**

1  A. The other -- the Tammy Miller subject had me

2 cornered at that time telling me the whole story, so I

3 was a few seconds or a minute behind.

4  **Q. But you told them do not go there?**

5  A. Yes.

6  **Q. Did you charge them with obstruction?**

7  A. No.

8  **Q. Did you charge them with any crime that**

9 **night?**

10  A. No.

11  **Q. Why not?**

12  A. Because I didn't have to.

13  **Q. You didn't have to charge them with a**

14 **crime?**

15  A. No.

16  **Q. Well, I agree you didn't have to. I'm**

17 **asking you why you didn't.**

18  A. My choice.

19  **Q. So you're just using your discretion?**

20  A. Yes.

21  **Q. You would agree with me that going to a**

22 **place that the police tell you not to go is**

23 **obstruction, right?**

24  A. Yes, or I could have used criminal trespass

1    if nothing else.

2        Q.    Perfect.  So you get there, and Curry and

3    Amanda Barnhart are already there?

4        A.    Yes.

5        Q.    Where do you park?

6        A.    I park between the complainants.

7        Q.    Well, there's only one complainant, right?

8        A.    Yeah.

9        Q.    All right.  So where do you park?

10       A.    I parked on Mrs. Latham's side of the

11   street.

12       Q.    Pointing which direction?

13       A.    It would be pointed east.

14       Q.    All right.  And what's the road?

15       A.    Main Street.

16       Q.    And does that help you remember what car you

17   were driving?

18       A.    Yes.

19       Q.    All right.  What kind of car are you

20   driving?

21       A.    The red, all-purpose police vehicle,

22   Explorer.

23       Q.    Does it have lights?

24       A.    Yes.

1     Q.   **Emergency lights on/off?**

2     A.   Off.

3     Q.   **Siren on/off?**

4     A.   Off.

5     Q.   **What kind of day is it?**

6     A.   It was a hot day, I remember that. Just

7 about dusk by then.

8     Q.   **Do you remember what time you got there?**

9     A.   No.

10    Q.   **About dusk though?**

11    A.   Yeah.

12    Q.   **What do you do when you first get there?**

13    A.   I went to the door and had Mrs. Latham to

14 bring out Roy, Jr., and confronted him with the

15 situation.

16    Q.   **Now, how do you confront him?**

17    A.   I told him that I had statements from --

18 verbal statements at that point in time but from

19 Amanda Barnhart and Richard Curry that he'd stolen a

20 bunch of stuff out of their yard and confirmation from

21 his own sister.

22    Q.   **Now, when you're telling him this, are you**

23 **telling it to him like you're telling me now in a**

24 **normal voice or are you yelling at him?**

1    A.    No, I hadn't got to yelling yet.

2    Q.    **All right.  Once he's confronted with that,**

3    **what does he say?**

4    A.    He showed me a trailer, which was the point

5    of the whole thing, in an adjacent garage.

6    Q.    **You go out there with him?**

7    A.    Yeah.

8    Q.    **And he shows it to you?**

9    A.    Yes, sir.

10    Q.    **You guys still getting along at this**

11    **point?**

12    A.    Yes, sir.

13    Q.    **All right.  And what do you say at that**

14    **point?**

15    A.    Well, at that point, I didn't know, but he

16    claimed that his dad had a title for that trailer.

17    Q.    **Did you tell him call your dad, get him over**

18    **here with the title?**

19    A.    No, I did not.

20    Q.    **All right.  Did you want to see the title?**

21    A.    I really wasn't concerned with the title.  I

22    wanted to see what his reaction was first --

23    Q.    **Well, if you're dealing with --**

24    A.    -- and see how much veracity either side had

1   as you say.

2       Q.   All right.  But when you're dealing with

3   stolen property, particularly a vehicle that's

4   registered, wouldn't you like to see who the owner of

5   the property is?

6       A.   If you can truly tell that by the title.

7       Q.   Okay.  Well, what do you do -- what do you

8   do now?

9       A.   I went back to talk to Amanda and Richard,

10  who were still yelling and screaming back and forth

11  across the street, to contain theirselves on that side

12  of the street.

13      Q.   Were you yelling back and forth?

14      A.   No.

15      Q.   Who was yelling back and forth?

16      A.   Amanda Barnhart; Richard Curry; Roy, Jr.;

17  the mother and some unknown sister because I didn't

18  even get that name.

19      Q.   Had you threatened to arrest Roy Barnhart,

20  Jr.?

21      A.   Not yet.

22      Q.   So now you leave the property, and you go

23  across the street to, basically, the village hall,

24  right?

1     A.   Yes, sir.

2     Q.   **And you're going to talk to Amanda and**

3  **Richard?**

4     A.   Yes.

5     Q.   **You talk to them?**

6     A.   Yes.

7     Q.   **What do you talk to them about?**

8     A.   I told them that as much -- he said/she said

9  thing, that the best thing for me to do is just take a

10  notice to appear watchmadoodle and let the State's

11  Attorney's Office figure it out.

12     Q.   **Take a notice to appear, what does that**

13  **mean?**

14     A.   No confinement at the time; just formal

15  notice to appear.

16     Q.   **Were you going to charge somebody with a**

17  **crime?**

18     A.   Yes.

19     Q.   **Who?**

20     A.   Roy, Jr.

21     Q.   **But you're not going to arrest him?**

22     A.   Right.

23     Q.   **So what are you going to charge him with?**

24     A.   Theft.

1    Q.   He's told you that he didn't steal it,

2   right?

3    A.   Yes.

4    Q.   And the other side has said they did -- that

5   Roy, Jr., stole it, right?

6    A.   Yes.

7    Q.   And Roy, Jr., says my dad has the title?

8    A.   Yes.

9    Q.   Don't you want to see that?  Maybe that will

10  be the determining factor?

11   A.   Part of it was still the eight or ten

12  fishing rods and equipment.

13   Q.   So you're just going to charge Roy, Jr.,

14  with a crime and let him figure it out?  That's your

15  plan?

16   A.   Let who figure it out?

17   Q.   Let the State's Attorney and Roy, Jr.,

18  figure it out?

19   A.   Also added to the fact of this Tammy Miller,

20  his sister, telling me that she had witnessed him

21  stealing that stuff.

22   Q.   Okay.  But I'm just saying the plan at this

23  point -- based on the information you have, the plan

24  at this point is to issue a ticket charging Roy, Jr.,

1    with a crime and let him and the State's Attorney's

2    Office figure it out?

3         A.    Yes, sir.

4         Q.    Do you have anything -- at this point on

5    July 7, 2013, when you show up to work, do you have

6    anything against the Barnharts?

7         A.    No.

8         Q.    Either Roy, Jr., or Roy, Sr.?

9         A.    No.

10        Q.    Okay.  So you're over there talking to

11   Richard and Amanda, and you tell them that's the plan,

12   right?

13        A.    No, I didn't tell them that.

14        Q.    You didn't tell them?

15        A.    No.

16        Q.    What are you over there talking to them

17   about?

18        A.    I told them to sign a couple of nontraffic

19   complaints, and I was going to give them -- and I did

20   give them two voluntary statements to fill out over

21   the theft, and I was just going to scoop it all up,

22   send it to the State's Attorney's Office.

23        Q.    Did they sign the complaints?

24        A.    Yes.

1    Q.   **Where are they?**

2    A.   That I don't know.

3    Q.   **Did you turn those in?**

4    A.   I don't know.

5    Q.   **Who would know?**

6    A.   Alan Barnfield.

7    Q.   **What did the complaints look like?  Did they**

8    **look like tickets?**

9    A.   Yeah, nontraffic tickets.

10   Q.   **When you write a nontraffic ticket, you give**

11   **a copy to the person that the ticket is directed at,**

12   **right?**

13   A.   Not at that point in time, I didn't.

14   Q.   **Okay.  But you turn in copies -- it's carbon**

15   **paper, right?**

16   A.   Yes, sir, at least three copies on

17   nontraffic complaints.

18   Q.   **Three copies, okay.  Where does the top copy**

19   **go?**

20   A.   Stays with me.

21   Q.   **All right.  Where does the middle copy go?**

22   A.   It all depends on which one you actually

23   want to give them, the bottom or the middle copy to

24   the arrestee.

1     Q.   Okay.  And where's the last copy go?

2     A.   I think it goes to NCIC.

3     Q.   What is that?

4     A.   National Crime Involvement, goes into a

5  person's criminal history anyway.

6     Q.   All right.  So, but we don't know if this

7  was ever done?

8     A.   No.

9     Q.   Do you have your ticket book?

10     A.   No.

11     Q.   What happened to your ticket book?

12     A.   I don't know what happened to any of that

13  stuff.

14     Q.   Did you turn it in?

15     A.   No.  Like I said, Chief Barnfield might

16  still have copies of that if he's got the ticket

17  book.

18     Q.   When you left that night, you had the ticket

19  book?

20     A.   No.

21     Q.   You didn't?

22     A.   No.

23     Q.   Where'd you leave your ticket book?

24     A.   Well, actually, I left it either on the

1  bench or on the lawn mower.

2      Q.  **How do you know that?**

3      A.  Because one of the EMTs or the ambulance

4  crew brought it back to me at Central.

5      Q.  **All right.  So you got it at Central?**

6      A.  Yeah, I got it there.

7      Q.  **You leave there to take the ticket -- or**

8  **your report to Barnfield?**

9      A.  Yes, sir.

10      Q.  **That's in Buckner?**

11      A.  Yes, sir.

12      Q.  **And then you go home to Royalton?**

13      A.  Yes, sir.

14      Q.  **At the time you get home, you have your**

15  **ticket book?**

16      A.  No, sir.

17      Q.  **What did you do with your ticket book?**

18      A.  Back in the console in the police vehicle.

19      Q.  **All right.  You put the ticket book in the**

20  **console of the red pickup?**

21      A.  Yes, sir.

22      Q.  **You came back to work the next day?**

23      A.  Well, like I said, I was actually paid for

24  one more day there in Buckner.  I did not go back to

1    work.

2         Q.   So after this day, after this shift, you

3    never worked in Buckner again?

4         A.   No.

5         Q.   Did Barnfield ever ask you where your ticket

6    book was?

7         A.   I don't remember whether he did or not.

8         Q.   Has anybody, other than me, ever asked you

9    before where is your ticket book?

10        A.   No.

11        Q.   These written statements that you gave to

12   them, you keep blank copies of written statements in

13   your police vehicle?

14        A.   Yes, sir.

15        Q.   You handed them to Curry and Barnhart?

16        A.   Yes, sir.

17        Q.   Amanda Barnhart?

18        A.   Yes, sir.

19        Q.   And instructed them, fill these out?

20        A.   Yes.

21        Q.   Did they fill them out?

22        A.   Yes, I think I got them back.

23        Q.   Where are they?

24        A.   I don't know.

1          MR. PIERCE:  They're in the documents you've

2     got somewhere because I've seen them.  You've got

3     them.  I'll dig them out later, but they're in ISP

4     documents.  I'm sure I've seen them, handwritten

5     statements from Curry and Barnhart.

6          MR. BEASLEY:  I think those are after.  It's

7     neither here nor there.

8          MR. PIERCE:  It's not a very relevant issue

9     anyway, as to what charges were issued against Roy,

10    Jr.

11    (Discussion off the record.)

12          BY MR. BEASLEY:

13    Q.   Okay.  So do you know what you did with

14    those statements?

15    A.   I don't know.  Like I said, it's just a

16    memory thing.  I can't --

17    Q.   You have -- you say it's a memory thing.  Do

18    you have a bad memory?

19    A.   At times, yes, I do.  Now especially.

20    Q.   Is that based on anything?

21    A.   This ordeal.

22    Q.   This ordeal has caused you to lose certain

23    memories?

24    A.   Of the sequence of events that night and

1    stuff, yes.  I'm trying honest -- answer as honestly

2    as I can.

3        Q.    You're doing fine.  You're doing fine.

4              Let's go on.  Once this happens, once

5    you give them the witness statements, is Richie Dale

6    there yet?

7        A.    Yes.

8        Q.    Okay.  Richie Dale is there.  You've given

9    them the statements.  He's standing there.  Do you

10   talk to Richie?

11       A.    Yes.

12       Q.    What do you tell him?

13       A.    I told him just the gist of the theft call,

14   you know, and all these people are screaming and

15   yelling over us and --

16       Q.    Did you tell him these two are in the middle

17   of a divorce; they don't like each other; they've been

18   a problem for a year?

19       A.    Well, this is, actually, even after the

20   divorce.  Divorce is finalized.

21       Q.    Okay.  But do you explain that to -- do you

22   explain that to Officer Dale, that, you know, these

23   people do not like each other, and here's the root

24   cause of it, this divorce?

1    A.   Yes.

2        MR. PIERCE:  It's signed by Amanda Barnhart,

3   one of the tickets.

4        BY MR. BEASLEY:

5    **Q.  Did you explain -- you explained that to**

6  **Richie.  Did he have a reaction?**

7    A.   No.

8    **Q.  Then what happens?**

9    A.   That was about the time that Roy, Sr.,

10  pulled up on a riding lawn mower.

11    **Q.  All right.  Roy, Sr., pulls up on a riding**

12  **lawn mower.  Obviously, you can hear it.  It's a**

13  **mower?**

14    A.   Yeah.

15    **Q.  It's not a silent mower?**

16    A.   No.

17    **Q.  Where does he park the mower?**

18    A.   Right up on the sidewalk on the -- at the

19  city hall.

20    **Q.  On the corner?**

21    A.   Corner?  It was a 4-foot sidewalk there.  It

22  was mostly on the sidewalk.

23    **Q.  Did he tell you why he rode the mower over**

24  **there?**

1    A.   No.

2    **Q.   Did you ever see him drive the mower around**

3  **down there?**

4    A.   Everybody drove mowers over in Buckner.

5  They'd stop -- which wasn't surprising whenever we

6  heard the mower, because everybody would stop at the

7  soda machine while they were cutting grass at

8  different locations and get them a sody.  I just

9  couldn't believe that he come up on a riding lawn

10  mower.

11    **Q.   You couldn't believe that he came up on**

12  **it?**

13    A.   Right.

14    **Q.   But you said it wasn't unusual?**

15    A.   Well, it wasn't until I recognized him

16  coming to the fight on a riding lawn mower.

17    **Q.   But there wasn't a fight, was there?**

18    A.   Well, it wasn't a peaceful thing already.

19    **Q.   They're yelling back and forth, and Roy**

20  **pulls up on the lawn mower.  Does he turn the lawn**

21  **mower off?**

22    A.   Yes.

23    **Q.   Gets off?**

24    A.   No, he hadn't exited it yet.

1     Q.   What does he do when he pulls up and turns

2  the mower off?

3     A.   Well, he showed us the title first to --

4  supposedly the title for this lawn mower trailer.

5     Q.   Who does he hand it to?

6     A.   I think he handed it directly to Richie.

7     Q.   And he's still on the mower?

8     A.   Yes.

9     Q.   Hasn't gotten off the mower?

10    A.   No.

11    Q.   And he hands it to Richie.  What does Richie

12  do with it?

13    A.   Richie took a look at it.  We determined --

14  we set that part aside for a minute, but that's

15  whenever he started with the confrontation between

16  Amanda and Richard Curry.

17    Q.   Now, when he hands Officer Dale the title,

18  do you and Officer Dale have a conversation about the

19  validity of the title or what you're going to do

20  now?

21    A.   Well, like I said, I told Roy, Sr., and

22  Richie at the time, we'll just put this on the back

23  burner, and we'll check the title against the trailer,

24  but here is the situation with still the eight or ten

1    fishing rods and reels and whatever other

2    paraphernalia they were talking because I did not get

3    the whole list of items.

4        Q.   **And he is on the -- Roy, during this**

5    **conversation, is still on the mower?**

6        A.   Yes.

7        Q.   **Mower's off?**

8        A.   Mower's off.

9        Q.   **And then Amanda and Richard start screaming**

10   **at Roy, Sr.**

11       A.   No, Roy, Sr., started screaming first.

12       Q.   **Okay.  What's he saying?**

13       A.   He's calling Richard Curry a son of a bitch

14   at the top of his lungs, repeatedly.

15       Q.   **Anything else?**

16       A.   He said to the gist that Richard Curry had

17   caused the whole confrontation or family squabble

18   between all of them.

19       Q.   **And Richard Curry and Amanda are screaming**

20   **back?**

21       A.   Right.

22       Q.   **And they're probably not saying very nice**

23   **things about Roy, Sr.**

24       A.   Right.

1     Q.  And Roy, Sr., at this point is still on the

2  mower?

3     A.  (Nodding head.)

4     Q.  And you are between Roy, Sr., Curry and

5  Amanda Barnhart?

6     A.  Yes, sir.

7     Q.  And Richie Dale is there with you?

8     A.  Yes, sir.

9     Q.  Okay.  What happens next?

10    A.  Roy had finally agitated Richard Curry

11  enough so that he was going to jump up and pound

12  him.

13    Q.  Richard Curry was going to jump up and pound

14  Roy, Sr.

15    A.  Yeah.

16    Q.  Okay.  So does he get up?

17    A.  Tried to.

18    Q.  Tried to.  Was he sitting on a bench at the

19  time?

20    A.  Yes.

21    Q.  Was Amanda sitting on the bench at the

22  time?

23    A.  Yes, sir.

24    Q.  So Richard Curry says I've had enough; he

1   jumps up?

2       A.   Yes.

3       Q.   **And does he go at Roy?**

4       A.   He hadn't because I'd stopped him.

5       Q.   **But he was going to?**

6       A.   Yes.

7       Q.   **And you stopped him.  How'd you stop him?**

8       A.   I told him, I said, sit back down on that

9   bench.  I don't want to have to arrest you over

10  this.

11      Q.   **Okay.  Did he do it?**

12      A.   Yes.

13      Q.   **And Roy, Sr., still's sitting on the**

14  **mower?**

15      A.   And still screaming and cussing.

16      Q.   **And Amanda and Curry are still probably**

17  **cussing at him?**

18      A.   Yeah.

19      Q.   **All right.  And from across the street,**

20  **maybe some people are cussing over there?**

21      A.   Yes, sir.

22      Q.   **All right.  So now what happens?**

23      A.   Well, whenever Roy, Jr., jumped off the lawn

24  mower --

1      Q.   Roy, Sr., was on the lawn mower?

2      A.   Yeah, all right.  I said Junior, didn't I?

3  I'm sorry.  Yeah, Roy, Sr., jumped off the lawn and

4  jumped between the two of us to get to --

5      Q.   Go ahead.

6      A.   -- Richard Curry.  That was the time we had

7  to take an immediate action.

8      Q.   All right.  So hang on just for a second.

9      A.   Okay.

10      Q.   Roy, Sr., when he pulls up, you know Roy,

11  Sr.

12      A.   Yes, sir.

13      Q.   You know that he has a pacemaker?

14      A.   I knew he had a heart condition.  I did not

15  know it was, quote, a pacemaker.

16      Q.   Did you ever tell anybody that you knew he

17  had a pacemaker?

18      A.   That I don't -- no, I don't think.

19      Q.   And if you did previously tell someone that

20  you knew Roy had a pacemaker when he arrived on the

21  scene that day, that would be incorrect?

22      A.   They just, quote, told me he had heart

23  problems.

24      Q.   All right.  So as far as a pacemaker goes,

1    you didn't know?

2        A.   Not specifically.

3        Q.   And if you said that in the past, that was

4    just a mistake?

5        A.   Yes.

6        Q.   He has heart issues.  Do you know anything

7    else about his physical condition?

8        A.   No, sir.

9        Q.   Do you know he has diabetes?

10       A.   No, sir, I did not.

11       Q.   He's not what you would call fit, is he?

12       A.   Just to physically look at, you couldn't

13   tell any different.

14       Q.   Did you know he was disabled?

15       A.   No, I did not know that.

16       Q.   Did you know -- you knew that he only lived

17   a couple blocks away, right?

18       A.   Yes.

19       Q.   Did you ever wonder why he didn't just walk

20   instead of ride his mower?

21       A.   No, never crossed my mind.

22       Q.   Did it ever cross your mind that maybe he

23   couldn't walk that far so he had to take the mower?

24       A.   Why didn't he get in the vehicle?

1    Q.   I'm asking you if that ever crossed your

2    mind.

3    A.   No.

4    Q.   So you said, quote, jumps off the mower.  Is

5    that -- do you mean to say he got off the mower

6    quickly?

7    A.   He jumped off the mower and barreled between

8    me and Richard Dale.

9    Q.   Please describe to me what you mean by jumps

10   off the mower.

11   A.   He jumped off the seat of the riding mower

12   between the two of us to get to Richard Curry.

13   Q.   Between you and Officer Dale?

14   A.   Yes, sir.

15   Q.   You were directly in his way?

16   A.   Yeah.

17   Q.   What side of the mower did he get off of?

18   A.   Well, it was pointed east, so I guess he

19   would have got off the south side.

20   Q.   Is that the right side of the mower or the

21   left side of the mower?

22   A.   Right side of the mower.

23   Q.   Okay.  And he jumps off and gets right

24   between you and Dale?

1      A.    He barreled over -- off the seat of the

2    mower in mid air between me and Richie Dale to get to

3    Curry.

4          **Q.    About how far away from the mower were you**

5    **and Officer Dale standing?**

6      A.    Three or 4 feet.

7          **Q.    So he jumped the 3 or 4 feet and landed**

8    **right in the middle of you guys?**

9      A.    Well, no, actually he spun Richard Dale.

10         **Q.    Spun him?**

11     A.    Yeah, with a (indicating) shoving, tackling

12   move.

13         **Q.    With his right hand?**

14     A.    Yes, sir.

15         **Q.    I want to get this right.**

16     A.    Okay.

17         **Q.    He shoved, tackled him, what does that**

18   **mean?**

19     A.    (Indicating.)

20         **Q.    Okay.  Where did he hit Richie Dale?**

21     A.    Left shoulder.

22         **Q.    Left shoulder and spun him?**

23     A.    Yes, sir.

24         **Q.    How far?  All the way around?**

1    A.    Yeah.

2    Q.    **Spun 360?**

3    A.    Well, 180 anyway.

4    Q.    **180.  How many steps did it take Richie Dale**

5    **to catch himself if you know?**

6    A.    That I don't know.

7    Q.    **But a few?**

8    A.    If I even saw it.

9    Q.    **Well, did you -- you just described it to me**

10   **like you saw it.  Did you see it?**

11   A.    I was already taking action.

12   Q.    **So you're already taking action.  Were you**

13   **taking action before he even made contact with Richie**

14   **Dale?**

15   A.    No.

16   Q.    **Only after he made contact with Richie**

17   **Dale?**

18   A.    Yes.

19   Q.    **And what action did you take?**

20   A.    He was actually, in my mind, under arrest

21   for aggravated battery then.

22   Q.    **Did anybody tell him what was in your**

23   **mind?**

24   A.    No.

1    Q.   So in your mind he's under arrest, but Roy,

2    Sr., doesn't know that he's under arrest?

3    A.   Not at that point in time.

4    Q.   What action do you take?

5    A.   I pepper sprayed him.

6    Q.   You had your pepper spray on you?

7    A.   Yes.

8    Q.   Does it come out in a stream or a puff?

9    A.   This is mistulets (ph.).

10   Q.   Mistulets?

11   A.   Yes, not a stream.

12   Q.   Is mistulets a word, or are you screwing

13   with me right now?

14   A.   Well, I might be screwing with you too.

15   Q.   So it comes out in mistulets?

16   A.   Small droplets.

17   Q.   It comes out in mistulets.  I don't care.

18   We're using mistulets.

19   A.   Small droplets.

20   Q.   All right.

21   (Discussion off the record.)

22        BY MR. BEASLEY:

23   Q.   So it comes out in mistulets.  How far does

24   it spray?

1        The droplets will not spray as far as the

2   stream.  The spray -- stream is guaranteed for 10

3   feet.

4        Q.   But what we're dealing with --

5             MR. BLEYER:  Mistulets.

6             BY MR. BEASLEY:

7        Q.   -- the mistulets, we're talking about, you

8   know, within a few feet, right?

9        A.   Right.

10       Q.   And when you deploy the pepper spray,

11  you're -- you can touch Roy, can't you?

12       A.   Yes, sir.

13       Q.   And you spray him in the face?

14       A.   Yes, sir.

15       Q.   That's what you're supposed to do with

16  pepper spray, right?

17       A.   Yes, sir.

18       Q.   At the point you deploy the pepper spray, is

19  Roy resisting arrest?

20       A.   He'd already resisted arrest.

21       Q.   Okay.  How did he resist arrest?

22       A.   He hit Richie.  You don't get to touch the

23  cop.

24       Q.   All right.  So that's where he resisted

1   arrest?

2        A.   (Nodding head.)

3        Q.   **Yes?**

4        A.   Yes.  I'm sorry.

5        Q.   **So was he actively resisting at the time you**

6   **deployed the --**

7        A.   He had committed a crime at that time.

8        Q.   **I'm asking you if he had -- if he -- well,**

9   **strike that.**

10             **You didn't tell him he was under**

11  **arrest, right?**

12       A.   No.

13       Q.   **He didn't know he was under arrest, right?**

14       A.   If you jump between two policemen to get to

15  another individual, as smart as you are or as dumb as

16  he possibly could have been, you know that you are

17  going to be charged with a crime.

18       Q.   **Perfect.  All right.  Listen.**

19       A.   Yes, sir.

20       Q.   **You didn't tell him he was charged with a**

21  **crime?**

22       A.   No.

23       Q.   **You didn't tell him he was under arrest,**

24  **right?**

1    A.   Exactly.

2    **Q.  Then how can he resist arrest?**

3    MR. PIERCE:  I'm going to object to the form

4 and foundation because that mischaracterizes the

5 actual criminal charges.  Subject to that, you can

6 answer.

7    MR. BEASLEY:  I didn't mischaracterize

8 anything.  I'm repeating what he said.

9    BY MR. BEASLEY:

10    **Q.  Go ahead.**

11    MR. PIERCE:  You're mischaracterizing the

12 statutory language of the charge.

13    THE WITNESS:  I took action because he had

14 committed a crime.

15    BY MR. BEASLEY:

16    **Q.  All right.  And here is what I'm -- I think**

17 **maybe we're getting off track here.**

18    A.  Yes, we are.  Yes, we are.

19    **Q.  Here is what I'm asking you:  Before you**

20 **pepper sprayed him, in your mind Roy, Sr., was under**

21 **arrest?**

22    A.  As he come through two of us to get to

23 another individual to batter him.

24    **Q.  Okay.  Well, Richard Curry tried to get up**