1      IN THE UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF ILLINOIS

2

  SUSAN BARNHART, as        )
3  Administrator of the Estate )
  of Roy D. Barnhart, Sr.,   )
4  Deceased,             )
                     )
5       Plaintiff,     )
                     )
6  vs.              )   No. 13-CV-00772-SMY-DGW
                     )
7  THE VILLAGE OF BUCKNER,   )
  ILLINOIS, and PATROLMAN    )
8  WILLIAM MCKINNEY,       )
  Individually and in his   )
9  Official Capacity as an    )
  Officer for the Buckner    )
10 Police Department, and THE  )
  CITY OF CHRISTOPHER,      )
11 ILLINOIS, and OFFICER RICHIE)
  DALE, Individually and in   )
12 his Official Capacity as an )
  Officer for the Christopher )
13 Police Department,       )
                     )
14       Defendants.    )

15

16               Deposition of
           RICHARD W. DALE, JR.,
17     taken on behalf of the Plaintiff
          on February 12, 2015.

18

19

20   REPORTER:  ERIN M. BRUCE, C.S.R., C.C.R.
  IL CSR No. 084-004263      MO CCR No. 850(G)

21

          Mueller Reporting, P.C.
22          P. O. Box 509
      Edwardsville, Illinois 62025
23    (618) 692-9890   Fax:  (618) 692-9891
          mrpc@att.net

24

```
 1                 A P P E A R A N C E S
 2   On Behalf of the Plaintiff:
 3              Kuehn, Beasley & Young, P.C.
                By:  Mr. Jarrod P. Beasley
 4              23 Public Square, Ste. 450
                Belleville, Illinois 62220
 5              (618) 277-7260
 6
     On Behalf of the Defendant the Village of Buckner,
 7   Illinois:
 8              Bleyer & Bleyer
                By:  Mr. Joseph A. Bleyer
 9              P.O. Box 487
                Marion, Illinois 62959
10              (618) 997-1331
                jableyer@bleyerlaw.com
11
12   On Behalf of the Defendant William McKinney:
13              Pierce Law Firm, P.C.
                By:  Mr. Charles A. Pierce
14              #3 Executive Woods Court, Suite 200
                Belleville, Illinois 62226
15              (618) 277-5599
16
     On Behalf of the Defendants the City of Christopher,
17   Illinois, and Officer Richie Dale:
18              Black, Hedin, Ballard, McDonald, P.C.
                By:  Mr. Jerome E. McDonald
19              108 S. Ninth Street
                P.O. Box 4007
20              Mt. Vernon, Illinois 62864
                jmcdonald@illinoisfirm.com
21
22
23
24
```

1                    I N D E X

2   Examination by Mr. Beasley . . . . . . . . Page 4

3

4             E X H I B I T S   I N D E X

5   Plaintiff's                              Page

6    Exhibit                              1st Ref.

7     A    Christopher Police Department

           Incident/Offense Report            36

8

      B    Narrative Supplement               46

9

10  (Exhibits attached to transcript.)

11

12

13           * * * * * * * * * * * *

14           IT IS STIPULATED AND AGREED by and between

15  counsel for Plaintiff and counsel for Defendants that

16  the deposition of RICHARD W. DALE, JR., may be taken

17  pursuant to the Federal Rules of Civil Procedure by

18  and on behalf of the Plaintiff on February 12, 2015,

19  at Bleyer & Bleyer, 601 W. Jackson Street, in the City

20  of Marion, State of Illinois, before Erin M. Bruce,

21  RPR, a Notary Public and Certified Shorthand Reporter

22  within and for the County of Madison, State of

23  Illinois, and Certified Court Reporter within and for

24  the State of Missouri; that the issuance of notice is

1   waived and that this deposition may be taken with the

2   same force and effect as if all Federal Rules had been

3   complied with.

4           IT IS FURTHER STIPULATED AND AGREED that any

5    and all objections to all or any part of this

6    deposition are hereby reserved, except as to form of

7    the question, and may be raised on the trial of this

8    cause; and that the signature of the deponent is

9    waived.

10          * * * * * * * * * * * *

11  (On the record at 9:07 a.m.)

12          RICHARD W. DALE, JR.,

13  produced, sworn and examined on behalf of the

14  Plaintiff, deposes and says as follows:

15               EXAMINATION

16       BY MR. BEASLEY:

17    Q.  **Can you please state your name for the**

18  **record.**

19    A.  Richard William Dale, Jr.

20    Q.  **Mr. Dale, have you ever had your deposition**

21  **taken?**

22    A.  Yes.

23    Q.  **When?**

24    A.  You talking about this case or in general?

1      Q.   Have you ever had your deposition taken,

2   ever?

3      A.   Yeah, in a court of law several times.

4      Q.   Okay.

5           MR. MCDONALD:  We're talking a deposition,

6   like where you're with a court reporter in this type

7   of scenario.

8           THE WITNESS:  No, not this type of scenario,

9   no.

10          BY MR. BEASLEY:

11     Q.   Have you ever been sued before?

12     A.   No.

13     Q.   All right.  There's a couple of rules that

14  we need to follow.  You can see she takes down

15  everything I say.  She's going to take down everything

16  you say.  She's going to take down everything

17  everybody in the room says.  She's going to put it

18  together into a little booklet.  In order for that to

19  be legible to us, there are a couple of rules to

20  follow.  First of all, she can't take down two people

21  talking at once.  So sometimes you may be able to

22  anticipate the end of my question, try and wait for it

23  to end before you start your answer, and I'll try and

24  do the same, okay?

1      A.    Okay.

2      Q.    Head shakes and head bobs are okay as long

3    as they're accompanied by words.  If you say unh-unh

4    or uh-huh, I'll ask you to clarify.  I'm not trying to

5    be rude.  I'm just trying to get it right for the

6    record, okay?

7      A.    Okay.

8      Q.    If I gave you this pen and asked you to

9    write down uh-huh and unh-unh, they would look

10    remarkably similar in print, so that's why I'm doing

11    that.

12              The next thing is that if you need a

13    break for whatever reason, let us know.  This is --

14    this is not supposed to be an arduous task.  It's

15    basically to gather information.  So if for whatever

16    reason you need a break, let us know, and we'll

17    accommodate that.

18              Last thing, you are sworn in much like

19    you would be in a courtroom.  So if I ask you a

20    question and you don't understand it, ask me to

21    rephrase it and I'll do that.  If you answer a

22    question, I'll assume that you understood it.  Is that

23    fair?

24      A.    That's fair.

1     Q.   What's your highest level of education?

2     A.   Associate's degree.

3     Q.   Where?

4     A.   Rend Lake College.

5     Q.   When did you get that?

6     A.   2012.

7     Q.   What was the associate's degree in?

8     A.   Information technology.

9     Q.   How old are you?

10    A.   Thirty-nine.

11    Q.   Date of birth?

12    A.   12-9 of 1975.

13    Q.   You are wearing your uniform right now.  Are

14 you currently employed?

15    A.   Yes.

16    Q.   Where?

17    A.   City of Zeigler.

18    Q.   What is your position?

19    A.   Interim police chief.

20    Q.   How long have you had that?

21    A.   Seven months for the interim police chief.

22 I've been employed for over 14 years.

23    Q.   You've been employed with Zeigler for 14

24 years?

1     A.   Yes.

2     Q.   **Prior to interim police chief, what was your**

3 **position?**

4     A.   Lieutenant.

5     Q.   **How long did you hold that position?**

6     A.   Eight years.

7     Q.   **When this incident with Barnhart occurred,**

8 **you were a lieutenant with the Zeigler Police**

9 **Department?**

10    A.   No, I was working my other job at the City

11 of Christopher part time.

12    Q.   **I understand that.  I'm just -- that was**

13 **also your position at Zeigler at the time?**

14    A.   Yes.

15    Q.   **And prior to being lieutenant at Zeigler,**

16 **what was your position?**

17    A.   Patrol officer.

18    Q.   **And is that how you got hired in?**

19    A.   Yes.

20    Q.   **Did you go to the police academy?**

21    A.   Yes, I did.

22    Q.   **Where?**

23    A.   I went through MT-15 with Mike Norrington

24 over in Herrin, Illinois, part-time police academy.

1       Q.   Say that again so she can understand it

2    because I sure didn't.  MT --

3       A.   I went to Mobile Training Unit 15, Herrin,

4    Illinois, part-time police academy, 400 hours, and

5    then I attended the 80-hour transition at the Police

6    Training Institute in Champaign, Illinois.

7       Q.   When did you do the transition?

8       A.   2003.

9       Q.   When did you do the part-time?

10      A.   2001 to 2002.

11      Q.   And we're just talking about Zeigler here

12   now.  I know that you had another job at the time, but

13   I want to specifically focus on Zeigler for now.  Had

14   you ever been -- in your time at Zeigler, have you

15   ever been disciplined by the department?

16      A.   No.

17      Q.   Any letters of reprimand?

18      A.   No.

19      Q.   You were working for Christopher at the time

20   of this incident; is that right?

21      A.   Yes.

22      Q.   How long -- are you still working there?

23      A.   Yes, I'm on their roster, yes.

24      Q.   And what was your job title in -- what was

1    this -- 2013?

2         A.   Yes, part-time policeman, part-time police

3    officer.

4         Q.   Now, in your capacity as part-time police

5    officer, what were your responsibilities?

6         A.   Provide law enforcement services for the

7    City of Christopher within the corporate limits and

8    assist other communities on a needed basis, also

9    assist the public and enforce the state and local --

10   state laws and local ordinances.

11        Q.   You were working full time at Zeigler during

12   this time?

13        A.   Yes.

14        Q.   As lieutenant?

15        A.   Yes.

16        Q.   Full-time job, forty hours a week?

17        A.   Yes.

18        Q.   How many hours a week were you working at

19   Christopher in your part-time capacity?

20        A.   Eight.

21        Q.   When you say eight, is that the maximum you

22   ever worked at Christopher?

23        A.   No, I've worked sometimes as much as twenty

24   hours a week, but it was the average of eight hours a

1   week was all I was working at the time.

2       **Q.   How long have you been working part time at**

3  **Christopher?**

4       A.   Ten years.

5       **Q.   So 2005?**

6       A.   '03 to '13.

7       **Q.   Okay.  2003, and you said to 2013, but**

8  **you're still --**

9       A.   Well, I'm still actually on the roster.  I

10  just haven't worked since '13.

11       **Q.   And why haven't you done any work since**

12  **2013?**

13       A.   They hired some more part-time officers to

14  fill the shifts, and I was pretty tied up with my

15  current job being the supervisor.  I was doing it just

16  to help them out.

17       **Q.   When did you stop working for Christopher?**

18  **Do you remember the month?**

19       A.   About three months after the incident.

20       **Q.   And when you say the incident, you're**

21  **talking about the incident with Roy Barnhart, Sr.?**

22       A.   Yes.

23       **Q.   While at Christopher, were you ever**

24  **disciplined by the department?**

1    A.    No.

2    Q.    **Any letters of reprimand?**

3    A.    No.

4    Q.    **You know Bill McKinney?**

5    A.    Yes.

6    Q.    **How long have you known Bill McKinney?**

7    A.    Fourteen years.

8    Q.    **Do you remember how you came to know Bill**

9    **McKinney?**

10   A.    I actually started working with him at

11   Zeigler.

12   Q.    **How would you characterize your relationship**

13   **with Bill McKinney up until 2013?**

14   A.    Good friends and we also were good patrol

15   partners.

16   Q.    **When you say friends, you hung out**

17   **socially?**

18   A.    No, we didn't hang out socially.  We just

19   hung out during work hours.  He had a family and so

20   did I.

21   Q.    **Are you married?**

22   A.    No.

23   Q.    **Children?**

24   A.    No.

1     Q.   You said you had a family?

2     A.   I hang out with my brothers and sisters and

3 mom and dad and all that.

4     **Q.   Okay.  When Bill McKinney was at -- when you**

5 **worked with Bill McKinney at Zeigler, did you ever**

6 **know him to be disciplined by the department?**

7     A.   He was disciplined once by the department a

8 long time ago, but I don't know the specifics of the

9 incident.

10     **Q.   Did it involve the use of his Taser?**

11     A.   No.

12     **Q.   Did it involve the use of pepper spray?**

13     A.   Yes.

14     **Q.   Does that refresh your recollection as to**

15 **what it involved?**

16     A.   As I recall, it was an incident involving

17 pepper-spraying a dog or something like that.

18     **Q.   Okay, pepper-spraying a dog.  There's**

19 **something in his records about pepper-spraying a cat.**

20 **Does that --**

21     A.   Maybe that's what it was because I really

22 don't remember.  It's been a long time ago.

23     **Q.   Do you remember as far as you know while you**

24 **were at Zeigler -- and Zeigler is not a big**

1    department, is it?

2        A.   No.

3        Q.   How many folks work there now?

4        A.   Right now, three full time and five part

5    time.

6        Q.   All right.  And at the time you were working

7    with Bill during these, I don't know, 13, 14 years --

8    or I guess it would be closer to ten years, you worked

9    with Bill over at Zeigler?

10       A.   Bill and I, when I worked with him was only

11   for the first three years, and then he resigned to

12   take other employment interests.  I --

13       Q.   When you say -- I'm sorry.  Did I interrupt

14   you?

15       A.   I was going to say in that three years, I

16   was part time, he was full time.  I mainly worked on

17   the weekends with him.

18       Q.   Do you know, when you say he left to pursue

19   other interests, do you know -- did you have a

20   conversation with him about why he left?

21       A.   Well, he just left because he wanted to --

22   he was doing heating and air, and he made more money

23   doing that.

24       Q.   Anybody ever make any complaints to you at

1   Zeigler about Bill McKinney?

2       A.   No.

3       Q.   Did you ever hear of an incident involving

4   him shooting a dog?

5       A.   I heard the incident, yeah, but I wasn't

6   there at the time.

7       Q.   And as far as any discipline, you weren't

8   aware of that?

9       A.   No.

10      Q.   Bill ever tell you he was ordered to go to

11  additional -- I'm sorry.  Strike that.

12           Bill ever tell you he was ordered to go

13  to anger management classes?

14      A.   No.

15      Q.   And because he didn't tell you that, I don't

16  imagine if he ever told you if he ever completed them,

17  right?

18      A.   No, he never told me anything.

19      Q.   Have you ever been ordered by any department

20  to attend additional training?

21      A.   No.

22      Q.   Anger management classes?

23      A.   No.

24      Q.   You guys do continuing education?

1      A.    As in like training classes, yes.

2      Q.    Okay.  Who put -- do you guys have a -- like

3   in St. Clair County, they go to a place called

4   S.I.L.E.C. who does a lot of their training.  Do you

5   guys have a similar type place?

6      A.    Yeah, it's Mobile Training Unit 15.  We go

7   through them.

8      Q.    Do they provide training on pepper spray?

9      A.    Yes.

10     Q.    Tasers?

11     A.    Yes.

12     Q.    And you get recertified in each of those

13  every year?

14     A.    We get recertified in Tasers every year, not

15  pepper spray.

16     Q.    Pepper spray, how often do you get

17  recertified?

18     A.    I haven't -- actually, there is no

19  recertification, to my knowledge, with pepper spray,

20  but I don't even use pepper spray anymore.  I just use

21  a Taser if I have to.

22     Q.    Now, let's talk about the Taser you have.

23  You are certified --

24     A.    Yes.

1    Q.   -- in using the Taser?

2    A.   Yes.

3    Q.   Who provided you with that certification?

4    A.   The initial training was Mobile Training

5    Unit 15, but our recerts are done by Officer Andrew

6    Trogolo with the Christopher Department who is a

7    licensed Taser instructor.

8    Q.   And in 2013 when this incident occurred,

9    your Taser certification was up to date?

10   A.   Yes.

11   Q.   And current?

12   A.   Yes.

13   Q.   What did the training to be certified in

14   using a Taser, what did that consist of?

15   A.   The initial training or the recert?

16   Q.   The initial training.

17   A.   The initial training was a cardboard cutout

18   of like those shooting silhouettes demonstrating a man

19   standing there, noncompliance, and then we also had

20   two people one-on-one showing them how to use

21   compliance with drive stunning where you take the

22   Taser and put it in their leg to make them comply if

23   they're resisting arrest, and then you fire two

24   cartridges for familiarization into the cardboard

1    cutout and also a written exam of a hundred

2    questions.

3         Q.    **Do you get tased?**

4         A.    Yeah, the initial one you do, yeah.

5         Q.    **How's that?**

6         A.    Horrible.

7         Q.    **Okay.  The recertification that happens**

8    **every year, what's that entail?**

9         A.    That's just refiring the two cartridges,

10   taking the written exam and being tased again.

11        Q.    **Every year you get tased?**

12        A.    Yes.

13        Q.    **Do they run the full 5-second cycle on**

14   **you?**

15        A.    I have, yes, but, like I said, it's

16   optional.  You don't have to do it, but I do it just

17   because I figure if I'm going to use the Taser, I'm

18   going to be tased by it.

19        Q.    **So you get an option.  What is your**

20   **option?**

21        A.    Either not to be tased or to be tased.

22        Q.    **And you have exercised your option to be**

23   **tased every year?**

24        A.    Well, not every year, but I've been tased

1    just about every time I've done it, yes.  I couldn't

2    recall exactly what year I didn't do it, but it's been

3    every year since '06.

4        Q.   **What Taser do you carry?**

5        A.   I now carry the X2 Taser, which is a

6    two-shot.  Before that, I carried the X26, which was

7    the one shot.

8        Q.   **At the time of this incident, you were**

9    **carrying the X26?**

10       A.   Yes.

11       Q.   **And that's a one-shot Taser; and when you**

12   **say one shot, that means the prongs deploy one time,**

13   **right?**

14       A.   That is correct.

15       Q.   **When they deploy, confetti come out?**

16       A.   It's not confetti.  It's little tags with

17   license numbers on them.

18       Q.   **I mean, it's small pieces of paper, right?**

19       A.   More or less, yes.

20       Q.   **No camera on the X26?**

21       A.   No.

22       Q.   **Any camera in your squad car?**

23       A.   No, I didn't have one.

24       Q.   **Any button cam?**

1      A.   No.

2      **Q.   Do you wear a button camera?**

3      A.   I do now.

4      **Q.   Did you beforehand?**

5      A.   No, we didn't have them.

6      **Q.   Somebody said that you -- it was your**

7 **practice to wear a button cam when they spoke --**

8      A.   They thought I might have wore one of those

9 little ones that Galls has for like 80 bucks.  I tried

10 that once, but the thing broke, like, within three

11 days, and I never wore one since.

12      **Q.   So that's where they would have gotten that**

13 **information?**

14      A.   Yes, and that would have been Dennis Estes

15 who said that.

16      **Q.   And you bought that yourself?**

17      A.   Yeah.

18      **Q.   When did you buy it; do you remember?**

19      A.   I don't remember.  It was a long time ago.

20      **Q.   Before 2013?**

21      A.   Yes.

22      **Q.   So it was not functioning at the time of**

23 **this incident?**

24      A.   No, it was in the trash, gone.

1     Q.  Let's talk about the Taser again for a

2  minute.  What's the range on the Taser?

3     A.  The -- I'm not a Taser instructor, but I do

4  know the cartridges are the range.  One is like 15

5  feet, one is 25 feet, and I believe one is 35 feet.

6     Q.  Whose Taser was the X26?  What department?

7     A.  Christopher's, and it's not the Taser that's

8  the distance.  It's the cartridges.

9     Q.  I got you.  So it was Christopher's Taser,

10  and is that something that you would turn in after

11  every shift?

12     A.  Yes.

13     Q.  Put it back on the charger?

14     A.  It's actually got its own battery.  We just

15  put it inside of the lockbox, and the next shift picks

16  it up.

17     Q.  What was the range on the Taser cartridge

18  that you had that day?

19     A.  I don't know.  I think it was 25.

20     Q.  Well, did they have different Taser

21  cartridges that you could pick up?

22     A.  They have the tan one, which is the

23  tan-colored one, and they have the green one.  That's

24  how you know the distance is by the color of the

1    cartridge, and I think it was green, so that would be

2    the 25-footer.  I can't recall, though, because I

3    never really looked at the color of it, because those

4    are mainly used more along the lines of, like, longer

5    distances.

6           Q.   Okay.

7           A.   But I'm a hundred percent sure it wasn't the

8    35-footer because those are orange, and we don't have

9    those.

10          Q.   So the only two you do have is the 15 and

11   the 25?

12          A.   Yes.

13          Q.   So we can be sure of one thing, it was

14   either 15 or 25?

15          A.   Yes.

16          Q.   And once the prongs deploy, the X26 is a

17   5-second cycle?

18          A.   Yes.

19          Q.   You fire it, it automatically puts out

20   electricity for 5 seconds?

21          A.   Yes.

22          Q.   You don't have to do anything additional is

23   what I'm saying?

24          A.   No, just one trigger pull.

1     Q.   And once that is complete, once that cycle

2  has run its course, the Taser prongs are still in the

3  person, it's possible to fire the Taser again,

4  right?

5     A.   Deploy it, yes.

6     Q.   Basically, recirculate the electricity?

7     A.   Yes, if you're being noncompliant.

8     Q.   And if you pull that trigger again, it's

9  another 5-second cycle?

10    A.   Yes, unless you shut it off with your

11  finger.  There's a safety.

12    Q.   So there is a safety on the X26?

13    A.   Yeah, you can stop the 5-second discharge

14  midway if you want to just by turning it off.

15    Q.   And when you do that, does the Taser keep a

16  record?

17    A.   Yes.

18    Q.   And it is capable of being downloaded onto a

19  computer?  Is that your understanding?

20    A.   Yes.

21    Q.   So let's talk specifically about this

22  incident.  You deployed the charger or circulated the

23  electricity twice on Roy Barnhart, Sr., right?

24    A.   I deployed it the first time 5 seconds.  The

1   second time, I shut it off midway, which would have

2   been 2.5 to 3 seconds.

3       Q.   You have given a statement to the Illinois

4   State Police in this case, right?

5       A.   Yes.

6       Q.   You went out, gave them a walk-through of

7   the scene?

8       A.   Yes.

9       Q.   You filled out a police report in this

10  case?

11      A.   Yes, I did.

12      Q.   Filled out a supplemental police report in

13  this case?

14      A.   Yes.

15      Q.   Have you ever, in any of those things,

16  mentioned that you stopped the second cycle short?

17      A.   Yes.

18      Q.   Okay.  Who did you tell that to?

19      A.   I told that to the investigators.

20      Q.   And when you say investigators,

21  investigators for the Illinois State Police?

22      A.   Yeah, Aaron Cooper, and I can't remember the

23  female's name, but I was recorded saying that.

24      Q.   Let's talk about your training.  Since the

1    academy, have you been trained in the use of force at

2    Christopher Police Department?

3         A.   I've been trained in the use of force with

4    the Zeigler Police Department using refreshers from

5    time to time, yes.

6         Q.   That would be through Zeigler, not through

7    Christopher?

8         A.   Yes.

9         Q.   To your knowledge -- well, strike that.

10              Are there policies and procedures at

11   the Zeigler Police Department?

12        A.   Yes.

13        Q.   And are there also policies and procedures

14   at the Christopher Police Department?

15        A.   Yes.

16        Q.   Are they written at the Christopher Police

17   Department?

18        A.   Yes.

19        Q.   Are they written at the Zeigler Police

20   Department?

21        A.   Yes.

22        Q.   And when you are employed at the Zeigler

23   Police Department, do they hand you those policies and

24   procedures like in a booklet form and say, here you

1    go, here are the rules?

2         A.    There is a book that we actually read, and

3    then we just sign it saying we read it.

4         Q.    All right.  So somewhere there is a document

5    at Zeigler that you've signed that says I read through

6    the policies and procedures?

7         A.    Yes, from 12, 13 years ago.

8         Q.    All right.  Once you sign that, are you then

9    tested on that material?

10        A.    No.

11        Q.    Is there any refresher course on that

12   material?

13        A.    The refresher course was through Mobile

14   Training Unit 15, and the last time I did a refresher

15   and I believe -- not a hundred percent positive

16   because it's been a while, but 2008.

17             MR. MCDONALD:  Are you speaking specifically

18   on use of force?

19             THE WITNESS:  Yes.

20             BY MR. BEASLEY:

21        Q.    Now, when they train you with regard to the

22   use of force in 2008, they're not training you with

23   regard to specifically Zeigler's policies and

24   procedures?  They're training you in general police

1    practice; is that fair?

2        A.   Yes.

3        Q.   How about Christopher, do they ever hand you

4    a similar packet with policies and procedures and have

5    you sign for it?

6        A.   I didn't sign for anything, but I did read

7    it.

8        Q.   And when you read it, they don't make you

9    sign for it, but is there a test that goes with it to

10   make sure that you read it?

11       A.   No.

12       Q.   They just take you at your word?

13       A.   Yes.

14       Q.   When did you read the Christopher policies

15   and procedures?

16       A.   Well, when I first got hired in '03, and

17   after Taser training when they wrote the Taser -- not

18   the Taser policy, but use of force policy update, I

19   read it since then, so 2008, '9 time frame.

20       Q.   Talk to me about the use of force update.

21   You're talking about 2008, 2009.  What was updated?

22       A.   Well, they implemented putting the Taser

23   within the use of force.

24       Q.   And you're familiar with the use of force

1   policy for Christopher, the Christopher Police

2   Department?

3      A.   I've read it, yes.

4      Q.   In your opinion that night, how would you

5   characterize -- would you characterize Roy Barnhart as

6   resisting arrest?

7      A.   Yes.

8      Q.   Would you characterize that resistance as

9   passive or active?

10     A.   Active.

11     Q.   Why do you say active?

12     A.   Because -- well, passive at first, then

13   active when he shoved me and then took off running.

14   That would be passive; active when he shoved me.

15     Q.   And because you deemed him to be an active

16   resister, are you then allowed to use force?

17     A.   Yes.

18     Q.   Tell us about the use of force that you

19   believe you're entitled to use at that point.

20     A.   The amount of force necessary to effect the

21   arrest.

22     Q.   Roy Barnhart, Sr., did you know him when you

23   showed up that day?

24     A.   I had never met him before.

1    Q.   He pulled up on a lawn mower, right?

2    A.   Yes.

3    Q.   Did he tell you why he pulled up on a lawn

4    mower?

5    A.   No.

6    Q.   Did it seem odd that he pulled up on a lawn

7    mower?

8    A.   Not uncommon around where I live.

9    Q.   He lived -- did you know where he lived?

10   A.   No.

11   Q.   Did anybody tell you that he just lived a

12   couple blocks away?

13   A.   No.

14   Q.   When you looked at Roy Barnhart, Sr., and

15   he -- he got off of the lawn mower, right?

16   A.   Yes.

17   Q.   When he got off the lawn mower, did he seem

18   like a particularly spry guy?

19   A.   He seemed like he was upset about

20   something.

21   Q.   Let me ask you this:  Did he seem like he

22   was in good health?

23   A.   No, he was -- well, I'm not a doctor, so I

24   don't really know, but, I mean, he was just mad about

1    something.

2         Q.   Well, I mean, was he -- he was able to walk,

3    right?

4         A.   Right.

5         Q.   Did he get off the mower with difficulty?

6         A.   No.

7         Q.   Did he have any trouble standing or

8    walking?

9         A.   No.

10        Q.   And you didn't get the impression that he

11   was drunk or under the influence of drugs, did you?

12        A.   No.

13        Q.   Did you have any -- before that moment that

14   he pulled up, you didn't know anything about his

15   health history or anything like that?

16        A.   No.

17        Q.   So whether or not he had ran a marathon the

18   weekend before or whether or not he was in the

19   hospital the weekend before, you can't tell us one way

20   or the other?

21        A.   That's right.

22        Q.   You're the Zeigler interim chief, right?

23        A.   Yes.

24        Q.   So if I send a subpoena over to Zeigler, you

1    would -- you know where the use of force policy and

2    the policies and procedures for Zeigler are, right?

3        A.    That is correct.

4        Q.    And your personnel file is also there,

5    correct?

6        A.    Correct.

7        Q.    When you deploy your Taser, is there a

8    report that needs to be filled out that accompanies

9    that?

10        A.    Yes, it's -- some departments just have you

11    do it on a regular narrative saying I used the Taser

12    for such and such, whatever incident.  Other

13    departments actually have a use of force sheet.

14        Q.    Is there a use of force sheet at

15    Christopher?

16        A.    Not to my knowledge.  They just write it in

17    the regular report.

18        Q.    Is there a use of force sheet at Zeigler?

19        A.    Yes.

20        Q.    You didn't fill out a use of force sheet,

21    right?

22        A.    No, I just filled out a report.

23        Q.    Let's go back to the day of the incident

24    here.  What day of the week was this?

1      A.    Sunday, I believe.

2      Q.    Now, if the week starts on a Monday and

3   Sunday is the last day of that week, how many hours

4   had you worked for Christopher that week?

5      A.    That was my first shift that week.

6      Q.    And how long was your shift supposed to

7   be?

8      A.    Three to eleven, eight hours.

9      Q.    Three in the afternoon till eleven at

10  night?

11     A.    Yes.

12     Q.    Had you worked for any other department that

13  day?

14     A.    No.

15     Q.    The night before, did you work for

16  Zeigler?

17     A.    Yes.

18     Q.    Do you remember what your shift was the day

19  before?

20     A.    Yeah, it was -- actually, no, I did not

21  work.  I worked Friday, and that was 7 P to -- no, 7 A

22  to 7 P, twelve hours.

23     Q.    Before you started your shift at Christopher

24  on July 7th -- does that sound right to you?

1     A.   Yes.

2     **Q.   On July 7th, what did you do that day?**

3     A.   You mean in general or --

4     **Q.   Take me back to when you woke up on July**

5 **7th.**

6     A.   I came to work, I clocked in and was

7 patrolling Christopher when the call came out.  I

8 don't remember what -- it was one of those slow

9 Sundays.  There wasn't much going on.

10    **Q.   You say you woke up and went to work.  You**

11 **didn't start work until three o'clock, right?**

12    A.   I'm a late sleeper sometimes on my days

13 off.

14    **Q.   So that day, you recall you were sleeping**

15 **until a little before three o'clock?**

16    A.   Probably about noon, and then for those

17 three hours, sat at home, watched TV and got dressed

18 and came to work.

19    **Q.   All right.  So you start your shift.  Is**

20 **there a place to clock in?**

21    A.   Yes, at the police department.

22    **Q.   Did you do that?**

23    A.   Yes.

24    **Q.   They provide you with a patrol vehicle?**

1    A.   Yes.

2    Q.   It's not your personal vehicle, right?

3    A.   No.

4    Q.   You get in the vehicle.  What do you do?

5    A.   You call dispatch that you're on duty, on

6  the radio, and then you start patrolling.

7    Q.   Do you know the Taser at issue in this case,

8  do you know if it was ever tested?

9    A.   I don't know.

10    Q.   Anybody ever tell you that it was?

11    A.   As in tested for functionality, or are you

12  talking about --

13    Q.   Downloaded to --

14    A.   Oh, yes, I do know that.

15    Q.   Okay.  Do you know what the testing

16  revealed?

17    A.   No, I don't.

18    Q.   How many Tasers did Christopher have?

19    A.   I'm not sure.  I think five maybe.

20    Q.   All right.  So you're in your car.  You're

21  patrolling Christopher.  Anything of note that happens

22  that day before this call comes in?

23    A.   None that I can recall.

24    Q.   In your capacity as a police officer, you've

1    been trained in how to write reports, right?

2        A.   Yes.

3        Q.   Tell us -- I've never been to the police

4    academy.  Tell me how you're trained to write reports.

5        A.   Pretty much the who, what, when, where, why

6    and how.

7        Q.   So the five -- what we call the five W's?

8        A.   Yes.

9        Q.   All right?

10           MR. PIERCE:  Is H a W?

11           MR. MCDONALD:  It's got one at the end.

12           MR. PIERCE:  Okay.  I just wanted to

13    clarify.

14    (Discussion off the record.)

15           BY MR. BEASLEY:

16        Q.   All right.  So the who, what?

17        A.   When, where, why and how, with the W.

18        Q.   Perfect.  So you do all of those things.

19    What else -- I mean, is there any other specific --

20        A.   Okay.  You ascertain if there is a victim

21    and a suspect; and if there is, you take statements

22    from all the involved parties; and depending on what

23    kind of case you have is depending on what kind of

24    action you need to proceed with; such as, is it a

1  domestic disturbance, you would proceed with trying to

2  find a suspect of the domestic and the victim and

3  interviewing the people involved, and then going from

4  there if they want to sign a complaint and make an

5  arrest.

6      Q.   **You want to take down all of the significant**

7  **events that happened while you're on the scene,**

8  **right?**

9      A.   You want to eliminate hearsay and try to get

10  the facts.

11      Q.   **The facts?**

12      A.   Yes.

13      Q.   **Fair enough.**

14          **You wrote a report in this case for the**

15  **Christopher Police Department, and I'm going to show**

16  **that to you and ask you if, in fact, this is the**

17  **report you did.**

18  **(Plaintiff's Exhibit A marked for**

19                  **identification.)**

20          **BY MR. BEASLEY:**

21      Q.   **Take a look at that, and tell me if that is**

22  **your police report.**

23      A.   That is my police report.

24      Q.   **All right.  Now, at the top, it says**

1    Christopher Police Department, 208 North Thomas

2    Street, Christopher, Illinois 62822.  That's who you

3    did that for?

4         A.   Yes.

5         Q.   When did you do this report?

6         A.   Immediately after the incident.

7         Q.   Now, when you say immediately after, is

8    that -- immediate to people means different things.

9    Is this five minutes after in your police car or

10   thirty minutes after when you get back to the

11   station?

12        A.   Within one hour.

13        Q.   Within one hour.  Where'd you do it?

14        A.   The Christopher Police Department.

15        Q.   Did you do it on a computer?

16        A.   Yes.

17        Q.   Do you have to submit this to somebody?

18        A.   Yes.

19        Q.   Okay.  Who do you submit it to?

20        A.   The State's Attorney.

21        Q.   You don't submit it to a superior officer?

22        A.   Not at Christopher or Zeigler because I've

23   been doing it long enough, they trust my paperwork.

24        Q.   Okay.  So this goes directly to the State's

1    Attorney's Office?

2        A.    Yes.

3        Q.    And how do you get it to the State's

4    Attorney's Office?

5        A.    Hand carry it.

6        Q.    Okay.  Did you take this to the -- Exhibit A

7    to the State's Attorney's Office the following day?

8        A.    I did not take it to the State's Attorney's

9    Office the following day.  I believe I took it there,

10   to the sheriff's office, which is the State's Attorney

11   box, that night, but I'm not 100 percent positive

12   because I really cannot remember.

13       Q.    Sheriff department, State's Attorney has a

14   box there?  Like a mailbox there?

15       A.    Yeah, it's a mailbox there on their dispatch

16   center for the SA to get his paperwork for any arrests

17   that are made.

18       Q.    At the sheriff's department, is that also

19   the central -- or the Cen Com or whatever?

20       A.    Actually, we have our own dispatch center.

21       Q.    Okay.  But is that the dispatch center

22   there?

23       A.    They have one, but we have our own in

24   Christopher.

1    Q.   All right.  You have your own in

2  Christopher?

3    A.   That would be West Franklin County Central

4  Dispatch.

5    Q.   I can't remember the girl's name.

6    A.   Lacy Jones.

7    Q.   There you go, I found it, Lacy Jones.  So

8  Lacy Jones works for who?

9    A.   She formerly worked for Central at the

10  time.

11    Q.   But she doesn't anymore?

12    A.   No.

13    Q.   Where'd she go?

14    A.   I have no idea.  She's living down the road,

15  but she was -- I don't know if she was terminated or

16  resigned, but I know she's no longer there.

17    Q.   You don't know the circumstances of her

18  leaving?

19    A.   No.

20    Q.   Not your job?

21    A.   Exactly.

22    Q.   Perfect.  When she's working for dispatch, I

23  guess, Franklin County Dispatch?  Is that what you

24  called it?

1          A.    West Franklin County Central Dispatch.

2          Q.    **West Franklin County Central Dispatch, where**

3    **is her office?**

4          A.    It would be in the dispatch center at 218

5    West Market Street in Christopher.

6          Q.    **218 West Market, Christopher, but the --**

7    **where is the Christopher Police Department in**

8    **relationship to that?**

9          A.    One block south -- sorry.  One block

10   north.

11         Q.    **Now, you did your report at the police**

12   **station, right?**

13         A.    Yes.  It's through inner badge, which is the

14   cloud server through Central Dispatch.

15         Q.    **So you could do it there as well?**

16         A.    I can do it at Central.  I can do it at the

17   police station.  I could do it at home if I wanted to

18   because I have access to it.

19         Q.    **And once you complete it, is there a button**

20   **you hit that uploads it to the cloud?**

21         A.    You just hit "okay," and it saves it

22   immediately.

23         Q.    **And once it's saved on the cloud or on the**

24   **server, wherever it's saved, can anyone go in and**