1    alter the document?

2       A.   No.  Only the chief of police had access to

3    that.

4       Q.   Who was the chief at the time?

5       A.   Bill Southerd.

6       Q.   Have you talked to Bill about this?

7       A.   I have, yes.

8       Q.   Bill ever tell you that he had to change

9    things in your police report?

10      A.   No.

11      Q.   You didn't change anything in your police

12    report after you submitted it that night within one

13    hour after the incident, right?

14      A.   No.

15      Q.   Did you read -- or have you talked to Lacy

16    Jones about this incident?

17      A.   No.

18      Q.   Did you see her interview with the Illinois

19    State Police?

20      A.   No.

21      Q.   Did anybody ever tell you what she told

22    them?

23      A.   No.

24      Q.   Did you go over to the West Franklin Central

1    communications center in Christopher that evening?

2       A.   Yes, I did.

3       Q.   And when you were there, was Officer

4    McKinney there?

5       A.   Yeah, he was.

6       Q.   Was Cole Smillie there?

7       A.   I don't recall Cole Smillie being there.

8       Q.   Was Ben Burkhamer there?

9       A.   Not to my knowledge, no.

10      Q.   Did you have any conversations that evening

11    in a break room at Central Dispatch involving Roy

12    Barnhart and that incident?

13      A.   Yes.

14      Q.   Who do you remember being there?

15      A.   Bill was there for sure.  It was just him

16    and me talking for a few minutes.

17      Q.   As far as you -- I mean, if you can take a

18    snapshot of that moment, as far as you know, at that

19    point it was just you and McKinney?

20      A.   For that period of time, yes, plus, Lacy

21    Jones being up front.

22      Q.   Door open or closed?

23      A.   Open.

24      Q.   And at some point during that conversation,

1    did anyone else come there?

2         A.    There might have been somebody, but I cannot

3    recall.

4         Q.    **Lacy Jones said that she overheard one of**

5    **the officers in that room state that Barnhart was**

6    **tased once but stupid enough to get up so he was tased**

7    **again?**

8         A.    Uh-huh.

9         Q.    **Do you recall making that statement?**

10        A.    I did not make that statement.

11        Q.    **Did Bill McKinney make that statement?**

12        A.    No.

13        Q.    **Did Barnhart get up after he was tased**

14   **once?**

15        A.    No.

16        Q.    **Then another officer, presumably not the**

17   **same one, since it says then another officer stated**

18   **that McKinney took care of the situation and drug**

19   **Barnhart across the lawn.  Do you remember saying**

20   **that?**

21        A.    No.

22        Q.    **Is it possible that you said that?**

23        A.    No, I didn't say it.

24        Q.    **Did Bill say that?**

1    A.  No.

2    **Q.  Did anybody in that room say either one of**

3  **those statements?**

4    A.  I never heard any of those statements when I

5  was in there.

6    **Q.  Did you ever hear McKinney having a**

7  **conversation with Lacy Jones that night?**

8    A.  No.  Like I said, I wasn't there that long.

9  It was like maybe five, ten minutes, tops, and then I

10  left.

11    **Q.  Had McKinney written his report yet?**

12    A.  He was in the process of writing it.

13    **Q.  How was he writing it?**

14    A.  I think he was doing it handwritten.

15    **Q.  Is there a table in that break room?**

16    A.  Yeah, there is.

17    **Q.  So he's sitting there with, what, a pad of**

18  **paper?**

19    A.  No, he had like a -- it looked like a --

20  maybe it was a pad of paper or some kind of sheet for

21  like an incident, voluntary statement type thing.  I

22  think that's what it was.

23    **Q.  So McKinney is handwriting his report --**

24    A.  Yes.

1     Q.   -- at the time you get there?

2           Is that before or after you wrote your

3 report?

4     A.   He was actually in the process of writing it

5 when I walked in.

6     Q.   Was that before or after you wrote yours?

7     A.   That was -- I had already written mine.

8     Q.   Did you bring a copy of it with you?

9     A.   I did have a copy of it, yes.

10    Q.   Did you let Bill read it?

11    A.   I let Bill look at it, yes.

12    Q.   And you let Bill look at it as he was

13 writing his report?

14    A.   He was writing his report as he was looking

15 at mine, yeah, but he didn't -- like I said, I told

16 him I charged Roy Barnhart with aggravated battery for

17 pushing me and that's what I was sending to the

18 State's Attorney, and he said okay, and he was writing

19 his incident for what happened on his side of it.

20    Q.   Now, when he's writing his report, he has a

21 copy of yours with him?

22    A.   To take to the State's Attorney.  Now,

23 actually, let me refresh that.  I was taking mine to

24 the State's Attorney, but the -- to my knowledge, he

1    wasn't actually plagiarizing my report to use it for

2    his.

3        Q.   I'm not suggesting he is.  I'm saying at the

4    point he's writing his report, he has your report and

5    he's writing his report?

6        A.   Yeah.

7        Q.   In Plaintiff's Exhibit A, which is your

8    initial report --

9        A.   Yes.

10       Q.   -- there's nothing in there about Bill

11   McKinney hitting Roy Barnhart, Sr., is there?

12       A.   No, that was the initial arrest report.

13       Q.   And that was written within an hour of the

14   incident?

15       A.   Yes.

16       Q.   You then wrote a narrative -- what's called

17   a narrative supplement, right?

18       A.   Yes, and I wrote that at the same time.

19       Q.   You wrote this at the same time?

20       A.   Yes, after that one.

21       Q.   Okay.  So then -- well, let's mark the

22   narrative supplement.

23   (Plaintiff's Exhibit B marked for

24                          identification.)

1        **BY MR. BEASLEY:**

2     **Q.  Now, when you write the narrative supplement**

3   **Exhibit B --**

4     A.  Uh-huh, yes.

5     **Q.  -- tell us when you wrote it.**

6     A.  I wrote it just directly after that

7   report.

8     **Q.  When you say directly after, what does that**

9   **mean?**

10    A.  Within two hours.

11    **Q.  Within two hours after that?  Before or**

12   **after you went to McKinney -- before or after you went**

13   **to the Central Dispatch?**

14    A.  I had written it before I'd seen Bill.  Are

15   you talking about when he was actually sitting there?

16   No, I wrote that before, but he had never actually

17   seen this one.  This one was for my chief and his

18   chief for the alleged incident that had occurred that

19   I had heard about.

20    **Q.  So you showed him Exhibit A?**

21    A.  Yeah, for the initial arrest.

22    **Q.  But not Exhibit B?**

23    A.  No.

24    **Q.  And it's your testimony that Exhibit B was**

1    completed before you met with Bill?

2        A.   Yes.

3        Q.   And Exhibit B was done, it looks to me at

4    least, like on the same computer program, right?

5        A.   Yes.

6        Q.   And it looks to me, as you were describing,

7    it's saved on the cloud or whatever, right?

8        A.   Yes.

9        Q.   So you hit okay and it's saved?

10       A.   Yes.

11       Q.   And it has the same incident number as

12   Plaintiff's Exhibit A, doesn't it?

13       A.   Yes.

14       Q.   I can show you if you would like to look.

15       A.   Same case number.

16       Q.   Same case number, same incident number?

17       A.   Correct.

18       Q.   So if I type in that incident number, I get

19   the documents -- I pull up the documents associated

20   with that incident number, right?

21       A.   That's correct.

22       Q.   So if I type that in, I pull up both Exhibit

23   A and Exhibit B, don't I?

24       A.   Yes.

1      Q.   When you went and met with the Illinois

2  State Police five days after this incident on --

3  7-12ish?

4      A.   Uh-huh.

5      Q.   7-12, does that sound right as to when you

6  gave your statement?

7      A.   I think so, yeah.

8      Q.   They had a copy of Plaintiff's Exhibit A,

9  didn't they?

10     A.   Yeah, they had B too.

11     Q.   You didn't hand them Exhibit B?

12     A.   I may have, but I thought they had B.

13     Q.   So your understanding is that they had

14  Exhibit B at the time they interviewed you?

15     A.   Let me rephrase that because my memory is

16  kind of shot at the moment, but no, you're right.  I

17  gave them B because I had actually wrote that up and

18  gave that to my police chief as an incident report in

19  case there was going to be any kind of -- someone

20  coming to file a complaint against whether it be me or

21  Bill in reference to the tasing or whatnot like that,

22  and I did that report just because of the allegations

23  that those firemen made, and I turned it over to the

24  chain of command.  Now, that being said, I do recall

1    they got that report.  Now, I can't remember -- I did

2    do that report that night, but I cannot remember

3    whether or not I gave that to them the day they

4    interviewed me or beforehand, but the police chief did

5    have access to it.

6    **Q.   There's a couple of questions here.**

7    **Plaintiff's Exhibit B, you just said you handwrote it.**

8    **You didn't handwrite it; you typed it?**

9    A.   No, I type it.

10    **Q.   Okay.  I understand, I understand.  It's an**

11    **easy thing to mix around.**

12    **Is it your understanding that the**

13    **Illinois State Police asked for your police reports --**

14    A.   Yes.

15    **Q.   -- relative to this Barnhart situation?**

16    A.   I know they asked for them and we gave them

17    everything we had.

18    **Q.   Do you know if you gave them Plaintiff's**

19    **Exhibit B?**

20    A.   I didn't give them anything.  They came in

21    and asked for stuff, and I believe the chief gave it

22    all to them.

23    **Q.   Do you know if the chief -- who is the chief**

24    **again?**

1    A.   Southerd, Bill Southerd.

2    **Q.   Do you know if the chief gave him Exhibit**

3    **B?**

4    A.   I think he did, but I don't know.  I know

5    somebody got it.

6    **Q.   You took a copy of it with you to the**

7    **interview, didn't you?**

8    A.   I believe so, yes.

9    (Discussion off the record.)

10    BY MR. BEASLEY:

11    **Q.   Did you ever -- do you remember talking to**

12    **the Illinois State Police?**

13    A.   Yes, I do.

14    **Q.   Okay.  And did you ever -- do you remember**

15    **ever telling them that you also wrote a supplemental**

16    **report which you needed to give to law enforcement?**

17    A.   Yeah, I do remember telling them that, but I

18    assumed they already had it because they already

19    talked to the chief of police, to my knowledge, prior

20    to me.

21    **Q.   So, and you can -- I don't know if you**

22    **understand my confusion or not.**

23    A.   Well, I understand what you're saying --

24    MR. BLEYER:  I don't.

1              THE WITNESS:  -- but I'm confused, too,

2    because I gave them information about the supplement

3    the day of the incident, not the state police, my

4    boss, and at that time that was Assistant Chief Scott

5    Davis, who is acting chief, but he is now deceased,

6    and I told them that I had done an incident just

7    because of the alleged allegations that I had not

8    actually witnessed, and I just had that on file; and

9    then when the state police showed up, I believe you

10   said the 12th, because I remember talking to, I think

11   her name was Alicia Barr maybe and then Aaron Cooper,

12   and that report was mentioned.  Now, I can't remember

13   whether or not it was me that gave it to them or not,

14   but I do remember the report was given to them.

15             BY MR. BEASLEY:

16        **Q.   You went to this -- you went to talk to the**

17   **Illinois State Police?**

18        A.   At the Christopher Police Department, yes.

19        **Q.   Who all was there that day?**

20        A.   I believe her name was Alicia Barr or

21   something like that, Aaron Cooper, myself and my

22   attorney, Rebecca Whittington.

23        **Q.   Rebecca Whittington is your personal**

24   **attorney?**

1     A.   She was representing me for the City.

2     **Q.   So did the City send her with you or did you**

3  **hire her?**

4     A.   It's the legal defense fund through Local

5  773.

6     **Q.   So you guys are unionized?**

7     A.   Yes.

8     **Q.   Pay your dues?**

9     A.   Oh, yes, and I will still continue to pay

10  them.

11     **Q.   Let's go back.  How do you become aware of**

12  **this incident on July 7th?**

13     A.   I was -- are you talking about the initial

14  call.

15     **Q.   Yep.**

16     A.   Okay.  I was dispatched to assist Buckner PD

17  for a fight in progress in front of Buckner city

18  hall.

19     **Q.   You were dispatched.  Is it unusual for you**

20  **to be dispatched to Buckner?**

21     A.   No.

22     **Q.   So you're dispatched.  What do you do?**

23     A.   I respond with lights and siren safely, of

24  course, as fast as I can but driving safely to

1    Buckner, which is 2 1/2 miles east of the City of

2    Christopher.  I arrive and see that the parties have

3    been separated, and I slow down -- well, actually, I

4    believe he radioed in that the parties have been

5    separated and people can slow down, so I shut the

6    lights off and just continued to respond based on what

7    he was saying just to provide routine assistance.

8         Q.   **When you say he, who are you talking**

9    **about?**

10        A.   William McKinney.

11        Q.   **All right.  Now, how long does it take for**

12   **you to get from Christopher to Buckner?  I'm not**

13   **familiar with it.**

14        A.   Just regular drive time?

15        Q.   **Sure.**

16        A.   Five minutes.

17        Q.   **Police drive time, less than that?**

18        A.   If you're responding, yeah.

19        Q.   **And in your reports, it says that they told**

20   **you there was a fight going on involving up to 15**

21   **subjects?**

22        A.   Yes.

23        Q.   **Where did that information come from?**

24        A.   That came from dispatch, and I guess the

1    woman on the phone was the one that told them that.

2         Q.   Do you know who the woman on the phone

3    was?

4         A.   No idea.

5         Q.   When you got there, there weren't 15 people

6    there, were there?

7         A.   No, there were probably actually six or

8    seven maybe.

9         Q.   And there wasn't an altercation in progress,

10   was there?

11        A.   No, there was just some heated arguments,

12   but nobody was fighting physically.

13        Q.   You park your car.  Where do you park your

14   car?

15        A.   Directly west of Buckner city hall right

16   there on the corner of the intersection there, and I

17   don't know what the names of the streets are.

18        Q.   What direction are you pointed?

19        A.   I'm pointed east.

20        Q.   All right.  You get out of the car

21   immediately?

22        A.   Yes.

23        Q.   When you get out of the car, first thing you

24   see, do you see Bill McKinney?

1    A.   Yes.

2    Q.   **What's Bill McKinney -- where's he?**

3    A.   He's in front of the city hall talking to a

4  male and female subject.

5    Q.   **You don't know them?**

6    A.   No, I don't.

7    Q.   **You know them now, right?**

8    A.   Amanda Curry and Richard Curry.  Does that

9  sound right?

10    Q.   **Amanda Barnhart and Rich Curry?**

11    A.   Amanda Barnhart, okay.

12    Q.   **Like I said, you're in the ballpark.  You're**

13  **fine.**

14    A.   Okay.

15    Q.   **And anybody else you see?**

16    A.   Some people sitting on the porch over there

17  at the house across the street, the Latham residence,

18  and then I think it was Louise Latham was her name I

19  found out later, she was standing across the street

20  from us watching us.

21    Q.   **How far away is the porch from where**

22  **McKinney is?**

23    A.   Probably five, ten yards.

24    Q.   **Five, 10 yards?**

1     A.   About 30, 40 feet.  Of course, I'm not a

2  math wizard.  I know there's 3 feet in a yard, but I'm

3  trying to think --

4     **Q.  No, no, I'm trying to think -- because it's**

5  **on the opposite side of the street, right?**

6     A.  Right, because you got city hall here, then

7  you got -- the street is pretty wide there in the

8  village and then you go across, there's the driveway,

9  the yard and then the house.  I would think 30 yards

10  between me and them.

11     **Q.  Thirty yards?**

12     A.  Yeah.

13     **Q.  Okay.  That makes -- because how long -- do**

14  **you know how wide an average road is?**

15     A.  No, I don't.

16     **Q.  Fifteen, 20 feet probably?**

17     A.  I'm not an engineer.

18     **Q.  Me either.**

19     MR. BLEYER:  I can tell.  Does street have a

20  W in it?

21     MR. BEASLEY:  Can I continue my examination?

22  (Discussion off the record.)

23     BY MR. BEASLEY:

24     **Q.  Officer Dale?**

1    A.   Sir.

2    **Q.   Welcome back.**

3    A.   Thank you.

4    **Q.   So the house is about -- the porch is about**

5    **30 yards away --**

6    A.   Give or take.

7    **Q.   -- from where McKinney is?**

8    A.   Yes, and McKinney was only 12 to 15 feet to

9    my right, which would have been to the east.

10    **Q.   Okay.  And what do you do?**

11    A.   I walk up to him and ask him what's going

12    on.

13    **Q.   What does he tell you?**

14    A.   He says there's a little disagreement over a

15    title for a trailer.

16    **Q.   All right.  What happens next?**

17    A.   After that -- and I could hear some people

18    across the street talking.  I don't know if they were

19    starting to get heated or whatever.  I decided the

20    best course of action was keep the peace between the

21    parties until we decided what's going on because

22    Amanda Barnhart was shouting across the street, and I

23    don't know who was yelling back, but somebody was, and

24    I decided just to keep them separated and we shouldn't

1    have a problem here.

2        Q.   **So Amanda Barnhart is yelling at the people**

3    **on the deck or the porch?**

4        A.   That direction.

5        Q.   **Okay.  At least yelling in that direction?**

6        A.   Yes.

7        Q.   **Do you know what she's saying?**

8        A.   I don't remember.  Something about this is

9    ours, I think, something like that.

10        Q.   **And are they responding back?**

11        A.   I could hear them yelling, yeah, but I don't

12    remember what they were saying.  Like I said, it was

13    just a bunch of people shouting back and forth about

14    gibberish that I really didn't know what they were

15    meaning about.

16        Q.   **Did you ask McKinney do you know these**

17    **people, what's going on?**

18        A.   No, I didn't ask him anything like that.

19        Q.   **Did you ask him, hey, who lives in that**

20    **house?  How are they related?**

21        A.   No, I was just trying to keep the peace

22    between the parties involved until Bill was going to

23    decide what he was going to do and then he'd tell me

24    what he was going to do and then we'd go from there.

1    Q.    When you say keep the peace, what are you

2    trying to do to keep the peace?

3    A.    Keep both parties from getting into a

4    physical altercation on both sides of the street.  I

5    figured these guys didn't like these guys, so don't

6    let them get together.

7    Q.    So the conversation continues for how

8    long?

9    A.    Five minutes maybe.

10    Q.    Okay.  And during that five minutes is

11    anything resolved?

12    A.    They're just talking, but it's calm.

13    Q.    And has McKinney moved?

14    A.    No, he's still talking to them.

15    Q.    He's still talking to the same two people?

16    A.    Yes.

17    Q.    In the same general location?

18    A.    Yes.

19    Q.    And are the people still on the porch?

20    A.    Yes.

21    Q.    At the Latham's?

22    A.    Yeah, except for Louise, I think, she got

23    off right there and was standing in the yard, her

24    yard, you know, and she was just talking, but she

1   wasn't yelling or anything like that.

2          Q.    **And what are you doing?**

3          A.    Just standing there.

4          Q.    **In relation to Bill, where are you?**

5          A.    I'm still behind him.  After I had

6   determined that the Curry subject and the Barnhart

7   subject weren't a threat to anybody, to him, he had it

8   under control, I just walked back towards my car and

9   just kind of hung out there and watched the people

10  across the street.

11         Q.    **You say you went back to my car?**

12         A.    Well, I didn't go in it.  I just walked near

13  it, and I was just standing there toward the corner

14  and just watched them across the street.

15         Q.    **When you -- as a police officer, you want to**

16  **know when you show up on a scene who the -- if**

17  **possible, who the people are, right?**

18         A.    Right.

19         Q.    **For example, if you show up in this room,**

20  **you might want to know that Joe Bleyer is a felon?**

21         A.    Correct.

22         Q.    **Yeah, because, you know, felons are more,**

23  **generally speaking, you know --**

24                MR. BLEYER:  Now, remember, you say that,

1  we're going to use that next time we depose your

2  client.  Keep coming.

3       BY MR. BEASLEY:

4       Q.  **I'm just saying that, generally speaking,**

5  **you know, as a police officer, you want to be alerted**

6  **to people who are felons, been in jail, those type of**

7  **things?**

8       A.  Yeah.

9       Q.  **Did you ever -- do you have the capacity to**

10 **run somebody's name and figure that out?**

11      A.  Yeah, through LEADS.

12      Q.  **Did you do that?**

13      A.  No.

14      Q.  **Did you know that Richard Curry -- at that**

15 **point did you know that Richard Curry had recently**

16 **gotten out of prison?**

17      A.  I did not know that.

18      Q.  **Didn't know if he was a felon or why he**

19 **would be the felon?**

20      A.  No.  Like I said, my strict interest there

21 at that moment was just to provide routine assistance

22 to the Buckner police officer William McKinney to keep

23 him protected from any type of incidents that may

24 arise.

1      Q.   **And you'd known Bill for a long time?**

2      A.   Yes.

3      Q.   **Would you describe Bill as a hothead?**

4      A.   I wouldn't describe him as a hothead.  Bill

5  is just one of the -- you know, he is from the old era

6  of law enforcement, and what I say by that is that

7  they took care of one another, and I'm not talking

8  about the police.  I knew him back in the old days

9  when he changed a guy's diaper at a house who was

10  elderly just because the guy was using the bathroom on

11  himself.  He believed in community.  That's how he

12  was.  As for his temperament, like most people, we all

13  get ticked off at one thing or another, but I never

14  seen him blow up to the point of going crazy or

15  anything, no.

16      Q.   **Okay.  So everything -- people are talking,**

17  **things are relatively normal, you're standing there.**

18  **The conversation goes on for about 5 minutes.  What**

19  **happens next?**

20      A.   Then I hear a lawn mower roaring -- not

21  roaring, shall I say.  Let me rephrase that -- putting

22  along behind me.  You know the sound of a lawn mower

23  when it's coming, and I'm like what the heck's going

24  on with a lawn mower coming up here, and then that's

1 when the lawn mower pulled up, and that's when I first

2 observed Roy Barnhart --

3   **Q. Okay.**

4   A. -- who I later identified as Roy Barnhart.

5 I didn't even know him.

6   **Q. You didn't know who he was at the time?**

7   A. No.

8   **Q. When he pulls up, does he get off the**

9 **mower?**

10   A. Yes, he does.

11   **Q. Does he turn the mower off?**

12   A. Yes, he does.

13   **Q. So you no longer have to listen to the**

14 **mower?**

15   A. That's correct.

16   **Q. He gets off and he comes over -- does he**

17 **talk to you?**

18   A. No, he immediately goes to talk to Bill, and

19 he has a document in his hand, and he seems to be

20 really upset about something, and I'm not sure what at

21 the time.

22   **Q. Does he talk to Bill?**

23   A. Yes.  He said something along the lines of

24 that trailer is his and he's got the title for it, and

1   he had the title in his hand.

2      **Q. And did you talk to Roy?**

3      A. Yes, I did, and Bill asked me to go ahead

4   and talk to him. So I was talking to Mr. Barnhart,

5   and I said let me see your title, and he said okay,

6   and I was looking at the title, and I hadn't got

7   midway through when the incident started.

8      **Q. Well, all right. Let's go back. Bill tells**

9   **you to talk to Roy Barnhart?**

10     A. Yeah.

11     **Q. And that was after he went up to Bill and he**

12   **said, hey, I've got the title to the truck?**

13     A. Right.

14     **Q. Where do you talk to Barnhart in relation to**

15   **where Bill and Curry is?**

16     A. Okay. Here's the corner with my police car.

17   Barnhart and me are right here. Just directly behind

18   me is Amanda and Richard, I believe, and then Bill.

19     **Q. Okay. So what side of the street are you**

20   **on?**

21     A. Still in front of city hall, so that would

22   be on the south side.

23     **Q. And in relation to where you are, are you at**

24   **one end of the building?**

1      A.    Yes, on the corner right there.

2      Q.    **On the corner of the building.  Which corner**

3  **is that?**

4      A.    That would be the southwest corner.

5      Q.    **All right.  Now, where McKinney and Curry,**

6  **are they on the -- are they on another corner of the**

7  **building?**

8      A.    No, they're in the center.  They're directly

9  behind me.

10     Q.    **About the center of the building?**

11     A.    Yeah.

12     Q.    **I'm just trying to get it so I can figure**

13  **out if I go out there --**

14     A.    If you've got a block -- here is me on the

15  corner and here is the other corner, and I'm here on

16  this corner, they're right behind me in the middle.

17     Q.    **They're about the middle of the block?**

18     A.    Yeah.

19     Q.    **Do you have an estimate as to how far that**

20  **is from you to them?**

21     A.    Six to 12 feet.  Right where the benches

22  are.  If you go to Buckner, you'll see them.  That's

23  where Bill and the ladies were standing, Barnhart --

24  or Amanda and Richard were standing, and I was

1   directly in front of them.

2       Q.   Okay.  You take a look at the title?

3       A.   I was looking at the title.  I was starting

4   to read it.

5       Q.   The title looked to you to be a title for a

6   trailer?

7       A.   It was a title, yes.

8       Q.   What are you doing with it?  You're just

9   reading it?

10      A.   I'm reading it to ascertain what they're

11  talking about with this title, because, see, I never

12  actually saw this trailer that they keep fighting

13  over.  I don't even know where it's at.  You know, for

14  all I know, it's in another town, you know, but I know

15  that people are upset about this trainer.  It turns

16  out it's a civil matter, but, I guess, the Amanda

17  Barnhart is wanting the trailer, and I guess Roy don't

18  want her to have it because he's got the title; and as

19  I'm reading the title, Amanda said some things to Roy

20  that really agitated him and made him mad.

21      Q.   What did she say?

22      A.   Something along the lines that ticked him

23  off.  There were some cuss words, a few threats.  I

24  don't really recall what she said because when that

1    happened, he immediately went in explosive mode and

2    grabbed the title and shoved me and said he was going

3    to take care of it himself.

4         Q.   **When you say he grabbed the title --**

5         A.   Snatched it out of my hand.

6         Q.   **Took it out of your hand.  Did it rip it?**

7         A.   No, it didn't rip it.

8         Q.   **So he grabs it out of your hand.  He's got**

9    **it now.  Which hand does he take it out of your hand**

10   **with?**

11        A.   His right hand grabbed it out of my -- I had

12   both hands with it and he just yanked it out.

13        Q.   **And he takes it out with his right hand.**

14   **And you said he shoves you?**

15        A.   Yeah.

16        Q.   **All that in basically one move?**

17        A.   One second or two seconds because what I

18   think what it was, was I was in his way to get to his

19   mower, so he shoved me with his hand, open palm.

20        Q.   **Okay.  Where did he shove you?**

21        A.   Right here in my shoulder.

22        Q.   **You're pointing to your right shoulder?**

23        A.   My right shoulder.

24        Q.   **The front of you?**

1    A.   Yes.

2        Q.   **And when he shoves you, do you fall down?**

3    A.   I don't fall down, but it pushes me back a

4    little bit.

5        Q.   **Like do you take a step?**

6    A.   Yeah, I took a step.

7        Q.   **You take a step and catch yourself?**

8    A.   Yes.

9        Q.   **And how far from the mower are you at that**

10   **point?**

11   A.   A foot, maybe less.

12       Q.   **And Roy is not going after Amanda?  He's**

13   **going towards his mower?**

14   A.   Well, he may be going towards his mower,

15   but, either way, she was coming that direction as well

16   as so was he.  I was trying to get him stopped, you

17   know, because of her aggressiveness and his

18   aggressiveness, and we thought a fight was going to

19   break out.  Whether or not he was charging her and I

20   was in the way or he was trying to get to his mower, I

21   cannot tell you that, but I know that he was going

22   that direction, and they happened to both be in the

23   same place.

24       Q.   **So he shoves you in the right shoulder?  You**

1  take a step back?

2      A.   Yes.

3      Q.   Do you then tell him you're under arrest for

4  pushing me or touching me?

5      A.   No, I didn't tell him that that second.

6  Like I said -- if you let me do the whole scenario,

7  I'll tell you the whole scenario real quick, and then

8  you can ask me questions on it.  It would be easier

9  for me to do that if that's okay with you.

10     Q.   That's fine with me.

11     A.   All right.  Mr. Barnhart shoves me after he

12  grabs the title and says I'll take care of it myself

13  when Ms. Curry -- or Barnhart says these things to him

14  that agitates him.  When he says that, he makes a

15  beeline towards his mower, which happens to be me in

16  between his mower, as well as Amanda behind me.  Now,

17  I can't place where she was at because my back is

18  turned.  He shoves me, I take one step back, he gets

19  on his mower, and he's trying to start it and it won't

20  turn over.  Officer McKinney tells him --

21     Q.   Hang on.  Hang on.  Let's stop there.  We'll

22  get to that, okay?

23     A.   Okay.

24     Q.   So you said don't know if he's going after

1    Amanda or the mower, but we know where he went.  He

2    went to the mower?

3        A.    Yes.

4        Q.    So he gets on the mower.  Does he have any

5    difficulty getting on the mower?

6        A.    No.

7        Q.    Gets on the mower, and you said you were

8    about 1 foot from the mower?

9        A.    Yes.

10        Q.    While he gets on the mower, do you grab

11   him?

12        A.    No.

13        Q.    Do you say anything to him?

14        A.    No.

15        Q.    He starts trying to start his mower?

16        A.    Yes.

17        Q.    But it won't turn over?

18        A.    Yes.

19        Q.    At this point from here until the time this

20   ends, that mower does not turn on again?

21        A.    Yes.

22        Q.    Correct?

23        A.    No, it never turned on, no.

24        Q.    Okay.  So he's trying to get it to fire, it

1  won't, and you're not saying anything?

2      A.   No, and like I said, this is all within 3

3  seconds --

4      Q.   I understand that.

5      A.   -- so it's very fast.

6      Q.   So now he's on the mower; it won't start;

7  you're standing there.  Tell us what happens next.

8      A.   Okay.  I was going to tell him he was under

9  arrest for shoving me, and I was going to arrest him,

10  but Bill, Officer McKinney, was right beside me and he

11  saw him push me, so he came into action first and said

12  he was under arrest, and he was going to -- he was

13  trying to get him off the mower, and he wouldn't get

14  off and he was pulling him.  So that's when Bill

15  removed his pepper spray and sprayed him in the face

16  to try and subdue him.  Now, I don't know how long he

17  sprayed him for because I wasn't really counting, and

18  that's when Roy got off the mower, you know, and he

19  made that threat of saying he's going to take care of

20  it himself; and, I mean, he didn't seem like he was in

21  his right mind to me, and I didn't know this guy, and

22  he made a sprint towards that residence across the

23  street.

24      Q.   Well, let's stop there for a second.  You

1   said he's pulling him. Who's pulling who?

2     A.  Bill is trying to pull Roy off the mower

3   after he said he was under arrest.

4     Q.  Okay. And you said after he's pepper

5   sprayed, he says I'm going to take care of it

6   myself?

7     A.  No, he said all that beforehand, and that's

8   when he was trying to get on the mower, and then when

9   he got on the mower and after he'd already shoved me

10   and before I had a chance to do anything, Bill had saw

11   everything -- that he'd done or seen everything he'd

12   done to me -- I hate my bad grammar sometimes,

13   sorry -- and he came to my aid because he saw me get

14   shoved, and he told him he was under arrest.

15     Q.  So he tells him he's under arrest, tries to

16   pull him off the mower. How long does this go on

17   for?

18     A.  Couple seconds.

19     Q.  And then he lets go, presumably?

20     A.  Yeah, and that's when he removes his pepper

21   spray from his holster and he administers a short

22   burst into his face.

23     Q.  Now, Bill described that short burst as "I

24   drowned him down" to the Illinois State Police?

1      A.   Well, that's how Bill talks, you know.

2      **Q.   All right.  When you say a short burst, how**

3   **long did he spray him with this -- well, do you know**

4   **what it was?**

5      A.   It was os- -- I can't say the name of it,

6   but it's pepper spray.  It's os- -- OC spray, the

7   actual capsicum.  I can't remember how you say the

8   first part of it.

9      **Q.   Have you ever been sprayed with pepper**

10  **spray?**

11     A.   Oh, yes.

12     **Q.   How is it?**

13     A.   It's not pleasant.

14     **Q.   It burns, you can't see, your eyes water?**

15     A.   Yeah.

16     **Q.   It's hard to breathe?**

17     A.   However it doesn't disable your motor

18  functions unlike other items, you know, other

19  things.

20     **Q.   So how long was the burst that you**

21  **described?**

22     A.   It wasn't more than 2, 3 seconds, tops.

23     **Q.   Roy Barnhart, is he wearing a shirt?**

24     A.   Yes.

1     Q.   What color was the shirt?

2     A.   I think it was white.  He was also wearing a

3 Marine Corps hat too.  I do remember that.

4     Q.   And when he is sprayed with the mace -- I'm

5 sorry, the pepper spray -- those are two different

6 things, right?

7     A.   Yes.  One's for dogs; one's for people.

8     Q.   Perfect.  The white shirt, do you notice

9 that it's wet?

10    A.   I never even noticed.

11    Q.   Sprays him for 2 to 3 seconds.  What is

12 Barnhart -- what is -- what happens next?

13    A.   Barnhart, when he was spraying him and

14 trying to get him off the mower, because when he was

15 spraying him, Barnhart's trying to cover his face, and

16 then he gets off the mower and he just makes a dead

17 sprint for that house.

18    Q.   His movement towards the house, what house

19 we talking about?

20    A.   Louise Latham's, George Latham I think his

21 name was.

22    Q.   Does he say anything?

23    A.   At that time, no.  He'd said all that prior,

24 but like I said --

1      Q.   **At this point he hasn't said anything?**

2      A.   No, because I think he can't breathe because

3  he has pepper spray in his eyes.

4      Q.   **Yeah, okay.  So, and you say he takes off on**

5  **what you describe as a dead sprint?**

6      A.   Yeah, he sprinted pretty hard.

7      Q.   **Do you know how old Roy Barnhart was?**

8      A.   He was in his sixties, I believe.

9      Q.   **How old are you?**

10     A.   I'm 39.

11     Q.   **Do you guys have physical training**

12  **requirements at Christopher?**

13     A.   No.  We -- if you're talking about annual

14  physical tests, no, we don't do that.  We had to take

15  one to get in the academy though.

16     Q.   **At the time this happened, what, two years**

17  **ago, you would have been 37?**

18     A.   Yes.

19     Q.   **How tall are you?**

20     A.   Five-ten.

21     Q.   **At the time this happened, how much did you**

22  **weigh?**

23     A.   220, but I'm actually a pretty good

24  runner.

1     Q.  And when you say you're a good runner, are

2  you a good runner because you run or you just

3  happen --

4     A.  Yeah, I treadmill a lot.  I try to keep my

5  cardiovascular up and because you never know in this

6  job who you might come across.

7     Q.  When he takes off -- and you described it as

8  a dead sprint -- did you run after him?

9     A.  Yes, I did.

10     Q.  Did you catch him?

11     A.  I did not actually physically catch him with

12  my hands, no, because he was moving fast, and, of

13  course, because -- another reason why I wasn't able to

14  catch him on foot is because he hopped off the mower

15  and the mower was still in front of me, so I had to go

16  around it.

17     Q.  It has been described, by at least one

18  person, as him walking across the street covering his

19  face?

20     A.  No.

21     Q.  I know you didn't describe it as a walk; but

22  as far as covering his face, was he covering his

23  face?

24     A.  Yeah, he was running, and he had his hands

1    up like this, but, I mean, he was sprinting towards

2    that house, and he knew where he was going.

3        Q.   **Did you ever hear him say I need to wash my**

4    **eyes out?**

5        A.   No, I never heard that.

6        Q.   **What does Bill McKinney do when this**

7    **happens?**

8        A.   Bill McKinney -- well, you got to remember,

9    he was still behind me.  He wasn't anywhere near

10   Mr. Barnhart when I went after him.  He was still

11   behind me dealing with Curry and Amanda -- or Curry

12   and Barnhart back there.  Now, I don't know what he

13   did back there because I was after Mr. Barnhart.

14       Q.   **Well, which side of the mower were you**

15   **standing on?**

16       A.   I would have been on the right-hand side of

17   it.

18       Q.   **And what side was Bill McKinney on?**

19       A.   He was on the same side as me.

20       Q.   **On the same side as you?**

21       A.   Yeah.

22       Q.   **So when he pepper sprays him, he reaches**

23   **over you?**

24       A.   No.  I'm here, Bill's next to me, and then I

1   took a step back when Bill started spraying him

2   because I didn't want to get pepper spray in my eyes,

3   and then when he bounced -- then when he got off the

4   mower, it's really fast on the left-hand side, because

5   the mower is in between us.  He takes off running in a

6   dead sprint towards the Latham residence.

7          **Q.   And you reacted?**

8          A.   Yes, I immediately reacted.

9          **Q.   Did Bill react?**

10         A.   I don't know.  I didn't see him, and the

11   only thing I think -- he probably did because he

12   showed up right after I administered the Taser, but he

13   was wearing those low loafer shoes that might fall off

14   your feet if you run.

15         **Q.   Did you yell anything at Barnhart?**

16         A.   Yeah, I did, I told him to stop or he would

17   be tased.

18         **Q.   How many times did you say that?**

19         A.   Once, top of my lungs.

20         **Q.   Did you hear McKinney say anything?**

21         A.   No.

22         **Q.   Did you hear Barnhart say anything?**

23         A.   No.

24         **Q.   Did you hear anybody say anything from that**

1    point until the time you deploy your Taser?

2         A.    I heard shouting, but I don't know who was

3    talking what.

4         Q.    **Where are you when you deploy your Taser?**

5         A.    In the driveway.

6         Q.    **How long is the driveway?**

7         A.    The length of it?  40, 50 feet maybe from

8    the roadway to their garage, because their garage is

9    separate from the house, but it was one of those old,

10   grown up driveways with gravel.  You could hardly see

11   it.

12        Q.    **You could hardly see it because they had**

13   **grass growing in it?**

14        A.    Right.

15        Q.    **You deployed your Taser from your -- you're**

16   **in the driveway?**

17        A.    Yes.

18        Q.    **How far behind Roy are you?**

19        A.    Probably 10 to 12 feet most likely.  I'm not

20   going to -- I'm not trying to judge, but I really

21   don't remember, but I know I was right up behind him.

22   I was trying to catch him on foot, but he was just

23   going too quick for that house.

24        Q.    **And how far from the house was Roy at the**