1    time?

2        A.    Twenty, 30 feet.

3        Q.    **And was he -- now, when you run to this**

4    **house, do you run up the driveway or do you run across**

5    **the yard?**

6        A.    Well, we ran across the street and then into

7    the driveway, and then he was actually turning towards

8    the right to where the front door is, and that's when

9    I told him to stop or he would be tased, and he kept

10   running, so I administered the Taser.

11       Q.    **And when you administer the Taser, did you**

12   **hit him?**

13       A.    Yes.

14       Q.    **Where'd you hit him?**

15       A.    One prong hit him in the back and the other

16   one hit him in the right buttock, I believe.

17       Q.    **What is his body's reaction to that?**

18       A.    He immediately falls on the ground.

19       Q.    **And when you say he immediately falls on the**

20   **ground, does his body stiffen up?**

21       A.    Yeah.

22       Q.    **And when he falls, does he put his hands**

23   **out?**

24       A.    When he -- no, his hands stayed in while he

1    was being -- while the 5-second burst still being

2    administered; but once that was over with, he --

3    that's when Officer McKinney arrived, right after I'd

4    tased him, and then he immediately started resisting

5    Officer McKinney.  After I had tased him, when Bill

6    was trying to handcuff him, get him on his back -- or

7    sorry, get him on the stomach, because he fell

8    facedown, and then he rolled on his back when Bill was

9    trying to handcuff him, and then that's when I

10   administered the second 5-second burst, which I

11   actually turned off midway, because that's when Louise

12   Latham -- who I found out later what her name was --

13   came out and yelled don't tase him, he's got a

14   pacemaker, so I shut it off.

15        Q.   Okay.  When he falls on the initial tase, he

16   falls face first?

17        A.   He falls face first, yes.

18        Q.   And does he fall in the gravel or in the

19   yard?

20        A.   The same -- the line of where the grass

21   meets the driveway, there's a little rock right there.

22   So it would have been right at the line between the

23   grass and the gravel.  He was -- part of his body

24   laying on the gravel, part of it landed on the grass.

1  His head landed right on the line where the grass and

2  the gravel meet.

3       Q.  **And he hits the ground, the 5-second burst**

4  **is still going?**

5       A.  Yes.

6       Q.  **And he's on his stomach?**

7       A.  Yes.

8       Q.  **Once the burst is over, you say he rolls**

9  **onto his back?**

10      A.  Yes.

11      Q.  **Is the Taser cartridge still in the Taser?**

12      A.  Yeah.

13      Q.  **You haven't pulled it off?**

14      A.  No.

15      Q.  **And how long after the 5-second burst is**

16  **over before McKinney gets there?**

17      A.  A matter of a second or two.

18      Q.  **And in that second or two, you're saying**

19  **that Barnhart rolls over onto his back?**

20      A.  Yes.

21      Q.  **Does he roll over onto his back into the**

22  **driveway, or does he roll over towards the yard?**

23      A.  He rolls over towards the -- he would -- if

24  he was on his back, he rolled on from his left side,

1    so would have been towards me in the driveway.

2        Q.   **So now he's laying on his back?**

3        A.   Yes.

4        Q.   **McKinney shows up?**

5        A.   Yeah, McKinney tells him to get back on his

6    stomach to handcuff him, and Roy's complaining that

7    he's got some pain, because, I guess, the pepper spray

8    among the tasing, of course, you know, and all that,

9    and we just told him to put his hands behind his back,

10   and he begins to resist Bill.  Now, during this

11   course, I had actually still had the Taser prongs in

12   him, and he was resisting, actively resisting Bill

13   trying to handcuff him.  So that's when I administered

14   a second 5-second burst to get him into compliance,

15   and when that happened, that's when that Louise Latham

16   came out screaming don't tase him, he's got a Taser

17   (sic).  So midway through the 5-second burst, I shut

18   it off.

19       Q.   **All right.  Hang on.  So you say he's**

20   **complaining of pain.  What complaints is he making at**

21   **this point?**

22       A.   Says he couldn't breathe.

23       Q.   **Couldn't breathe?**

24       A.   Yes.

1    **Q.   Any other complaints?**

2    A.   That was it.

3    **Q.   Did he complain about his chest?**

4    A.   No, he didn't complain about anything like

5    that until afterwards, and I immediately called for

6    medical anyway.

7    **Q.   Now, when you say -- you know, you're using**

8    **words like immediately.  You immediately called for**

9    **medical right after you fired the first --**

10    A.   No, I called for medical after he was

11    complaining of having problems.

12    **Q.   Okay.  So he's now on his back.  The Taser**

13    **prongs are still in his back?**

14    A.   Yes.

15    **Q.   Bill McKinney tells him to roll over?**

16    A.   Yes, which he gets him rolled over, but he's

17    still fighting him trying to get the cuffs on.  He's

18    got the left arm already cuffed and he's trying to get

19    the right arm and Roy's fighting him like this, trying

20    to get the right arm to cuff, and Roy's not -- or he's

21    actively resisting him, telling him to stop, you know,

22    you're under arrest, so that's when I hit him with the

23    second one -- or I don't say hit, I say administered

24    the second 5-second burst, and that's when Louise

1  Latham came out and said please don't tase him, he's

2  got a pacemaker, but she said it a lot louder than

3  that, and I shut it off midway.

4      **Q.   How long do you estimate the second cycle**

5  **ran before you shut it off?**

6      A.   Three seconds.

7      **Q.   And once you administer that second burst,**

8  **his body seizes up again?**

9      A.   Yes.

10     **Q.   He doesn't fall, though, because he's**

11  **already on the ground?**

12     A.   Already on the ground, yes.

13     **Q.   And Bill is able to get the handcuff on him**

14  **at that point?**

15     A.   He got -- he got his arm behind the back,

16  but he still hadn't been able to get him cuffed

17  because after I had stopped the Taser, he started

18  resisting Bill again, and Bill was able to get him up

19  on his feet.

20     **Q.   Taser prongs still in?**

21     A.   Yes.

22     **Q.   Cartridge still attached to the Taser?**

23     A.   Cartridge was disconnected after that

24  because he was -- Bill was trying to get his right

1    hand in to cuff him, and the Latham woman and whoever

2    that other person was that was really agitated at Bill

3    started coming out.  So I threw the Taser cartridge

4    off of the Taser and threw it on the ground and went

5    over there and kept them separate.

6        Q.   **So he's got his right hand behind his back**

7    **and he gets him up?**

8        A.    He's got his left hand behind his back, and

9    he's fighting him for his right, and he gets him up on

10   his feet, yes, and there's, I guess you could call it,

11   a shuffle, you know.  They're weaving up and down

12   because Roy is like going up and down with his body

13   like this because he's still fighting Bill with his

14   right hand trying to get that hand cuffed, and that's

15   when they fell down again right there by the corner of

16   the driveway, but it was in the grass, and that was

17   the last place Mr. Barnhart fell before he was

18   finally -- that's where he -- the medical personnel

19   arrived to work on him at the same spot to check him

20   out.

21       Q.   **Now, when you say he fell the second time,**

22   **did McKinney fall too?**

23       A.   Yes.

24       Q.   **Did he fall on top of him?**

1        A.   He fell either on top or right next to him,

2    and that's when Officer Cole Smillie had actually

3    arrived to help cuff him at that same time.

4        **Q.   Have you ever read Officer McKinney's**

5    **report?**

6        A.   No.

7        **Q.   Have you ever read Cole Smillie's report?**

8        A.   No.

9        **Q.   If Bill McKinney says he got him cuffed**

10   **while he was on the ground that first time, you would**

11   **disagree with that?**

12       A.   I would disagree with the fact because his

13   arm came out again; and then when he got him cuffed,

14   when he got him on the ground -- and like I said, I'm

15   not 100 percent certain if there were two falls or one

16   because I remember -- because the second -- the first

17   the one he kind of fell, but he didn't actually fall.

18   It was more like on his knees, and then the second

19   one, he actually fell down, but Cole Smillie had to

20   help Bill cuff him.  I do know that.

21       **Q.   All right.  Well, let's go back to what**

22   **we're talking about.  I'm sorry.  I misunderstood.**

23   **You said there were two falls?**

24       A.   Yeah, one was a half fall, I guess you could

1    say, but it wasn't really a fall because he landed on

2    his knees and then he got back up.

3        Q.    **And that was in the driveway?**

4        A.    Yeah, because he was walking, you know,

5    trying to get him to the car, and then Roy kind of

6    just fell down on his kneecaps, and then he got back

7    up, you know, but he never actually fell facedown or

8    anything.

9        Q.    **And he didn't hit his head then?**

10        A.    No, no.  He didn't hit his head on the

11    second one either.  He just landed more on his side

12    than he did anything.

13        Q.    **And you're talking about the fall that you**

14    **were describing earlier?**

15        A.    Yeah, the one where Officer Smillie helped

16    Bill cuff him; but like I said, during the time of

17    the -- or when I deceased using the Taser to the time

18    I tried to keep the Latham woman at bay, just to make

19    sure there were no problems, anybody, you know,

20    sneaking up behind you or whatever, for scene

21    security; and then, like I said, Bill was walking him

22    towards that red Explorer, police car they had, and

23    that's when Roy came down once on his knees and got

24    back up, and then he was still struggling with his

1    right arm, and that's when they fell down on the

2    corner of the driveway right there in the grass, and

3    that's when Officer Smillie -- Officer Smillie had

4    already gotten there, and that's when he helped Bill

5    cuff him.

6        Q.   When did Smillie get here?

7        A.   He got on the scene probably about 1 minute

8    to 90 seconds after I had tased Mr. Barnhart the

9    second time.

10       Q.   I'm sorry.  Say that again.

11       A.   He got on scene probably 1 minute to 90

12   seconds -- 60 to 90 seconds after I had tased

13   Mr. Barnhart the second time.

14       Q.   And then when he got on the scene, your

15   understanding or your recollection is McKinney and

16   Barnhart were already down in the corner of the yard

17   where the EMTs ultimately found them?

18       A.   Yes.

19       Q.   So he gets there -- I'm sorry.  When do you

20   call for the emergency assistance?

21       A.   I called that directly after the second

22   tasing on the radio.

23       Q.   You've got a radio on your lapel?

24       A.   Lapel, yes.

1    Q.   **What do you say?**

2    A.   I said send first responders and ambulance

3  out here, because, I said, the Taser has been

4  deployed, and that's just a policy that we use.  Any

5  time the Taser has been deployed, we call for medical

6  to check their well-being.

7    Q.   **Whose policy is that?**

8    A.   There's no written policy.  That was just

9  the way I was always taught, that any time you use any

10  kind of use of force that may cause any kind of

11  injury, you need to contact an ambulance to check on

12  their well-being.

13    Q.   **Was Barnhart complaining of problems at that**

14  **point?**

15    A.   Barnhart wasn't complaining of any medical

16  problems at that time.  He was just mad at Bill.  By

17  the time he got to the corner of the driveway, he was

18  just angry.

19    Q.   **At any point up until the point when they**

20  **fall that you described earlier down in the corner**

21  **where the EMTs ultimately find them --**

22    A.   Uh-huh.

23    Q.   **-- up until that point, did Bill McKinney**

24  **ever hit Roy Barnhart?**

1     A.   I never witnessed William McKinney hit

2     Barnhart at all.

3     **Q.   Did you ever see him kick him?**

4     A.   No.

5     **Q.   Did you ever see him step on his hands?**

6     A.   No, and to answer your question on that,

7     sir, I'll explain to you how I know this, all right,

8     or what happened.

9               I was talking to Louise Latham and this

10    other woman -- I think it was her daughter.  I don't

11    know who it was, shorter woman with glasses -- and

12    they were pretty upset with Officer McKinney.  I guess

13    they know Bill from the past, but that was irrelevant

14    at the time, you know.  I guess, they were just

15    wondering why things went the way it did, and I was

16    trying to explain to them that this is what had

17    happened and everything, and that's when the firemen

18    and all that were there, and they were checking out

19    Mr. Barnhart's well-being.  Cole Smillie was standing

20    next to me; and like I said, when we were talking to

21    these ladies about the situation -- and, like I said,

22    the situation was calm, and then I heard some shouting

23    in the background, some screaming, and I heard someone

24    say what are you doing, man, you know, something like

1  that, and I turn around and that's when Mr. Barnhart

2  was alleging that Bill had slapped him while he was

3  handcuffed.  Now, I never witnessed it.

4       Q.   **When you say -- what does Barnhart say?**

5       A.   He says that Bill slapped him.

6       Q.   **He used the word "slap"?**

7       A.   Yeah.

8       Q.   **Do you know David Dolderer?**

9       A.   The fire chief, I know of him, yeah.

10      Q.   **Have you heard his statement?**

11      A.   No, I have not.

12      Q.   **You didn't see the hit?**

13      A.   No, I did not.

14      Q.   **So whether it's a punch or a hit or a slap,**

15  **you don't know?**

16      A.   No, I don't.

17      Q.   **And Barnhart's body reacting to either the**

18  **punch or the slap, you didn't see that either?**

19      A.   I did not.

20      Q.   **When you turned around after hearing the**

21  **screaming and the yelling, was Barnhart laying on his**

22  **side now?**

23      A.   No.  Barnhart was still sitting -- excuse

24  the phrase -- Indian style on the corner of the

1   driveway right there, and he was just yelling this is

2   the police, take this as that Bill hit me; and when

3   that transpired, believe me -- I had already called

4   medical as they were there.  When the allegations came

5   up that Bill had allegedly slapped the individual, I

6   called for his chief to come to the scene because

7   that's his supervisor.

8        Q.   **Who's the chief?**

9        A.   Alan Barnfield.

10       Q.   **You know Alan's phone number?**

11       A.   I don't know it off the top of my head.

12       Q.   **Well, I'm saying did you have the ability to**

13  **call him?**

14       A.   Yes.

15       Q.   **It's in your cell phone?**

16       A.   Yeah, but I didn't use my cell phone.

17       Q.   **Okay.**

18       A.   I used Pete Elko's cell phone because he had

19  his number at the time, and I didn't have it.

20       Q.   **So Pete Elko gives you his cell phone and**

21  **you call Barnfield?**

22       A.   Well, Pete Elko had dialed Barnfield for me.

23  I said do you have Barnfield's number?  He says yeah,

24  I'll call him.  He called him for me, and I used his

1    phone, and I said Barney -- we call him Barney.  I

2    said, hey, Barney, you need to get up here, there's

3    been a complaint that Bill slapped a guy in handcuffs.

4    I said I didn't witness it, but I said you need to be

5    up here because you're his supervisor, and we'll go

6    from there for what you want to do and turn the scene

7    over to you.

8    **Q.   Barnfield says that -- I believe he says**

9    **that -- well, strike that.**

10    **If Barnfield says that he didn't hear**

11    **about the hitting until after everything was resolved,**

12    **you would take issue with that?**

13    A.   Can you rephrase that.

14    **Q.   If Barnfield says I didn't hear anything**

15    **about Bill hitting someone until well after this**

16    **incident was completed, you would take issue with**

17    **that?**

18    A.   I wouldn't take issue with anything.  My

19    thing was, is I was just calling him as his

20    supervisor.  Because any time there's an allegation of

21    excessive use of force, you need to have an outside

22    party brought in immediately, whether it be a chief or

23    another agency just so there's no appearance of any

24    kind of impropriety, you know, and that's what I

1   did.

2       Q.   Well, let me ask you this:  Are you sure

3   that you told Barnfield it's been reported that Bill

4   hit a guy in handcuffs?

5       A.   I'm not a hundred percent sure, but I did

6   tell Barnfield that he needed to get up to the scene

7   because there's been an incident; and when he got

8   there, I do remember telling him that they said that

9   Bill slapped him.  That I do remember.

10      Q.   Perfect.  When it's reported to you -- when

11  you hear the noises and you turn around, what's

12  McKinney doing?

13      A.   McKinney is just standing there, and he was

14  in a heated discussion with one of the firemen.  I

15  don't remember which fireman it was.  I think it was

16  Minton, maybe that was his name, Alan Minton, and they

17  got into a -- kind of a disagreement over something,

18  and then that's when I actually walked over there.

19  Then that's when they were saying that he had slapped

20  him.  That's where I heard the word "slap," and so I

21  said Bill, come with me, and I brought Bill over to

22  his squad car, and I said just stay here, don't go

23  over there, and I'm going to call your chief, you

24  know, just so there's no problems and keep the scene

1    calm and secure.

2        Q.   Now, when you say they were -- Minton and

3    McKinney are arguing, are they nose to nose?

4        A.   No, they weren't nose to nose, but it seemed

5    like they had a disagreement over something.

6        Q.   Were they yelling?

7        A.   They were yelling, yeah.

8        Q.   Do you remember what was said?

9        A.   No, I don't because I was still far enough

10   away.  Like I said, I didn't run up there.  I walked

11   up there.

12       Q.   How far away were you when you first

13   noticed?

14       A.   Twenty, 30 feet.  Plus the sun was going

15   down, and it was also getting dark, so it was hard to

16   see people.

17       Q.   Now, Bill -- you take Bill to where?

18       A.   To his police car, which was on the other

19   side by -- near the -- further down to the east of

20   city hall.  It was that red Ford Explorer.  I brought

21   him over there, and I didn't ask him what he did.  I

22   didn't even talk to him about it.  I said just stay

23   here, I said, because I didn't want a fight breaking

24   out with the firemen agitating him or whatever,

1    because it just seemed like there was a lot of

2    commotion going on and a lot of confusion over what

3    had happened, you know, and I kind of got sucked into

4    it.  So I just took charge of the situation by

5    separating the parties involved and then calling in a

6    supervisor.

7         Q.   When Barnhart was handcuffed, he was no

8    longer a threat, right?

9         A.   That would be correct, yes.

10         Q.   If you have a suspect in handcuffs and you

11    hit them -- well, strike that.

12              You've been trained as a police officer

13    at the police academy, right?

14         A.   Yes.

15         Q.   You've performed your function as a police

16    officer for 13, 14 years, right?

17         A.   Yes.

18         Q.   In your opinion is it proper police practice

19    to strike a individual who's been handcuffed and is no

20    longer a threat?

21         A.   No longer a threat, yes.  There are certain

22    extenuating circumstances -- I'm not saying striking

23    somebody; but like if a guy was trying to bite you or

24    kick you or something like that, there's extra

1    measures you can take, but punching somebody or

2    slapping somebody being handcuffed, no.

3        Q.    **Not okay?**

4        A.    No.

5            MR. BLEYER:  Mr. Beasley, may we take a

6    break so I can get more coffee, or are you going to be

7    much longer?

8            MR. BEASLEY:  Yes, we can take a break, Joe.

9    Thank you.

10   (Brief recess in the proceedings;

11                    whereupon Mr. William McKinney

12                    joined the proceedings.)

13           BY MR. BEASLEY:

14       Q.    **You've now taken -- escorted McKinney over**

15   **to his car.  When you do that, how far away from**

16   **Barnhart is he?**

17       A.    Thirty feet.

18       Q.    **How long -- does the chief show up?**

19       A.    Yes.

20       Q.    **How long after you call the chief does he**

21   **show up?**

22       A.    Five minutes.

23       Q.    **Where does he go when he gets there?**

24       A.    He parked near the fire station and just

1    walked up to me, talked to me for a minute.

2        Q.   **Were you still standing there with Bill?**

3        A.   No, actually, Bill was still by his car, and

4    I walked up and talked to Barnfield real quick.

5        Q.   **What'd you say?**

6        A.   Well, I told Chief Barnfield -- I'm trying

7    not to confuse the names, Barnfield, Barnhart.

8        Q.   **Sure.**

9        A.   I told Chief Barnfield there'd been a

10   disagreement on the scene with some firemen and

11   Mr. Barnhart was making allegations against Bill, and

12   I said that you're his chief and I'm turning it over

13   to you.

14       Q.   **When you say there were allegations made,**

15   **what were the -- did you tell him what the allegations**

16   **were?**

17       A.   Well, I told him that he needed to talk to

18   them because I didn't want to give third-party

19   information.

20       Q.   **So earlier you said that you told Barnfield**

21   **that it had been said that Bill slapped a guy in**

22   **handcuffs?**

23       A.   That's what they said, yeah.

24       Q.   **But did you tell that to Barnfield?**

1     A.   I told that to Barnfield when he got on the

2  scene, yes, and then I turned the scene over to him.

3  I said that's what they were saying, and then I also

4  testified to Barnfield I didn't see Bill slap

5  anybody.

6     **Q.  Okay.  And where does Barnfield go from**

7  **there?**

8     A.   He went and talked to Bill.

9     **Q.  And did you go too?**

10    A.   No.  Actually, after that, I went back over

11  to where Barnhart was and talked to his wife, who was

12  asking if she could go -- he didn't want to go to the

13  hospital, I guess, at that time, and she said can I

14  talk to him to talk him into going to the hospital,

15  and I said yeah, sure, and she convinced him to go,

16  and then --

17    **Q.  At this point is Barnhart still**

18  **handcuffed?**

19    A.   Yeah, yeah, he is.

20    **Q.  Go ahead.  And then?**

21    A.   And then it was paramedic Ashley Barnett

22  that was administered aid to Mr. Barnhart, checking

23  his vitals and all that, and then they loaded him up

24  in the back of the Abbott EMS rig, and that's the last

1   time I ever saw Mr. Barnhart.

2      Q.   **And from there, where did you go?**

3      A.   I went back to Christopher.

4      Q.   **Did you go directly to the station?**

5      A.   Yes.

6      Q.   **And when you got there, did you begin**

7  **writing your report immediately?**

8      A.   Yes.

9      Q.   **Did you talk to anyone before you completed**

10  **your report?**

11      A.   No.

12      Q.   **Did you talk to anyone regarding this**

13  **incident other than your lawyer and other than the**

14  **Illinois State Police?**

15      A.   Are you talking about that same day?

16      Q.   **No, I'm talking about any time.**

17      A.   No.

18      Q.   **Now, in the police report here it says that**

19  **you've been told during your Taser training that it**

20  **won't affect a pacemaker; is that right?**

21      A.   That's what I was told.

22      MR. MCDONALD:  Jarrod, what report are you

23  talking about?  The summary of his statement?

24      MR. BEASLEY:  Yeah.

1          BY MR. BEASLEY:

2      Q.   **When you say that, is that true?**

3      A.   I'm not a Taser instructor, but that's what

4  I was told because it affects the central nervous

5  system, not the heart.

6      Q.   **In any event, they haven't -- in your Taser**

7  **training, they haven't told you do not tase people**

8  **with pacemakers; it could be potentially dangerous?**

9      A.   They haven't told me that, no.

10     Q.   **So why did you turn the Taser off then when**

11 **you heard that he had a pacemaker?**

12     A.   Because I was unsure, and I didn't want to

13 take a risk just in case.

14     Q.   **You were unsure on July 7th whether or not**

15 **it would affect a pacemaker?**

16     A.   Right, and the question of the pacemaker

17 being brought up for a Taser was brought up after that

18 incident.  So I didn't know whether or not it would

19 affect it or not, but I figured why take the risk, so

20 that's when I shut it off.

21     Q.   **And when did you find out that it wouldn't**

22 **affect a pacemaker?**

23     A.   A few months later.  When I talked to the

24 Taser instructor, he says that there's been no studies

1   that's proven that it has affected one.  Now, I'm not

2   an instructor, so I can't testify to that.

3       Q.   But when you gave your statement to the

4   Illinois State Police five days later, you told them

5   that you were told that the Taser wouldn't --

6       A.   Right, right, and the thing about it was, is

7   that at that particular time when the Illinois State

8   Police was interviewing me, the question of the

9   pacemaker coming up, I was told in the past by

10  somebody that they didn't affect them.  Now, that

11  being said, I didn't know yes or no, but it wasn't in

12  a training class.  It was just from another officer

13  who was a Taser instructor.

14      Q.   But you weren't sure?

15      A.   I was not sure, so that's when I shut it

16  off.

17      Q.   Did you know before you deployed the Taser

18  that Barnhart had a pacemaker?

19      A.   I did not.

20      Q.   Did Bill McKinney ever tell you that guy has

21  got a pacemaker?

22      A.   No.

23      Q.   When Bill McKinney is trying to handcuff him

24  on the ground, does Bill tell you, "hit him again"?

1      A.    Bill told me to tase him again, yes, because

2   he was resisting arrest.

3      Q.    Do you know if Bill McKinney knew that he

4   had a -- that Roy Barnhart had a pacemaker?

5      A.    I didn't know if he did or not.

6      Q.    As far as you know -- has Bill ever told you

7   I knew he had a pacemaker?

8      A.    No.

9      Q.    So Bill says hit him again, and what do you

10  do?

11     A.    I started to administer another 5-second

12  burst.

13     Q.    And which you cut short?

14     A.    Which I cut short when the Latham woman came

15  out and said he's got a pacemaker, so I shut it off,

16  but like I said, he was actively resisting.

17     Q.    Now, when I say -- when I use the words,

18  "hit him again," is that the words that Bill used?

19     A.    Yeah, and that's the words we use all the

20  time when we're using Tasers.  That's just our

21  lingo.

22     Q.    Are were you ever contacted by the Franklin

23  County -- is it Franklin County State's Attorney's

24  Office?

```
1       A.    Was I ever contacted by them?

2       Q.    Yeah.

3       A.    About?

4       Q.    Regarding Bill McKinney's criminal

5    prosecution?

6       A.    No.

7       Q.    You were aware that Bill McKinney was

8    prosecuted criminally for this event?

9       A.    Yes.

10      Q.    How did you find out about that?

11      A.    When -- which part are you talking about?

12      Q.    How did you find out he was being

13   prosecuted?

14      A.    As in arrested?

15      Q.    Arrested, charged with a crime?

16      A.    Southern Illinois newspaper.

17      Q.    Did you ever talk to Bill about it?

18      A.    No.

19      Q.    Following this incident, did you talk to

20   Bill McKinney?

21      A.    I've run into Bill a few times since the

22   incident, yes.

23      Q.    Okay.  Did you ever talk to him about it?

24      A.    No, we just talked about the old days.
```

1     **Q.   What old days?**

2     A.   Just the days we used to run around, hang

3  out back in the old days when I first started as a

4  cop.

5     **Q.   How about while McKinney -- or while**

6  **Barnhart was handcuffed, did you ever see McKinney**

7  **yelling at him or taunting him in any way?**

8     A.   No.  As I said before, I had never saw Bill

9  do anything wrong that day.

10     **Q.   While Bill was trying to handcuff him,**

11  **did -- was he saying things?**

12     A.   No, he was just trying to get his hands

13  behind his back, you know.  He -- when he was trying

14  to cuff him, like I said, Roy was actively resisting

15  him.  There was some cuss words exchanged between

16  them, but that's not uncommon for people resisting

17  arrest or even the police trying to get them under

18  arrest.

19     **Q.   When's the first time Barnhart reported to**

20  **you that his chest hurt?**

21     A.   He never actually reported his chest hurt to

22  me.  He just said he couldn't breathe, and that was

23  from the pepper spray, but that was when we called

24  medical.  I heard the comment my chest hurt, but he

1   never said that to me, but I don't know if that was

2   him saying that or one of his friends that was

3   standing there.

4       Q.  **Did you ever hear Roy Barnhart say my chest**

5   **hurts?**

6       A.  No, I never heard Roy Barnhart say my chest

7   hurts.

8       Q.  **Now, you said earlier that you only worked**

9   **for Christopher eight hours a week during that time?**

10      A.  Eight to sixteen sometimes.  It varied.

11  Part time at the need of the department, yes.

12      Q.  **When you worked, it would be an eight-hour**

13  **shift?**

14      A.  Yes.

15      Q.  **So if you told the Illinois State Police**

16  **five days after this incident that you were working**

17  **two days a week, that would be sixteen hours?**

18      A.  Yes.

19      Q.  **And as far as your recollection of how often**

20  **you were working at that time, your recollection five**

21  **days after the incident would probably be better than**

22  **your recollection as you sit here right now a couple**

23  **years later, right?**

24      A.  Yeah, that would be correct.

1      Q.   Did you take any photographs while you were

2   out there?

3      A.   No.

4      Q.   Did you take any written statements while

5   you were out there?

6      A.   I don't remember to be honest with you

7   because I know we had the aggravated battery on me,

8   which I charged Mr. Barnhart with, but I cannot

9   remember whether or not we actually took any

10  statements from anybody because, you know, it was

11  going full circle, just a lot going on at that

12  moment.

13     Q.   Now, when you say you charged Mr. Barnhart

14  with it, do you charge crimes or does the State's

15  Attorney's Office charge crimes?

16     A.   Well, we sign the tickets and send it to the

17  State's Attorney for prosecution, but it's up to him

18  whether or not he charges them.

19     Q.   Now, the ticket -- you wrote one ticket?

20     A.   For aggravated battery, yes.

21     Q.   Aggravated battery, is that a felony?

22     A.   Yes.

23     Q.   You charge felonies by ticket?

24     A.   I charge them with a felony by writing the

1    citation, ticket, whatever you want to call it, and

2    then writing the narrative with it.

3         Q.   Do you know if Bill McKinney took any

4    written statements while he was out there?

5         A.   I don't remember.

6         Q.   In your police car do you keep blank forms

7    of witness statements?

8         A.   Yes.

9         Q.   So if you wanted someone to fill out a

10   witness statement, you had the forms available?

11        A.   Yes.

12        Q.   Do you know if Bill McKinney keeps similar

13   forms in his police vehicle?

14        A.   Oh, yes, he carried many things that he

15   needed for his job.

16        Q.   But as far as you saw out there, you didn't

17   see McKinney getting a written report from anybody?

18        A.   No, no.

19        Q.   Do you keep any handwritten notes that don't

20   make its way into the police narrative?

21        A.   Sometimes, but in that particular incident,

22   I didn't have a notepad because that was my part-time

23   job, and all my note pads stay in my full-time pockets

24   for my other shirts.

1      Q.   Were you disciplined for your actions that

2  day by the Christopher department?

3      A.   No, I was not.

4      Q.   When did you become aware that McKinney had

5  been suspended from Buckner?

6      A.   Three or four days afterwards.

7      Q.   Who told you?

8      A.   He did.

9      Q.   Where did you see him?

10     A.   I didn't see him.  We just talked on the

11  phone for a minute because I saw him drive by and I

12  gave him a phone call, seen how he was doing.

13     Q.   And was that before or after Mr. Barnhart

14  had died?

15     A.   That was before.

16     Q.   Before he died?

17     A.   Yeah.

18     Q.   And what did Bill say?

19     A.   He just told me that Chief Barnfield had

20  suspended him pending the outcome of an investigation,

21  and I said, okay, you know, and then he said, you want

22  to go get a cup of coffee and hang out a minute, and I

23  said, well, I can't, because I'm working on this piece

24  of crap squad car at the moment, trying to get a new

1    battery in it, and that was the last time I talked to

2    Bill before all the stuff had happened.

3           MR. BEASLEY:  I think that's all the

4    questions I have.

5           MR. PIERCE:  No questions.

6           MR. BLEYER:  I have nothing.

7    (The deposition concluded;

8                    signature waived.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    C E R T I F I C A T E

2

3          I, Erin M. Bruce, RPR, C.S.R. No. 084-004263,

4    and Notary Public duly commissioned and qualified in

5    and for the County of Madison, State of Illinois, DO

6    HEREBY CERTIFY that, pursuant to agreement of counsel,

7    RICHARD W. DALE, JR., came before me on February 12,

8    2015, at Bleyer & Bleyer, 601 W. Jackson Street,

9    Marion, Illinois.  I CERTIFY that he was first duly

10   sworn to testify to the truth and that he was

11   thereupon carefully examined under oath and his

12   examination was immediately reduced to shorthand by

13   means of stenotype by me; that the deposition is a

14   true record of testimony given by the witness; that

15   the reading and signing of the deposition by the said

16   witness were expressly waived; and that the necessity

17   of calling the court reporter at time of trial for the

18   purpose of authenticating said transcript was waived.

19

20          IN WITNESS WHEREOF, I have hereunto set my

21   hand and affixed my Notarial Seal February 24, 2015.

22

                              _____

23                            Erin M. Bruce, RPR,

                                 CSR, Notary Public

24