## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

SUSAN BARNHART, as           )
Administrator of the Estate  )
of Roy D. Barnhart, Sr.,     )
Deceased,                    )
                             )
         Plaintiff,          )
                             )
vs.                          ) No. 13-CV-00772-SMY-DGW
                             )
THE VILLAGE OF BUCKNER,      )
ILLINOIS, and PATROLMAN      )
WILLIAM MCKINNEY,            )
Individually and in his      )
Official Capacity as an      )
Officer for the Buckner      )
Police Department, and THE   )
CITY OF CHRISTOPHER,         )
ILLINOIS, and OFFICER RICHIE )
DALE, Individually and in    )
his Official Capacity as an  )
Officer for the Christopher  )
Police Department,           )
                             )
         Defendants.         )

Deposition of
DAVID DOLDERER
taken on behalf of the Plaintiff
on May 11, 2015.

REPORTER: ERIN M. PANZAU, C.S.R., C.C.R.
IL CSR No. 084-004263     MO CCR No. 850(G)

Mueller Reporting, P.C.
P. O. Box 509
Edwardsville, Illinois 62025
(618) 692-9890  Fax: (618) 692-9891
mrpc@att.net

## Page 2

1           APPEARANCES
2  On Behalf of the Plaintiff:
3       Kuehn, Beasley & Young, P.C.
        By: Mr. Jarrod P. Beasley
4       23 Public Square, Ste. 450
        Belleville, Illinois 62220
5       (618) 277-7260
6
   On Behalf of the Defendant The Village of Buckner,
7  Illinois:
8       Bleyer & Bleyer
        By: Mr. Joseph A. Bleyer
9       P.O. Box 487
        Marion, Illinois 62959
10      (618) 997-1331
        jableyer@bleyerlaw.com
11
12 On Behalf of the Defendant William McKinney:
13      Pierce Law Firm, P.C.
        By: Mr. Charles A. Pierce
14      #3 Executive Woods Court, Suite 200
        Belleville, Illinois 62226
15      (618) 277-5599
16
   On Behalf of the Defendants The City of Christopher,
17 Illinois, and Officer Richie Dale:
18      Black, Hedin, Ballard, McDonald, P.C.
        By: Mr. Jerome E. McDonald
19      108 S. Ninth Street
        P.O. Box 4007
20      Mt. Vernon, Illinois 62864
        jmcdonald@illinoisfirm.com
21
22
23
24

## Page 3

1              INDEX
2  Examination by Mr. Beasley ......... Page 4
3  Examination by Mr. Pierce .......... Page 40
4
5
6         EXHIBITS INDEX
7  Plaintiff's                      Page
8  Exhibit                          1st Ref.
9    A    Statement of David Dolderer    11
10 (Exhibit attached to transcript.)
11
12
13
14
15         * * * * * * * * * * * * *
16      IT IS STIPULATED AND AGREED by and between
17 counsel for Plaintiff and counsel for Defendants that
18 the deposition of DAVID DOLDERER may be taken pursuant
19 to the Federal Rules of Civil Procedure by and on
20 behalf of the Plaintiff on May 11, 2015, at Bleyer &
21 Bleyer, 601 W. Jackson Street, in the City of Marion,
22 State of Illinois, before Erin M. Bruce, a Certified
23 Shorthand Reporter within and for the State of
24 Illinois, and Certified Court Reporter within and for

## Page 4

1  the State of Missouri; that the issuance of notice is
2  waived and that this deposition may be taken with the
3  same force and effect as if all Federal Rules had been
4  complied with.
5       IT IS FURTHER STIPULATED AND AGREED that any
6  and all objections to all or any part of this
7  deposition are hereby reserved, except as to form of
8  the question, and may be raised on the trial of this
9  cause; and the signature of the deponent is waived.
10 (On the record at 9:19 a.m.)
11           DAVID DOLDERER,
12 produced, sworn and examined on behalf of the
13 Plaintiff, deposes and says as follows:
14           EXAMINATION
15     BY MR. BEASLEY:
16 Q. Mr. Dolderer, can you please state your name
17 for the record.
18 A. David Dolderer.
19 Q. How old are you, sir?
20 A. Forty-three.
21 Q. Where do you live?
22 A. I live in Buckner, 406 South Jenette
23 Street.
24 Q. How do you spell Jenette?

PLAINTIFF'S EXHIBIT B

Page 5

1  A. J-e-n-e-t-t-e.
2  Q. What's your phone number?
3  A. 923-4680.
4  Q. What do you do for a living?
5  A. I work at National Railway Equipment in
6  Mt. Vernon, Illinois.
7  Q. What do you do there?
8  A. I am a junior technician in the engine
9  building.
10 Q. How long have you been there?
11 A. Almost two years.
12 Q. What's your highest level of education?
13 A. I took some college classes the Rend Lake.
14 Q. Any specialty that you had?
15 A. I started going elementary education and
16 then I got married and then that dream shattered.
17 Q. Like all of everybody's dreams when they get
18 married, yes. Everyone in this room is very familiar
19 with that.
20 A. Sorry. I shouldn't have said that.
21 (Discussion off the record.)
22      THE WITNESS: And firefighting is my hobby,
23 and I'm a volunteer fire chief of Buckner Fire
24 Department.

Page 6

1      BY MR. BEASLEY:
2  Q. How long have you been the volunteer fire
3  chief at Buckner?
4  A. Six years -- well, I have not been the chief
5  for six years. I've been involved with the department
6  for six years. I've been the chief for two years.
7  Q. Now, when you get the job as volunteer
8  fireman, is there any training that goes with that?
9  A. We go through -- it's not really a mandatory
10 training, per se, since we are a volunteer department.
11 Most of our roster members, they're either -- they're
12 either retired; they work for a living; they have
13 families, you know. They come as they can. I do
14 recommend that they take a first responder class. The
15 majority of the calls that we run in our village are
16 first responder calls. That is the bulk of our runs.
17 I highly recommend everyone to take that. I usually
18 have very good success in getting everyone interested.
19 We all take courses and classes as they become
20 available with the University of Illinois Fire Service
21 Institute throughout Southern Illinois.
22 Q. Now, in this -- have you taken the first
23 responder class?
24 A. Yes, sir.

Page 7

1  Q. And you took the first responder class
2  before this incident involving Roy Barnhart, right?
3  A. Yes, sir.
4  Q. Now, what does that -- what does the first
5  responder class entail? Let me just ask you this: Do
6  you get like a certificate or something when you
7  complete it?
8  A. We become certified with the State of
9  Illinois. Our first responder, we assess the scene or
10 we give immediate patient care until the paramedics,
11 EMTs arrive. When they arrive, they, of course,
12 supersede us. They take over the scene, but we can
13 assess the patient, get basic vital signs. If it's a
14 wreck, we can stabilize the patient, whatever we need
15 to do, just give them a hand that they can get to the
16 next step of getting the patient loaded, transported
17 and off to the hospital, whether it's a minor
18 situation or a life or death situation where they get
19 them going. It just kind of helps expedite it.
20 Q. And as a first responder, one of the things
21 you want to do is take the history, find out what
22 happened, right?
23 A. (Nodding head.)
24 Q. Yes?

Page 8

1  A. Yes.
2  Q. Find out if there's -- you know, what hurts,
3  what doesn't hurt, those type of things?
4  A. Yes, sir.
5  Q. Find out if there's any immediate distress
6  or if they have any medical history that you should be
7  aware of, right?
8  A. Correct.
9  Q. Alan Minton was there on July 7, 2013, in
10 this Roy Barnhart thing with you. Do you know if Alan
11 Minton is still at the department?
12 A. Alan Minton is no longer with the Buckner
13 volunteer fire department. He left the department
14 six, eight months ago.
15 Q. Okay. Do you know why he left?
16 A. Not really sure what it was. I believe he
17 had an offer from the department in his actual
18 hometown.
19 Q. Okay. He doesn't live in Buckner?
20 A. No. He lives in the neighboring town two
21 miles away of Christopher.
22 Q. Alan Minton, do you know if he ever took
23 that first responder class?
24 A. He was not a certified first responder at

Page 9

1  the moment. He was just responding as an automatic
2  tone out for just help. When we have a call, if it is
3  a medical call, it's not just first responders that
4  answer that call. There are firefighters there that
5  are standby for whatever we might need them to do.
6  They don't do anything first responder related. They
7  might, you know, hey, please go to the ambulance, grab
8  a jump bag, grab a tank of oxygen, help support this
9  patient's C-spine, help load, etc. They have other
10 duties that they can do.
11     Q. So let's go back to July 7, 2013. You
12 recall the incident with Roy Barnhart, right?
13     A. Yes, sir.
14     Q. Did you know Roy before this?
15     A. Met him a couple times in town. Really
16 didn't know him that well.
17     Q. He wasn't a particular friend, right?
18     A. Correct.
19     Q. He wasn't a particular enemy either?
20     A. Correct.
21     Q. Just a guy that you knew --
22     A. Just a guy.
23     Q. -- that lived there?
24     A. Just part of the general population of the

Page 10

1  village.
2      Q. Okay. How did you become aware that there
3  was an incident at 205 East Main Street?
4      A. I was at home performing -- doing some
5  reports for the department. I always have my scanner
6  on, just listening to what's going on in the
7  neighborhood. I'd heard that there was a domestic
8  call at that address that the police departments were
9  dispatched to, you know, doing my thing, just kind of
10 listening to it here and there, and then there wasn't
11 a whole lot of talk on there of what was going on. It
12 was kind of broken up and a little staticky, and I
13 remember hearing that there was a male subject that
14 had been tased, he had a -- you know, he recently had
15 a pacemaker put in. Something told me when I heard
16 that, I just got up, I told my wife, I said I'm going
17 to go just take a drive real quick. I said we might
18 get called out. I don't know. I don't know where
19 this is going. Something's telling me to go. I left.
20 I live about five blocks away from the station. By
21 the time I got to where the scene was, they toned us
22 out for a first responder call. I advised dispatch
23 that I was already on the scene. Immediately went
24 over and, you know, attempted to assess the patient.

Page 11

1      Q. Now, do you know about what time you got
2  there?
3      A. I know it was in the early morning.
4      Q. Do you remember if it was dark or if it was
5  dusk?
6      A. It was kind of dusk. It was still light
7  out.
8      Q. Now, following this incident, you gave a, I
9  guess, statement to Mayor John Coder. Do you recall
10 that?
11     A. Yes.
12     Q. And you've had an opportunity to review that
13 statement for your deposition today, right?
14     A. Yes.
15        MR. BEASLEY: Let me mark that one.
16        MR. BLEYER: So it doesn't have your
17 highlights on it?
18        MR. BEASLEY: Yeah.
19 (Plaintiff's Exhibit A marked for
20        identification.)
21        BY MR. BEASLEY:
22     Q. I'm going to show you what's been marked as
23 Plaintiff's Exhibit A.
24        You guys know what I'm talking about,

Page 12

1  right?
2         If you could, turn to page 2 of
3  Plaintiff's Exhibit A. There's a signature. Is that
4  your signature?
5      A. Yes, sir.
6      Q. Does Plaintiff's Exhibit A appear to be a
7  true and accurate copy of the statement that you typed
8  up and gave to the mayor?
9      A. Yes.
10     Q. And is there anything about that statement,
11 as you sit here right now, that you would like to
12 change?
13     A. No.
14     Q. You also spoke to the Illinois State Police
15 in this incident, right?
16     A. Yes, sir.
17     Q. They videotaped their conversation with you,
18 right?
19     A. Yes, sir.
20     Q. Have you ever seen that?
21     A. Actually, no, I haven't.
22     Q. And as far as you know, has that ever been
23 transcribed and you've given a copy of it or
24 anything?

Page 13

1  A. No, I've never received a copy of it, no.
2  Q. As far as what you told the Illinois State
3  Police, you told them the truth, right?
4  A. To the best of my knowledge, yes.
5  Q. And it was -- this interview you gave was
6  July -- it looks like July 12th at about 4:42. Does
7  that sound about right?
8  A. That sounds accurate, yes.
9  Q. That was about five days after the incident,
10 the incident is still fresh in your head, and when you
11 talk to the Illinois State Police, or any police
12 agency, you want to be as honest with them as possible
13 and give them the best information that you have,
14 right?
15 A. Absolutely, correct.
16 Q. Certainly wouldn't intentionally lie in
17 something like this?
18 A. Correct.
19 Q. All right. Let's go back. You get on the
20 scene. When you get on the scene, are you the first
21 guy other than Richie Dale and McKinney in an official
22 capacity?
23 A. If the question is am I the first guy with
24 my department, that is correct, yes.

Page 14

1  Q. All right. And there's no EMS or anything
2  there yet?
3  A. No, not at the moment.
4  Q. When you got on the scene, describe it for
5  me. What do you see?
6  A. I see the police vehicles, probably, I don't
7  know, other side of the road. There was two of them
8  there. Officer McKinney was kind of -- he's kind of
9  pacing back and forth on the Main Street there in
10 front of the address, the residence. I remember
11 seeing another officer. I believe that would have
12 been Richie Dale. He was kind of up towards the
13 house. He was on the property. Mr. Barnhart was
14 facedown, prone position, handcuffed on the back, two
15 Taser pins sticking out of his back side, one in his
16 right shoulder, one would be the left upper hip
17 region. He was, what I heard, screaming, "my chest,
18 my chest is killing me," handcuffs were too tight,
19 kind of briefly just -- you know, I wanted to get a
20 feel of what was going on. You know, are you doing
21 this or are you exaggerating? I never accuse anyone
22 of exaggerating, but I know sometimes at some of the
23 calls I've been on, just things have been greatly
24 exaggerated; and when you can't fit anything in

Page 15

1  between, yeah, they were too tight.
2  Q. The handcuffs were too tight?
3  A. Yeah, I was agreeing to the point that, hey,
4  these are slightly too tight.
5  Q. Now, when you say that he is facedown on the
6  ground in the prone position, I think you said, what
7  do you mean? He's laying on his front side
8  basically?
9  A. Yes, sir.
10 Q. All right. Where is he laying?
11 A. He was laying -- there's not exactly a
12 sidewalk in Buckner. That's one thing we're not real
13 blessed with in some areas. It's kind of, basically,
14 I guess what you'd call the curb line. Probably about
15 a little 1- or 2-foot area right off the curb where
16 the street is at, laying in the grass.
17 Q. So his entire body is in the grass?
18 A. Yeah, nothing was really even -- nothing was
19 laying in the street. He might have been maybe a foot
20 by the curb, you know. He wasn't exactly parallel
21 with the street.
22 Q. All right. Now, he's complaining that --
23 you said he's complaining that the handcuffs were too
24 tight and that his chest was hurting?

Page 16

1  A. Yeah, his chest was killing him.
2  Q. You said earlier when you got the -- when
3  you were at home something across the scanner told you
4  that he had been tased and that he had a pacemaker?
5  A. I don't remember whether -- I don't remember
6  whether it was actually the dispatch talking at that
7  time or whether it was one of the officers talking
8  back at that time. I don't remember who said it, but
9  it was in part of the conversation back and forth in
10 what we call the radio traffic. I heard that. I just
11 got this gut feeling, this doesn't sound good. I'm
12 just going to take a drive. We might get toned out;
13 we may not. I wasn't even paying attention to the
14 address. I did not know that, you know, it was that
15 close to our fire station. Literally we can throw a
16 rock at our station. It was two houses down from our
17 station. So I just -- like I said, I told my wife,
18 hey, I'm going to go, I'm going to take a drive, this
19 doesn't sound good, something is not right here.
20 Q. Now, you knew Roy before this. Did you know
21 he had a pacemaker?
22 A. No.
23 Q. You knew Bill McKinney before this
24 incident?

Page 17

1  A. Wouldn't state him as a friend. I would
2  state as an acquaintance. I had been on some other
3  medical calls, some 10-50 accidents, some actual fire
4  calls we had with Bill. Bill being a member of the
5  police department in town, he did assist us when
6  needed.
7  Q. You knew him?
8  A. So I knew him, yes.
9  Q. What about Richie Dale, did you know him?
10  A. I just kind of knew him off and on. I knew
11  that he was on -- he was on Zeigler Police Department
12  at one time. I knew he was on the Christopher Police
13  Department. Actually, before that, I kind of met him
14  because I used to work for the West City Police
15  Department and the administrator director there was
16  Richie Dale, Sr., that was Richie Dale's father, kind
17  of first met him there and getting acquainted with him
18  and knowing him and all that.
19  Q. In your interactions with Bill McKinney
20  before this night -- I'm talking about before, nothing
21  to do with this.
22  A. Okay.
23  Q. -- did you ever see him act inappropriately
24  towards an arrestee or a detainee or any member of the

Page 18

1  public, for that matter, in his official capacity
2  before this night?
3  MR. PIERCE: Object. Form. Foundation. Go
4  ahead.
5  THE WITNESS: No, I had never seen Bill act
6  in any -- show any aggression, anger, any type of
7  emotion related to that towards anyone before that
8  evening.
9  BY MR. BEASLEY:
10  Q. Now, this night you show up and you said
11  he's pacing back and forth. Did he appear to you to
12  be angry?
13  A. He seemed extremely agitated, yes. As
14  stated before, I worked with Bill on a couple calls.
15  I always kind of considered Bill -- he was kind of a
16  tough guy to get to know. I really don't know how to
17  describe his demeanor. You just had to get to know
18  him. The more that I dealt with him and the more
19  calls I went on with him, I seen him just kind of open
20  up to me more, and he would actually joke with me, you
21  know. He was very professional of being a police
22  officer. He acted very professional all the time. I
23  kind of got to see a little bit of an open -- he kind
24  of opened up to me a little bit more. You know, if I

Page 19

1  was driving by, he would wave at me, purposefully wave
2  at me because he knew it was me, and we had a good
3  working relationship. We would joke, we would cut up
4  to break the ice a little bit, you know, so everything
5  wasn't so serious.
6  Q. Okay. Now, so you get on the scene, and we
7  talked about the two complaints that Roy made. Did he
8  have any complaints about his eyes or his breathing?
9  A. Not at first, no. At first, while he was
10  handcuffed and facedown, it was just the handcuffs
11  being too tight and his chest was killing him.
12  Q. Now, when you discovered that the handcuffs
13  were too tight, did you tell anybody?
14  A. I told -- I told Bill please, hey, these
15  handcuffs are a little tight. Do you think we can
16  loosen them up a little bit? I asked for assistance,
17  you know, and I need to get these Taser needles out.
18  I need to assess this patient. I cannot do it with
19  him handcuffed and facedown. He did not offer any
20  assistance in the Taser needle removal. I removed
21  them myself. They gave me -- I don't even remember
22  what it was -- a little piece of cardboard that I just
23  stuck them in so they can dispose of them, do whatever
24  they do with them. I asked him to please loosen the

Page 20

1  handcuffs and to help assist me sitting Mr. Barnhart
2  up, because Mr. Barnhart was nothing but dead weight
3  at that moment. I -- I'm a buck sixty soaking wet.
4  He was a little bit bigger guy. I was not able to
5  move him completely on my own in a safe moving
6  maneuver to make sure that Mr. Barnhart was not
7  injured further.
8  Q. Okay.
9  A. He did help assist me in moving him. He was
10  a little overly aggressive and rough moving him.
11  Basically, he got him into kind of an Indian style
12  position and work, go from there. I need his arms
13  free, I can take his pulse and I can take his blood
14  pressure.
15  Q. And did he uncuff him?
16  A. Yes.
17  Q. And at what point did he uncuff him?
18  A. I believe it was after he was struck.
19  Q. So we're talking a little ways down the
20  road?
21  A. A little ways down the road, yes.
22  Q. So now we've got Roy, he's sitting up. You
23  described it as basically you wanted him in an Indian
24  style position. Is that where he got to?

## Page 21

1  A. Uh-huh.
2  Q. Yes?
3  A. Yes.
4  Q. All right. Still handcuffed and you said
5  McKinney was a -- what did you say -- very rough with
6  the victim in changing his position. Can you tell us
7  what you mean when you wrote "very rough with the
8  victim"?
9  A. Basically, like manhandling him. He did not
10 need to be manhandled to get the -- Mr. Barnhart from
11 a facedown position just to sitting-up-on-his-knees
12 position. I could have assisted. I really didn't get
13 a chance to. He just basically grabbed him and very
14 roughly just kind of slung him up and, you know,
15 helped him get his balance there, and I was like,
16 okay, easy enough type thing, but all right, now my
17 focus goes on the patient.
18 Q. And you say here the victim didn't want any
19 vitals taken and was basically refusing treatment. Do
20 you recall that?
21 A. Yes.
22 Q. After some coaxing, I got the victim
23 convinced to be checked out?
24 A. Correct.

## Page 22

1  Q. And you began the process of checking him
2  out?
3  A. Correct.
4  Q. You say at the same time, the victim and
5  Officer McKinney were exchanging words with one
6  another. I do not recall what was being said, dah,
7  dah, dah. Is it safe to say the words they were
8  exchanging were unpleasant words?
9  A. As in swearing?
10 Q. As in they weren't asking each other how the
11 weather was going to be later this week or if they
12 wanted to get coffee?
13 A. You would be correct. It was not a pleasant
14 conversation. As I stated in my summary there, I was
15 not paying attention to what they were actually
16 talking about, what words were used. It was not a
17 pleasant conversation. They were just, you know,
18 trash-talking back and forth, I guess, like at a
19 football game with opposing teams, just to kind of get
20 each other fired up, get the last word in. My focus
21 was calm down, please, you know, let me take your
22 vitals. If you're going to check out okay, you know,
23 I can't legally force you to do anything. I cannot
24 force you to go to the hospital. Please just for

## Page 23

1  everybody's peace of mind, for your family's peace of
2  mind, for your own peace of mind, let me check your
3  blood pressure, let me check your pulse, let me listen
4  to your heart, we'll go from there. Slowly getting
5  him calmed down, slowly getting him to agree to it,
6  Bill wouldn't shut up. Neither one of them would. If
7  one fired, then the other one fired back, and it broke
8  Mr. Barnhart's kind of channel that we had there.
9  It's like come on, please, you know, I almost had him,
10 and then I had to work a little harder to get him
11 calmed down again.
12 Q. And as this is going on, are you
13 face-to-face with Roy?
14 A. Yes. I got down to his level. He was in an
15 Indian style position; so was I.
16 Q. And where was McKinney?
17 A. McKinney was still kind of pacing back and
18 forth with the conversation that he was having with
19 Mr. Barnhart, just kind of to the side of me and
20 directly behind me and back to the side of me and
21 just -- I guess you would call it just east-west pace
22 down the short distance on the Main Street.
23 Q. And then you say in here as I was about to
24 start, Officer McKinney came from behind and over the

## Page 24

1  top of me and struck the victim in the head with a
2  closed fist. Is that correct? Do you remember
3  that?
4  A. Yes.
5  Q. Now, let's just kind of go through this.
6  "Over the top of me," did he -- it's my understanding
7  based on the Illinois State Police interview that you
8  gave that Officer McKinney would have come from your
9  left side?
10 A. I believe so, yes. I was bent over in my
11 jump bag. So, if I can demonstrate, like I said, I
12 was on the same level of him. He was Indian style; I
13 was Indian style. My jump bag was to my right. I got
14 him to the point --
15    MR. PIERCE: Sir, you just gestured to your
16 left when you said to my right.
17    THE WITNESS: I'm sorry. My left, but I
18 just got him calmed down. Can I check you out? Yes,
19 you can check me out.
20    When I bent over to get my bag, unzip
21 it to get my equipment out, that's when Mr. McKinney,
22 Officer McKinney, came overtop of me.
23    BY MR. BEASLEY:
24 Q. And in your Illinois -- at least -- well,

Mueller Reporting, P.C.
618-692-9890

**Page 25**

1  I've seen the statement; but in your Illinois State
2  Police interview, you told them that McKinney came
3  over you and hit Barnhart, Sr., on the right side of
4  the head? Is that your recollection as you sit here
5  right now?
6     A. That is the best of my recollection, yes.
7  Everything kind of happened so fast. I was kind of
8  down not really seeing everything of where he was
9  exactly hit at.
10     Q. And when he hit -- McKinney hit Roy, Roy was
11  handcuffed?
12     A. Yes.
13     Q. And when McKinney hit Roy, what did Roy's
14  body do?
15     A. It basically just slumped over.
16     Q. Slumped over to --
17     A. It would be slumped over to Roy's right/my
18  left.
19     Q. In your Illinois State Police interview, you
20  said that Barnhart, Sr., slumped over onto his left
21  side. Now, I'm not saying that you're being untrue to
22  either one of them. I'm just trying to get it clear.
23  In your mind, do you have a picture of what happened
24  that day?

**Page 26**

1     A. There was -- it was his right side, my
2  left.
3     Q. So you're just -- when you said onto his
4  left side --
5     A. Because everyone that I had -- I believe it
6  was Officer -- I believe it was Alan Minton that was
7  on my department that was there. I believe I had him
8  help me pull him up this way, to bring him from left
9  to center.
10     Q. I don't know that it's critical one way or
11  the other. I just wanted to make sure we got it
12  correct.
13     MR. PIERCE: And you're gesturing from your
14  left to center; is that correct?
15     THE WITNESS: Yes sir.
16     MR. PIERCE: Okay.
17     BY MR. BEASLEY:
18     Q. So Roy goes over onto his right side, so --
19  well, let me ask you this: Did anything else --
20  strike that.
21      When Roy slumped over onto his right
22  side, what caused him to slump over onto his right
23  side?
24     A. My impression would be from the strike of

**Page 27**

1  his fist or it would actually be if Mr. McKinney kind
2  of like rolled into him or a combination of both.
3  Like I said, I didn't actually see it because it was
4  when I was turned and then I had an officer on top of
5  me.
6     Q. And when McKinney hit him, did he also make
7  contact with you?
8     A. Just by going over the top of me. I was not
9  struck by Officer McKinney, no.
10     Q. Now, you know -- I mean, it's a small
11  town -- McKinney has said he didn't punch him. He's
12  slapped him, right?
13     A. I've heard that, yes.
14     Q. That's not what you -- that's not what
15  you -- well, strike that.
16      You say in your statement it was not a
17  smacking sound that would be associated with an open
18  hand, correct?
19     A. Correct.
20     Q. And Alan Minton was there, too, and he saw
21  it or at least heard it as well?
22     A. I believe so. Me and Alan never really
23  talked about what happened.
24     Q. But he was in close proximity when it

**Page 28**

1  happened?
2     A. He was behind me. He was actually the first
3  one to really jump into action, kind of help roll
4  McKinney off of me, to grab McKinney and start pulling
5  him back; and at that point I jumped up, figuring out
6  what happened, okay, McKinney's in front of me,
7  McKinney jumped over me. I spun around, pushed him
8  back, told Alan you take him away, just go smoke a
9  cigarette, go do something, get away from my area.
10     Q. Okay. And after that happens, you're able
11  to perform your assessment on him?
12     A. Once again, I had to start over --
13     Q. Okay.
14     A. -- in calming him Mr. Barnhart down.
15     Q. Mr. Barnhart didn't like getting punched
16  when he was handcuffed?
17     A. Apparently not. He was complaining about
18  that, once again, was saying that it jacked his heart
19  rate up again. His chest was hurting again, so.
20     Q. So now at this point has he made any
21  complaints about his face or his head?
22     A. No. Actually, he wasn't really complaining
23  about it. I immediately switched gears as far as
24  worrying about his heart rate for the moment. Okay,

Page 29

1  he just got struck in the head. Let's see if I can
2  find maybe where -- does he have redness, bruising.
3  You know, if he was scraped with a watch, a ring, does
4  he have any abrasions, contusions? Nothing in my
5  short assessment was visible at that moment.
6       Q.  Pete Elko, who is that?
7       A.  He is a firefighter on the Buckner Fire
8  Department.
9       Q.  And he was there that night, also?
10      A.  Yes. Don't recall much of anything that
11 Pete was involved in because he was standing in the
12 street with some other people that had come up that I
13 was unaware of because I was not facing that side of
14 the street at the time.
15      Q.  Do you recall, after the first punch,
16 McKinney trying to get at Roy again?
17      A.  I think he attempted to swing again, but he
18 did not connect. I believe it was basically a direct
19 hit to the ground.
20      Q.  At the point that you guys -- you say, you
21 know, Alan Minton has got him, you're standing up, you
22 know, you've just seen what happened. Can you
23 describe for us what McKinney is like at that point?
24      A.  Probably the worst condition that I had ever

Page 30

1  seen Bill in in the short period of time that I've
2  known him. He was -- if I would have had the
3  paramedics there by that time or had another first
4  responder available, I would have had them check him
5  out. He was shaking, just turning pale. I could just
6  see it in his eyes that he was kind of like the anger
7  and then kind of the shock and kind of like, I think,
8  there's almost like a reality was setting in like, oh,
9  my God, what did I just do? And, you know, when I
10 turned around, I don't think Bill liked what I said
11 when I told Alan Minton, I said, just get him out of
12 my area. I said I -- this is not going to happen
13 right now. This is my scene until the paramedics get
14 here, get him out of here. I could tell by the look
15 in Bill's eyes he didn't like me saying that, but we
16 got him away from the situation.
17      Q.  You knew at the time that you got there, Roy
18 had told you that he had been pepper sprayed, right?
19      A.  Yes.
20      Q.  Now, I know you said it was getting dark,
21 but it was a little bit -- still a little light out.
22 Did you see any redness or swelling or eyes watering,
23 that type of thing?
24      A.  His eyes were a little puffy. You know, of

Page 31

1  course, it made him tear up. Pupils were pretty much
2  normal. They were dilated slightly, a little redness.
3  Like I said, I offered him, you know, myself or
4  another one of my guys, you know, hey, we got bottled
5  water in the ambulance, we can go get it and rinse
6  your eyes out. It wasn't important at the moment.
7       Q.  That wasn't --
8       A.  To him it was not important at the moment.
9       Q.  And as far as you're concerned, that was not
10 the chief concern medically at that point anyway,
11 right?
12      A.  Correct. That would rank down third with
13 him, you know, just being struck, him having chest
14 pains, the pacemaker, etc.
15      Q.  Following this -- well, at some point the
16 EMS arrive?
17      A.  Yes.
18      Q.  And at that point, you pretty much take a
19 backseat to them?
20      A.  They outrank us as first responders. With
21 any call that we have with paramedics or EMTs,
22 whichever one of them show up, whichever combination,
23 we remain on scene for whatever assistance they may
24 need, helping getting the patient up, helping loading

Page 32

1  the patient. We give them any information that we may
2  have gotten, if we took any vital signs, you know,
3  hey, this and this, and they can jot it down on their
4  notes for the transport to the hospital.
5       Q.  And you did that here, right? You stayed on
6  the scene?
7       A.  Yes.
8       Q.  You helped?
9       A.  Yes.
10      Q.  Roy was loaded onto an ambulance?
11      A.  Yes.
12      Q.  Did you have any conversations with anyone
13 at the scene about Bill McKinney punching Roy?
14      A.  That really wasn't talked about to the best
15 of my knowledge. I kind of had a really good idea of
16 why it happened. Obviously, with them, their, quote,
17 trash-talking back and forth, obviously something that
18 Mr. Barnhart said struck a nerve with Officer
19 McKinney, and that's the only reason I can think of
20 for the punch and the attempted second punch. The
21 only thing that was really discussed afterward was I
22 remember seeing Richie Dale, and I'm like I need to
23 ask you a question. What exactly happened here? You
24 know, just out of curiosity, what happened before we

## Page 33

1  got here? You know, maybe I can try to piece some of
2  this together, and that was basically all that was
3  talked about.
4    Q. Well, what did Richie tell you?
5    A. Domestic dispute. Mr. Barnhart wasn't even
6  involved. After the cops arrived and separated the
7  parties, Mr. Barnhart came up. It was something over
8  the title, title of something, some piece of a trailer
9  or something, and he kind of poked and put his hands
10  on the officer, and the next thing I was told is he
11  was making a beeline for the house, the officers told
12  him to stop, he wouldn't stop, they didn't know what
13  he was going to do, whether he was going to get a
14  weapon or whatever, so he was tased, but he was tased,
15  apparently, up towards the house. So sometime between
16  when he was tased and I arrived on scene, he went from
17  the house to the curb and not under his own power.
18    Q. Okay. Did anybody describe to you how he
19  got from up there to down there?
20    A. Apparently, he was drug or helped or, you
21  know, picked up and escorted and placed there.
22    Q. Well, when you say drugged, I mean, you
23  didn't make that up? I mean, who told you that he was
24  drug?

## Page 34

1    A. No one told me that he was drug. That was
2  just my assumption that, okay, he did not get there on
3  his own power after being tased. The condition that
4  he was in at that point, there was no way that he
5  walked a good 75 to 100 foot from the house to the
6  curb where he was at facedown in handcuffs. It's not
7  like he walked there and then gently went down and got
8  in the positions. The officers didn't direct him
9  there; the officers obviously moved him there. I
10  don't know how. I didn't ask that. That was just my
11  assumption.
12    Q. Okay. Nobody told you that he was thrown
13  there or drug across the driveway or anything like
14  that?
15    A. No.
16    Q. Now, it looks like you talked to McKinney
17  again that same night after the incident; is that
18  right?
19    A. When we were kind of gathering everything up
20  and, you know, everybody was clearing the scene,
21  McKinney was over by our rescue unit/ambulance for
22  some reason. I don't really recall the reason why.
23  His ticket book -- and we can say this was the ticket
24  book -- was left on the back bumper of our ambulance;

## Page 35

1  and, you know, I asked the other officers, hey, if it
2  was theirs, they said no, it's probably Bill's. I
3  said, all right, well, I'll go run it over to dispatch
4  in Christopher and I'll just drop it off, and, you
5  know, figure he might need it later on; and after
6  everybody cleared and I cleared myself from the scene,
7  I drove to Christopher, went to the dispatch. Hey, I
8  think Bill left his ticket book. Hey, he's in the
9  back room. I went back there. Hey, you forgot your
10  ticket book on the back of the ambulance; you might be
11  needing this. Hey, thanks. That was it.
12    Q. Did you ever talk to him after that?
13    A. No. Honestly, after that, the only time I
14  ever seen Bill was on TV.
15    Q. How about Richie Dale, did you ever talk to
16  him about this incident after the incident?
17    A. I talked to him briefly when I walked out of
18  dispatch that night. I believe he was coming back in
19  to dispatch as I was leaving. I briefly talked to him
20  for about 2 or 3 minute afterward. Conversation was
21  like a hell of a night? Yep. That was about it.
22    Q. I mean, you were shocked with what you
23  saw?
24    A. I was still shocked. I was, yeah, I guess

## Page 36

1  the word for it, mind-blown over everything that
2  happened. I was still trying to, I guess, digest it,
3  you know. That was the last thing that I was
4  expecting to happen on, you know, something that would
5  seem like a routine call.
6    Q. Did Richie ever tell you that, you know, he
7  had seen it?
8    A. That he had seen?
9    Q. The punch.
10    A. No.
11    MR. BLEYER: Just show my objection to
12  foundation. I don't know if it was a punch or a
13  slap.
14    MR. BEASLEY: He does. He was there. He's
15  told us it's a punch, so we'll just go with his words.
16    BY MR. BEASLEY:
17    Q. This report that you wrote, Plaintiff's
18  Exhibit A, why did you write that?
19    A. Because I was told to by the mayor.
20    Q. Okay. So the mayor came to you and he asked
21  you to write, basically, your recollection of what
22  happened?
23    A. Uh-huh.
24    Q. Yes?

Page 37

1  A. Yes.
2  Q. Sorry. It's for her. I didn't give you the
3  rules or anything. I'm trying to be quick here.
4  A. That's all right. I apologize.
5  Q. So the last -- I don't see a date on here.
6  So I guess my question is -- first of all, is there a
7  date on there because I sure don't see it?
8  A. No, there is not a date on there.
9  Q. All right. Do you remember when you wrote
10 that?
11 A. I do remember when I wrote that. It was --
12 well, let me think here a minute. It was a day or two
13 after the incident happened. He had called me on the
14 phone and asked me to please write a narrative of what
15 I saw, I witnessed, I seen, smelled, heard --
16 Q. Okay.
17 A. -- just for future reference and to please
18 get it back to him as soon as possible.
19 Q. And is that the first time you talked to the
20 mayor about this incident?
21 A. Yes.
22 Q. The first time was when he called you?
23 A. Yes.
24 Q. Following this incident, did you report what

Page 38

1  you saw to anyone, you know, whether it be the mayor,
2  the chief of police, anybody about the punch?
3  A. Did not talk to the chief of police. Me and
4  Chief Barnfield don't think, honestly, we've ever
5  talked about this. He was there briefly at the end.
6  Probably -- it was after the ambulance was already
7  there and Mr. Barnhart was getting loaded up. We
8  didn't talk about it then. Honestly, me and Police
9  Chief Barnfield have never really talked about it.
10    I was told by the mayor what happened,
11 it's going to be under investigation. Just please
12 don't go talking about it. Keep it under your hat.
13 He was telling me just keep it on the down low for
14 now. A couple days later he gave me a call telling me
15 that Mr. Barnhart had passed away in the hospital.
16 Another ton of bricks hitting me. I was like, oh, my
17 God, this is like a dream. This is not happening, you
18 know. He goes probably -- he goes don't talk to
19 anybody until I tell you to, please don't, you know,
20 media, reporters, whatever. He goes this is going to
21 get bad. He goes just don't talk to anybody yet until
22 I tell you to, and then he called me up and said -- I
23 was working at my other job. I was working for the
24 Village of West City. He called me up and said the

Page 39

1  state police investigators, they're wanting to talk to
2  you and interview you. Hey, when are you off work? I
3  get off -- I think I got -- yeah, I got off at four.
4  They'll meet with you here at the firehouse or over at
5  the community building because they're conducting
6  interviews; you're allowed to talk to them; so I
7  did.
8  Q. Have you ever testified in any criminal
9  hearing?
10    MR. BLEYER: Involving this case or --
11    BY MR. BEASLEY:
12 Q. Relating to this?
13 A. In this case, no. It never went to -- it
14 went to court, yes, but it was never a thing where I
15 had to come in to court and testify. It was -- I'm
16 trying to think of the legal term you guys use.
17    MR. PIERCE: Plea bargain?
18    THE WITNESS: It ended up being plea
19 bargained, but it kept being extended, extended.
20    MR. BLEYER: Continued?
21    BY MR. BEASLEY:
22 Q. Continued?
23 A. Continued, it kept being continued, and then
24 finally I did go into the state's attorney's office.

Page 40

1  We were going over everything and then, yeah, you're
2  going to appear on this date at such-and-such time,
3  and then I got a phone call, no, you're not, plea
4  bargain, don't need you. That's it. That's all that
5  I've talked to and then you guys today.
6     MR. BEASLEY: Okay. I think that's all the
7  questions I have.
8     MR. MCDONALD: I don't have any.
9     MR. PIERCE: My name is Chuck Pierce. I
10 represent Bill McKinney. I just have a couple
11 questions, make sure I'm understanding what you
12 described to us there.
13    EXAMINATION
14    BY MR. PIERCE:
15 Q. At the scene right before this strike that
16 Bill administered, you said you were kind of sitting
17 Indian style, so you were kind of kneeling, squatting.
18 Is that how were you positioned?
19 A. I was kneeling.
20 Q. Kneeling?
21 A. Yes.
22 Q. And you were face-to-face with Roy
23 Barnhart?
24 A. Yes. Basically, I guess, in a directional

Page 41

1  standpoint, our streets on Main Street there run east
2  and west. I was facing to the north. He was facing
3  me to the south.
4       Q.  So your back would have been towards village
5  hall there basically?
6       A.  Yes, and everyone else, basically, beside
7  me. I had just a little bit of peripheral vision of
8  Bill walking back and forth, one maybe -- one at first
9  and maybe a second officer showing up towards the
10 house and then some of the family members around
11 the -- it would be the west side of the house
12 entrance.
13      Q.  Okay. And at the time that Bill hit Roy in
14 the face, you said you sort of leaned over to your
15 left to your duty bag; is that correct?
16      A.  Yes.
17      Q.  Okay. So McKinney kind of came over your
18 right shoulder?
19      A.  It almost seemed to be. Everything worked
20 simultaneously. As I was going down, he was coming
21 over. I don't know what would have happened if I
22 wouldn't have been over, if he would have tried to go
23 over me more or if he would have waited or I have no
24 idea how that happened, but, yeah, if I was turned

Page 42

1  like this, he would have came over -- well, it would
2  have been my left shoulder, but that's how he came
3  over me.
4       Q.  And you didn't actually see the strike,
5  whether it was a punch or a slap? You're just going
6  on the sound, correct?
7       A.  Going on the sound. It was a dead sound.
8  (Indicating.)
9       Q.  And in your -- then jumping forward a bit
10 when you examined him, you didn't find any marks that
11 would show a punch or a slap? You just didn't see
12 anything?
13      A.  I didn't see anything. I was looking for
14 just any signs of anything or whether it was a hand
15 print, redness, swelling, cut, abrasion, contusion,
16 anything. I didn't see anything. Okay. Let's move
17 back to here. We'll go back to the main objective of,
18 you know, his chest pains, try to get him calmed down
19 again. At that point with everything going on, the
20 EMTs had arrived. Guys, you ain't going to believe
21 this, this is what happened. You need to check this,
22 this, this and this. Please check his head a little
23 bit more thorough. He was struck in the head. I'm
24 not exactly sure where. While you're doing that,

Page 43

1  please, another one; get his pulse, get his heart
2  rate, please put him on the heart monitor. We got to
3  figure out what's going on. This gentleman has a
4  pacemaker. You know, let's take care of this guy.
5  Let's make sure everything is going good and do what
6  we got to do.
7       Q.  After Bill struck Roy, Roy fell to Roy's
8  right, which would to be your left; is that correct?
9       A.  Yes.
10      Q.  Okay. Going backwards a little further in
11 time, when you said Bill kind of manhandled Roy in
12 helping him get up, in doing that, did you see any
13 type of blow or strike to the head or anything like
14 that during that maneuver?
15      A.  No, there was no physical strike, contact or
16 anything like that. He was just kind of rough the way
17 he grabbed him, I guess you could say, by the forearms
18 and everything and just kind of slung him up real
19 quick.
20      Q.  You talked about your size being a buck
21 sixty. Bill's even smaller than you, isn't he?
22      A.  Pretty much, yeah. He had to manhandle him
23 to get him up. I mean, I really don't know what
24 Mr. Barnhart's weight was. He's, obviously, bigger

Page 44

1  than me and Bill, you know. It would take a little
2  bit more for us to really move him.
3       Q.  And in this manhandling you described where
4  Bill is setting Roy up, you didn't see anything that
5  would lead you to believe that that maneuver injured
6  Roy Barnhart?
7       A.  No, sir.
8       MR. PIERCE:  Okay. That's all I've got for
9  you, sir. Thank you.
10      MR. BEASLEY:  I don't have any questions.
11 (The deposition concluded;
12      signature waived.)

Page 45

```
 1              CERTIFICATE
 2      I, Erin M. Panzau, C.S.R. No. 084-004263, RPR,
 3  and Notary Public duly commissioned and qualified in
 4  and for the County of Madison, State of Illinois, DO
 5  HEREBY CERTIFY that, pursuant to agreement of counsel,
 6  DAVID DOLDERER came before me on May 11, 2015, at
 7  Bleyer & Bleyer, 601 W. Jackson Street, Marion,
 8  Illinois. I CERTIFY that he was first duly sworn to
 9  testify to the truth and that he was thereupon
10  carefully examined under oath and his examination was
11  immediately reduced to shorthand by means of stenotype
12  by me; that the deposition is a true record of
13  testimony given by the witness; that the reading and
14  signing of the deposition by the said witness were
15  expressly waived; and that the necessity of calling
16  the court reporter at time of trial for the purpose of
17  authenticating said transcript was waived.
18
19      IN WITNESS WHEREOF, I have hereunto set my
20  hand and affixed my Notarial Seal May 13, 2015.
21              _____
22              Erin M. Panzau, CSR,
                RPR, Notary Public
23
24
```

12 (Page 45)