## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

SUSAN BARNHART, as )
Administrator of the Estate )
of Roy D. Barnhart, Sr., )
Deceased, )
                )
   Plaintiff, )
                )
vs. ) No. 13-CV-00772-SMY-DGW
                )
THE VILLAGE OF BUCKNER, )
ILLINOIS, and PATROLMAN )
WILLIAM MCKINNEY, )
Individually and in his )
Official Capacity as an )
Officer for the Buckner )
Police Department, and THE )
CITY OF CHRISTOPHER, )
ILLINOIS, and OFFICER RICHIE )
DALE, Individually and in )
his Official Capacity as an )
Officer for the Christopher )
Police Department, )
                )
   Defendants. )

Deposition of
ALAN MINTON
taken on behalf of the Plaintiff
on May 11, 2015.

REPORTER: ERIN M. PANZAU, C.S.R., C.C.R.
IL CSR No. 084-004263     MO CCR No. 850(G)

Mueller Reporting, P.C.
P. O. Box 509
Edwardsville, Illinois 62025
(618) 692-9890  Fax: (618) 692-9891
mrpc@att.net

## Page 2

1          APPEARANCES
2  On Behalf of the Plaintiff:
3     Kuehn, Beasley & Young, P.C.
      By: Mr. Jarrod P. Beasley
4     23 Public Square, Ste. 450
      Belleville, Illinois 62220
5     (618) 277-7260
6
   On Behalf of the Defendant The Village of Buckner,
7  Illinois:
8     Bleyer & Bleyer
      By: Mr. Joseph A. Bleyer
9     P.O. Box 487
      Marion, Illinois 62959
10    (618) 997-1331
      jableyer@bleyerlaw.com
11
12  On Behalf of the Defendant William McKinney:
13    Pierce Law Firm, P.C.
      By: Mr. Charles A. Pierce
14    #3 Executive Woods Court, Suite 200
      Belleville, Illinois 62226
15    (618) 277-5599
16
   On Behalf of the Defendants The City of Christopher,
17  Illinois, and Officer Richie Dale:
18    Black, Hedin, Ballard, McDonald, P.C.
      By: Mr. Jerome E. McDonald
19    108 S. Ninth Street
      P.O. Box 4007
20    Mt. Vernon, Illinois 62864
      jmcdonald@illinoisfirm.com
21
22
23
24

## Page 3

1           INDEX
2  Examination by Mr. Beasley ......... Page 4
3  Examination by Mr. Pierce .......... Page 26
4
5
6       EXHIBITS INDEX
7  Plaintiff's            Page
8  Exhibit            1st Ref.
9    A    Statement of Alan Minton   6
10  (Exhibit attached to transcript.)
11
12
13
14
15       * * * * * * * * * * * *
16     IT IS STIPULATED AND AGREED by and between
17  counsel for Plaintiff and counsel for Defendants that
18  the deposition of ALAN MINTON may be taken pursuant to
19  the Federal Rules of Civil Procedure by and on behalf
20  of the Plaintiff on May 11, 2015, at Bleyer & Bleyer,
21  601 W. Jackson Street, in the City of Marion, State of
22  Illinois, before Erin M. Bruce, a Certified Shorthand
23  Reporter within and for the State of Illinois, and
24  Certified Court Reporter within and for the State of

## Page 4

1  Missouri; that the issuance of notice is waived and
2  that this deposition may be taken with the same force
3  and effect as if all Federal Rules had been complied
4  with.
5     IT IS FURTHER STIPULATED AND AGREED that any
6  and all objections to all or any part of this
7  deposition are hereby reserved, except as to form of
8  the question, and may be raised on the trial of this
9  cause; and the signature of the deponent is waived.
10  (Plaintiff's Exhibit A marked for
11     identification.)
12  (On the record at 10:17 a.m.)
13     ALAN MINTON,
14  produced, sworn and examined on behalf of the
15  Plaintiff, deposes and says as follows:
16     EXAMINATION
17  BY MR. BEASLEY:
18  Q.  Can you please state your name for the
19  record.
20  A.  Alan Minton.
21  Q.  Mr. Minton, how old are you?
22  A.  Sixty-six.
23  Q.  Where do you live?
24  A.  Christopher.

PLAINTIFF'S EXHIBIT C

Page 5

1  Q. What's your address?
2  A. 1004 East Market Street, 62822.
3     MR. BLEYER: Give me your phone number, too,
4  so it would be in the transcript.
5     THE WITNESS: (618) 724-4180.
6     BY MR. BEASLEY:
7  Q. What do you do for a living, sir?
8  A. I'm retired.
9  Q. What'd you do before you retired?
10 A. I was a coal miner.
11 Q. Were you also a volunteer policeman?
12 A. Firefighter.
13 Q. I'm sorry. Firefighter?
14 A. Yes.
15 (Discussion off the record.)
16    BY MR. BEASLEY:
17 Q. Volunteer fireman, how long did you do
18 that?
19 A. I'm still doing it.
20 Q. Still doing it, and where are you doing it
21 now?
22 A. Christopher.
23 Q. How long have you been in the volunteer
24 fireman game?

Page 6

1  A. Since 1967.
2  Q. And it's my understanding you were a
3  volunteer fireman for Buckner at some point?
4  A. Yes.
5  Q. How long were you there?
6  A. Off and on about seven years.
7  Q. In 2013, this incident with Roy Barnhart,
8  Sr., you were the assistant fire chief?
9  A. Yes.
10 Q. And the chief was David Dolderer?
11 A. Yes.
12 Q. I've got Plaintiff's Exhibit A marked, and
13 it's sitting in front of you there, sir. Can you tell
14 us what that is.
15 A. That is my statement to the mayor of Buckner
16 on what happened on that evening to the best of my
17 knowledge.
18 Q. And is that your signature on the middle
19 right there?
20 A. Yes, it is.
21 Q. And down there, it says witness?
22 A. That's my wife's name.
23 Q. Where'd you type this?
24 A. On my home computer.

Page 7

1  Q. Do you know when you typed it?
2  A. Within two or three days of the incident, I
3  believe.
4  Q. And do you know why you did it? Do you
5  recall?
6  A. I believe I was asked to write a statement
7  on what had happened by the mayor.
8  Q. And the mayor is John Coder?
9  A. Yes.
10 Q. And prior to writing this statement, had you
11 told -- had you talked to anyone about what had
12 happened that evening?
13 A. Other than the guys that were there, no.
14 Q. And you hadn't talked to the chief of police
15 about what had happened?
16 A. No.
17 Q. The mayor?
18 A. I don't recall whether I talked to the mayor
19 or not.
20 Q. Okay. That's fine. We're going back a
21 ways, so I understand you're not going to remember
22 every detail.
23 A. Yeah.
24 Q. Now, you've had an opportunity to take a

Page 8

1  look through the statement that you typed up,
2  correct?
3  A. Yes.
4  Q. Is there anything about that statement that,
5  as you sit here right now, you would like to change,
6  something that you messed up?
7  A. No.
8  Q. As far as you're aware, as you sit here
9  right now, this statement that we've marked as
10 Plaintiff's Exhibit A is the truth as you remember it
11 that night?
12 A. Yes, it is.
13 Q. And it looks like -- well, let's go back and
14 find out how you found out that there was an incident
15 going on on July 7, 2013.
16    MR. BLEYER: Jarrod, can I have one
17 second.
18    MR. BEASLEY: Yeah.
19 (Brief recess in the proceedings.)
20    BY MR. BEASLEY:
21 Q. How did you become aware something was going
22 on?
23 A. We had a radio dispatch, a beeper went off,
24 told us we had a possible heart attack at the address

Page 9

1   given and I responded from my house.
2       Q.  And in your statement, it says at 2045.
3   What does that make it?  8:45?
4       A.  Quarter to nine.
5       Q.  You also gave a statement to the Illinois
6   State Police; is that correct?
7       A.  Yes.
8       Q.  And that interview was videotaped?
9       A.  Yes.
10      Q.  Do you remember that?
11      A.  Yes.
12      Q.  And since that has happened, have you ever
13  seen a copy of it?
14      A.  Yes, I have.
15      Q.  How'd you see a copy of it?
16      A.  State's attorney.
17      Q.  Okay.  And was that in preparation for
18  testimony --
19      A.  Yes.
20      Q.  -- if Bill McKinney went to trial?
21      A.  Yes, it was.
22      Q.  And that was in the criminal case?
23      A.  Yes.
24      Q.  And so you've had a chance to review that

Page 10

1   statement.  When you reviewed it, was there anything
2   that said -- that you saw in that video that you
3   thought, well, that's wrong?  I need to change that?
4       A.  No, sir.
5       Q.  And when you spoke to the Illinois State
6   Police, just like when you gave this statement, your
7   intention was to be a hundred percent honest,
8   correct?
9       A.  Yes, it was.
10      Q.  So once you get the call or the page, I
11  guess, what do you do?
12      A.  I got in my vehicle, I drove about two miles
13  from my house to the location of the incident and then
14  started reacting to the incident.
15      Q.  When you got there, where'd you park?  Do
16  you remember?
17      A.  In front of the -- somewhere in front of the
18  community building.
19      Q.  So that would have been the opposite side of
20  the street?
21      A.  Of the street, yes.
22      Q.  And when you get out of your car, if you
23  can, just -- can you tell us who was there.
24      A.  When I got out of my car, I ran to the

Page 11

1   rescue truck to get rubber gloves on; and as in my
2   statement, I didn't even know the name of the police
3   officer that was there.  Alls I know is Dave was on
4   the ground with the -- Mr. Barnhart and I asked him
5   what I needed to do and he begin to tell me and then
6   everything started escalating.
7       Q.  And in your statement, it says you leaned
8   over to ask him what he wanted me to start doing when
9   Officer McKinney approached and a very vulgar verbal
10  altercation between victim and Officer McKinney
11  began?
12      A.  Yes.
13      Q.  Now, when you say victim, you're talking
14  about the Roy Barnhart, Sr.?
15      A.  Yes.
16      Q.  And did you know Officer McKinney before
17  this incident?
18      A.  Yes, I did.
19      Q.  And did you know him on a personal level or
20  was it just in --
21      A.  Yes.
22      Q.  -- professional interactions?
23      A.  I know Officer McKinney personally.
24      Q.  Is he a friend?

Page 12

1       A.  An acquaintance, yes.
2       Q.  And you had also interacted with him on a
3   professional level?
4       A.  Yes.
5       Q.  He had been on scenes where you had been
6   called to before?
7       A.  Yes.
8       Q.  Had you ever in your time, professionally
9   speaking, when you arrived on a scene, had you ever
10  seen him be inappropriate or what you deemed to be
11  excessive with any other arrestee or detainee?
12          MR. PIERCE:  Object.  Form.  Foundation.
13  You can go ahead and answer.  I just have to say
14  something for the record, sir, but you can go ahead
15  and answer his question.
16          THE WITNESS:  No, I haven't.
17          BY MR. BEASLEY:
18      Q.  And if you had, you would have told somebody
19  and reported it, right?
20      A.  Yes.
21      Q.  Because, you know, for example, that night
22  when it happened -- well, we can go back.
23          So when this very vulgar verbal
24  altercation began between the two of them, is what

Page 13

1  you're describing, they were cussing at each other?
2      A. Exactly.
3      Q. It was not a pleasant conversation?
4      A. No, it wasn't.
5      Q. Was it clear that the two were not enjoying
6  each other's company?
7      A. You could say that, yes.
8      Q. That's about the nicest way you can say it,
9  isn't it?
10         Now, Officer -- or, I'm sorry, Roy
11 Barnhart, Sr., at that point was handcuffed,
12 correct?
13     A. I didn't know that at that time.
14     Q. Okay. But you know now he was handcuffed?
15     A. Yes, I do.
16     Q. Now, was he -- how was Roy Barnhart
17 positioned?
18     A. I don't know if he was squatted on his knees
19 or he was sitting flat on the ground. I don't
20 remember that in all honesty. He was on the ground.
21     Q. Okay. But was he on the -- was he
22 sitting?
23     A. He was sitting on the ground. Whether, like
24 I said, he was sitting with his legs underneath him or

Page 14

1  flat on the ground, I don't remember.
2      Q. Okay. That's fine. And you're looking face
3  on with him?
4      A. Yes.
5      Q. And is David Dolderer to your right?
6      A. He's to my left.
7      Q. To your left, okay.
8         Now, Officer McKinney then stepped
9  around me on my left side and reached in and struck
10 the victim in the face area?
11     A. Yes.
12     Q. I just read from your statement there?
13     A. Yes.
14     Q. That's what you remember?
15     A. That's what I remember.
16     Q. And your left would also be David Dolderer's
17 right, correct?
18     A. Yes.
19     Q. So he basically comes over the top or
20 between you guys and hits Roy?
21     A. (Nodding head.)
22     Q. Yes?
23     A. Yes.
24     Q. Did you know Roy before this?

Page 15

1      A. No.
2      Q. Now, in your Illinois State Police
3  interview, it's got a quote in here. It says, and
4  it's attributed to you, quote, he thumped him, closed
5  quote. Do you remember saying that?
6      A. Yes, I do.
7      Q. And when you say he thumped him, you mean he
8  hit him hard?
9      A. Alls I can say is I never saw whether it was
10 openhanded, whether it was with a fist. I heard body
11 parts meeting body parts, whatever that sound makes,
12 and that's when I noticed that the handcuffs were on
13 Roy.
14     Q. And do you remember describing the strike --
15 the sound as a, quote, thud?
16     A. Yes.
17     Q. Okay. Now, when you say -- we go back to
18 this he thumped him, again, are you describing the
19 sound that it made, or are you describing the force
20 with which he had --
21     A. The sound that it made.
22     Q. Okay. And in your mind, as you sit here
23 right now, the thud or the thump that you heard, do
24 you associate that with a punch or a slap?

Page 16

1      A. I can't differentiate between the two. Alls
2  I know it was a strike and it was body parts hitting
3  body parts.
4      Q. And it was to Roy's head?
5      A. I assume.
6      Q. Do you know which side of the head he hit
7  him in?
8      A. In my statement, I noticed that the right
9  side was -- seemed to appear a little bit redder than
10 the left side.
11     Q. Okay.
12     A. So I was assuming that it was on the right
13 side of his head.
14     Q. And when this strike, however we describe it
15 happened, did Bill -- or did Roy tumble over?
16     A. No, he didn't tumble over. He kind of
17 leaned forward, and that's when I saw the handcuffs.
18     Q. Okay. And when you say he moved forward,
19 did he fall forward?
20     A. No, no. He didn't fall from --
21     Q. He didn't need to be sat back up after this
22 incident?
23     A. No.
24     Q. Okay. And once the strike happens, tell me

4 (Pages 13 to 16)

Mueller Reporting, P.C.
618-692-9890

### Page 17

1  what happens next.
2  A. Well, once he struck him and I realized he
3  was in handcuffs and then in my statement he come back
4  around to the other side and they started cussing one
5  another out again, and it was really getting hot and
6  heavy that time, and that's when I grabbed Bill in a
7  bear hug and led him away from the scene to try to
8  diffuse the problem.
9  Q. And you describe here the other officer on
10 the scene took charge of Officer McKinney?
11 A. Yes.
12 Q. Is that Richie Dale?
13 A. I don't remember if it was Richie Dale or if
14 Richie was still there with Roy. There was another
15 officer, I wasn't familiar with him, and I do remember
16 that after I calmed them down that Bill and this
17 officer went back a distance behind that dumpster that
18 was sitting there, and I think by that time the chief
19 of police had arrived.
20 Q. Now, when you say he walked back around me
21 on my right and leaned down in the victim's face when
22 another verbal altercation began, was Bill's face near
23 Roy's face?
24 A. Yeah, they were down there pretty close,

### Page 18

1  yes.
2  Q. And Roy was handcuffed and he was on the
3  ground, so Bill had to actually bend down to get into
4  his face?
5  A. Yes.
6  Q. And he was screaming at him?
7  A. Yeah, they were both screaming at one
8  another.
9  Q. And it's still unpleasant conversation,
10 correct?
11 A. Yeah, they were talking about one another's
12 mother.
13 Q. Okay. And lots of cuss words?
14 A. Lots of cuss words.
15 Q. I'm not going to have you repeat them all,
16 but there were a lot of them? I'm sure there were
17 more than one?
18 A. If I don't have to, I won't repeat them.
19 Q. Perfect. Did Bill McKinney at that point
20 when he's screaming at him or in the time before when
21 you said he was screaming at him, did he threaten Roy
22 in any way; do you remember?
23 A. No, but Roy threatened him.
24 Q. Okay. Roy threatened McKinney?

### Page 19

1  A. Yes.
2  Q. With what?
3  A. With a ball bat.
4  Q. But at this point he was handcuffed and
5  didn't have a ball bat, right?
6  A. No, he didn't, but he said he was going to
7  come back and get a ball bat and bash his head in.
8  Q. Was that before or after he hit him?
9  A. After.
10 Q. So it's safe to say Roy didn't appreciate
11 getting hit while he was handcuffed?
12 A. No.
13 Q. And when you saw that happen, you knew that
14 wasn't okay, right?
15 A. Yes.
16 Q. And you intervened and got Bill out of
17 there?
18 A. Yes.
19 Q. And then once you get Bill and the other
20 officer takes control of Bill, you come back over to
21 assist with treating the victim?
22 A. Yes, I did.
23 Q. And, again, in your statement, when you say
24 the victim, you're talking about Roy Barnhart?

### Page 20

1  A. Yes.
2  Q. You are not a certified first responder; is
3  that right?
4  A. That's correct.
5  Q. But you're -- in all of these instances when
6  you guys show up -- you know, you guys are first
7  responders. When you show up, you're certainly more
8  than capable of assisting, you know, patients and in
9  this case Mr. Barnhart --
10 A. Yes.
11 Q. -- right?
12 A. My EMT status had run out many years ago.
13 Q. But you didn't forget all of that, did
14 you?
15 A. No.
16 Q. Okay. You say here the paramedics then
17 arrive, and at that point you guys are kind of hands
18 off?
19 A. I left. When the paramedics got there, I
20 think Dave stayed there with him, and I retreated from
21 the scene.
22 Q. Okay. You describe here that the wife of
23 the victim arrived and the paramedics ordered her to
24 be moved away?

Page 21

1 A. Yes.
2 Q. And you were the person that helped move her
3 away; is that correct?
4 A. Yes, sir, I did.
5 Q. And you did it as politely as you possibly
6 could?
7 A. Yes, I did.
8 Q. Safe to say that she wasn't thrilled with
9 the treatment of her husband?
10 A. No, she wasn't.
11 Q. Yeah. And at that point that was pretty
12 much your entire interaction with what happened?
13 A. Yes.
14 Q. Now, when you first arrived on the scene, do
15 you remember if Roy was complaining of pain or
16 injury?
17 A. No, I do not.
18 Q. Like chest pains? Did you know he had been
19 pepper sprayed?
20 A. No, I did not.
21 Q. Complaining about the handcuffs at all?
22 A. No, I did not.
23 Q. Chief Dolderer was there before you were,
24 correct?

Page 22

1 A. Yes, he was.
2 Q. And at the point you got there, Chief
3 Dolderer had begun -- had he already taken the Taser
4 pins out?
5 A. I don't know. I did not know he was tasered
6 until way after the incident.
7 Q. Well, at least there were no Taser pins in
8 him when you got there?
9 A. I did not see any, no.
10 Q. Okay. I know they've asked you this before,
11 but you didn't feel threatened by Roy when you were
12 treating him, right?
13 A. No.
14 Q. When you noticed or when you were assisting
15 in the treatment of Roy, you noticed that his eyes
16 were reddened; is that right?
17 A. They looked red to me, yes, sir.
18 Q. After he was placed in the ambulance, you
19 talked to Bill McKinney; is that right?
20 A. Yes.
21 Q. Do you recall that conversation?
22 A. I think I said something to the fact that
23 I'm sorry that I had to grab him and that I knew that
24 I shouldn't put my hands on a police officer, but I

Page 23

1 had to try to control the situation, and we both kind
2 of laughed and he said that was all right and I think
3 we smoked a cigarette.
4 Q. And did you describe Bill McKinney as he's a
5 good officer but he's a bit of a loose cannon?
6 A. Yes, I did.
7 Q. When you say he's a bit of a loose cannon,
8 what do you mean?
9 A. Well, he's had other problems in the past
10 that are pretty well out there in public about when he
11 shot the dog and other things like that.
12 Q. Maced a cat, do you remember that one?
13 A. Vaguely.
14 Q. Okay. Any others that you can think of?
15 A. No.
16 Q. But that's what you were talking about?
17 A. That's what I was talking about. I liked
18 Bill. I thought he was a good officer. I still do.
19 Q. Have you talked to Bill after that
20 evening?
21 A. I haven't seen Bill since the incident.
22 Q. How about Richie Dale, have you talked to
23 him since?
24 A. I don't know if I would know Richie Dale if

Page 24

1 he walked up on me right now.
2 Q. He's not in the room so don't worry.
3 A. He's not in the room.
4 Q. How about, do you recall when the first time
5 you talked to the chief -- or you talked to the mayor
6 was following this incident?
7 A. I believe it was a couple days later.
8 Q. Did you call him or he call you?
9 A. I can't honestly remember.
10 Q. Okay. Do you recall what that conversation
11 was about?
12 A. It was about writing a statement. It seems
13 like he contacted me to write a statement of what had
14 happened, and that's the statement that I wrote.
15 Q. And at some point did he also call you and
16 tell you that the Illinois State Police wanted to talk
17 to you?
18 A. I don't know how I got word of that, whether
19 Dave Dolderer told me or -- it was one night, one
20 Saturday night when we were doing station duty that
21 they just showed up. I can't remember.
22 Q. Did you ever talk to the chief of police
23 about what happened that night?
24 A. No.

Page 25

1  Q. So other than the statement that you made to
2  the Illinois State Police and the statement that you
3  actually prepared and typed up yourself and,
4  obviously, today, have you ever made any other --
5  talked to anybody else about this incident?
6  A. Well, I'm sure I have within the department;
7  and after it was released from the state's attorney,
8  I'm sure I have.
9  Q. Okay. When did you find out that -- did you
10 find out that Roy passed away?
11 A. Yes, within a day or so.
12 Q. Okay. Did you have a reaction to that?
13 A. No.
14 Q. Do you know how you found out?
15 A. I guess it's through the department.
16 Q. Why did you leave Buckner, the fire
17 department?
18 A. Fire department, personal reasons.
19 Q. Okay. Can you share with us what those
20 personal reasons are?
21 A. Politics.
22 Q. Okay. You're being pretty vague. When you
23 say politics --
24 MR. BLEYER: I think that pretty well sums

Page 26

1  it up. I won't tell him not to answer it, but it has
2  nothing to do with this incident.
3  THE WITNESS: Nothing at all.
4  MR. BEASLEY: Well, that's what I'm about to
5  ask him.
6  THE WITNESS: It was nothing about with this
7  incident.
8  MR. BEASLEY: That's all the questions I
9  have.
10 MR. PIERCE: Sir, my name is Chuck Pierce.
11 I represent Bill McKinney. I just had a couple of
12 quick follow-ups.
13 EXAMINATION
14 BY MR. PIERCE:
15 Q. So when you were on scene that night, you
16 don't know what had occurred before you got there with
17 regard to Roy Barnhart?
18 A. No, I do not.
19 Q. When you said you saw a reddened area on his
20 face, you said you were assuming that's where Bill hit
21 him, but you don't know whether that could have been
22 from something that happened before you got there?
23 A. That's correct.
24 Q. You said you didn't know till way past this

Page 27

1  that Roy had been tased. How did you find that out?
2  Just scuttlebutt?
3  A. After the incident, we were all standing
4  around talking about it and where it's -- the incident
5  started to over in his front yard to where it ended
6  up. That was all before we got there.
7  Q. Okay. And just some guys talking in the
8  street, that's when you found out this guy had been
9  tased over in the yard or driveway or something?
10 A. Yes.
11 MR. PIERCE: Okay. That's all I've got for
12 you, sir. Thank you.
13 MR. BLEYER: We'll waive.
14 (The deposition concluded;
15     signature waived.)

Page 28

1  CERTIFICATE
2  I, Erin M. Panzau, C.S.R. No. 084-004263, RPR,
3  and Notary Public duly commissioned and qualified in
4  and for the County of Madison, State of Illinois, DO
5  HEREBY CERTIFY that, pursuant to agreement of counsel,
6  ALAN MINTON came before me on May 11, 2015, at Bleyer
7  & Bleyer, 601 W. Jackson Street, Marion, Illinois. I
8  CERTIFY that he was first duly sworn to testify to the
9  truth and that he was thereupon carefully examined
10 under oath and his examination was immediately reduced
11 to shorthand by means of stenotype by me; that the
12 deposition is a true record of testimony given by the
13 witness; that the reading and signing of the
14 deposition by the said witness were expressly waived;
15 and that the necessity of calling the court reporter
16 at time of trial for the purpose of authenticating
17 said transcript was waived.
18
19 IN WITNESS WHEREOF, I have hereunto set my
20 hand and affixed my Notarial Seal May 13, 2015.
21
22         Erin M. Panzau, CSR,
          RPR, Notary Public
23
24