Deposition of:
**Juliette Scantlebury, M.D.**

Susan Barnhart
-vs-
The Village of Buckner, Illinois

13-772-SMY-DGW

January 28, 2015

Reporter: Lynn C. Allard, CSR

Keefe Reporting Company
618-277-0190 or 800-244-0190
Reporter@KeefeReporting.com



PLAINTIFF'S EXHIBIT
F

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SUSAN BARNHART, as )
Administrator of the Estate )
of Roy D. Barnhart, )
Deceased, )
                )
      Plaintiff, )
                )
vs.             ) No. 13-772-SMY-DGW
                )
THE VILLAGE OF BUCKNER, )
ILLINOIS; PATROLMAN WILLIAM )
McKINNEY, Individually and )
in his Official Capacity as )
an Officer for the Buckner )
Police Department, THE CITY )
OF CHRISTOPHER, ILLINOIS; )
and OFFICER RICHARD DALE, )
Individually and in his )
Official Capacity as an )
Officer for the Village of )
Christopher Police )
Department, )
                )
      Defendants. )

Deposition of
JULIETTE SCANTLEBURY, M.D.
January 28, 2015

REPORTER: Lynn C. Allard, CSR, CCR
IL License #084-002828
MO License #507

Keefe Reporting Company
11 North 44th Street
Belleville, Illinois 62226

### Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SUSAN BARNHART, as )
Administrator of the Estate )
of Roy D. Barnhart, )
Deceased, )
                )
      Plaintiff, )
                )
vs.             ) No. 13-772-SMY-DGW
                )
THE VILLAGE OF BUCKNER, )
ILLINOIS; PATROLMAN WILLIAM )
McKINNEY, Individually and )
in his Official Capacity as )
an Officer for the Buckner )
Police Department, THE CITY )
OF CHRISTOPHER, ILLINOIS; )
and OFFICER RICHARD DALE, )
Individually and in his )
Official Capacity as an )
Officer for the Village of )
Christopher Police )
Department, )
                )
      Defendants. )

APPEARANCES:

For Plaintiff: KUEHN, BEASLEY & YOUNG, P.C.
    By Jarrod P. Beasley, Esq.
    23 Public Square
    Suite 450
    Belleville, IL 62220

### Page 3

APPEARANCES, cont.:

For Defendant (The Village of Buckner, IL):
    BLEYER & BLEYER
    By Joseph A. Bleyer, Esq.
    601 West Jackson Street
    Marion, IL 62959

For Defendant (William McKinney):
    PIERCE LAW FIRM, P.C.
    By Charles A. Pierce, Esq.
    #3 Executive Woods Court
    Suite 200
    Belleville, IL 62226

For Defendant (Richard Dale):
    BLACK, HEDIN, BALLARD, MCDONALD
    By Jerome E. McDonald, Esq.
    108 South 9th Street
    Mount Vernon, IL 62864

### Page 4

INDEX

| | Page |
|---|---|
| Examination by Mr. Pierce | 6 |
| Examination by Mr. McDonald | 19 |
| Examination by Mr. Beasley | 22 |
| Examination by Mr. Bleyer | 30 |
| Further Examination by Mr. Pierce | 32 |

## Page 5

1    IT IS STIPULATED AND AGREED by and between
2  counsel for Plaintiff and counsel for Defendant that
3  the deposition of JULIETTE SCANTLEBURY, M.D., may be
4  taken pursuant to the Federal Rules of Civil Procedure
5  by and on behalf of the Defendant on January 28, 2015,
6  at the Office of the Medical Examiner, 1300 Clark
7  Avenue, St. Louis, Missouri, before Lynn C. Allard, a
8  Certified Court Reporter; that the issuance of notice
9  is waived, and that this deposition may be taken with
10 the same force and effect as if all Federal Rules had
11 been complied with.
12    IT IS FURTHER STIPULATED AND AGREED that the
13 signature of the deponent is not waived.

## Page 6

1    JULIETTE SCANTLEBURY, M.D., produced, sworn and
2  examined as a witness on behalf of the Defendant,
3  testified and deposed as follows:
4
5                 EXAMINATION
6               By Mr. Pierce
7    (The deposition began at 11:25 a.m.)
8    Q.  Good morning, Doctor. We're here today
9  to talk about a postmortem exam that you participated
10 in with Roy D. Barnhart, Sr. It appears that you
11 brought a copy of your report with you; is that
12 correct?
13   A.  Yes.
14   Q.  All right. This is an open book test.
15 Feel free to refer to it at any time.
16   A.  Thank you.
17   Q.  First of all, do you know why -- just
18 tell me a little bit about the hierarchy here. I see
19 that you and a Dr. Turner were involved. Why were
20 there two physicians involved in this post-mortem?
21   A.  At that particular time, I was doing my
22 forensic pathology fellowship, so the attending
23 reviews all of my activities to aid in sorting out the
24 case.

## Page 7

1    Q.  Okay. So you actually performed the
2  post-mortem, and then Dr. Turner simply reviewed it
3  essentially?
4    A.  She was in the room for parts of the
5  autopsy that I did, and she reviewed everything else
6  after that, the microscopic examination and medical
7  records.
8        MR. BLEYER: You'll have to speak up a
9  little bit.
10       THE WITNESS: Okay. Sorry.
11   Q.  (By Mr. Pierce) Have you ever given a
12 deposition before, Doctor?
13   A.  Once.
14   Q.  Okay. Just -- I always go in assuming
15 that doctors have, and since you haven't done it very
16 often, you have to make sure that we're not talking at
17 the same time --
18   A.  Okay.
19   Q.  -- because she's taking down everything
20 we say. If I interrupt you, I'll try to stop and
21 vice versa. We need you to answer audibly. You can't
22 just nod your head or shake your head or things like
23 that because those don't translate well on paper,
24 okay?

## Page 8

1    A.  Okay.
2    Q.  Prior to performing Mr. Barnhart's
3  autopsy, what information, if any, were you provided?
4    A.  At the time of the autopsy, I was just
5  getting an oral presentation about what possibly
6  happened, and it was just the tasing incident at that
7  point in time. A couple weeks later I had more
8  information about what could have happened at the
9  scene.
10   Q.  Okay. What information did you get a
11 couple of weeks later?
12   A.  The -- I guess the possible -- he being
13 possibly struck by a police officer.
14   Q.  And first of all, where did you obtain
15 that information?
16   A.  I'm not for sure. I can't remember his
17 name right now, but an Illinois police officer or
18 investigator, something like that.
19   Q.  And did they give you any further
20 information about who may have struck Mr. Barnhart,
21 where, how violently, anything like that?
22   A.  It kind of varied, but I heard about
23 being struck in the jaw. The story changed from
24 open-handed to a closed fist. It wasn't a consistent

Page 9

1   story.
2       Q.   Okay.  Now, just the primary reason we're
3   here today is to talk about your findings and the
4   cause of death.
5       A.   Uh-huh.
6       Q.   And it's my understanding that you
7   believe that there was a closed head injury that
8   Mr. Barnhart experienced which was the primary cause
9   of death; is that correct?
10      A.   Yes.
11      Q.   With regard to closed head injuries --
12  and I believe part of the closed head injury was he
13  had a subdural hemorrhage; is that correct?
14      A.   Yes.
15      Q.   There's two primary mechanisms for that,
16  one being a direct blow to a particular part of the
17  head and the other being the brain moving around
18  within the skull; is that -- am I correct so far?
19      A.   Mostly correct, yes.
20      Q.   Okay.  What's incorrect about that?
21      A.   There's something hitting the head or the
22  head hitting something.  So it may be the head moving
23  and then hitting a structure like the ground or a hard
24  object hitting the head like a hand or some kind of

Page 10

1   hard object instead of moving around.
2       Q.   Is there any way to differentiate either
3   radiographically or via autopsy the difference between
4   an injury which was caused by a direct blow as in a
5   head striking something or something striking the head
6   versus the brain moving around within the skull in --
7   I guess is that coup contrecoup fashion?
8       A.   Uh-huh.  If there's coup contrecoup --
9   not exactly because it would have to be -- coup
10  contrecoup can occur if you do hit something as well,
11  so it just depends on what bruising you find on the
12  brain, but it's very variable, but not definitively
13  would you be able to distinguish all the time.
14      Q.   With the information you've been provided
15  both prior to the autopsy and then subsequent when you
16  talked to the Illinois police officer, did you form an
17  opinion which blow, if any, was cause of
18  Mr. Barnhart's death?
19      A.   No.
20      Q.   Is there any way that you feel you can
21  make that determination?  Any additional information
22  which you would need to be able to make that
23  determination?
24      A.   From examining the original CT

Page 11

1   examination that was done at the Herrin Hospital, I
2   could say that the fall that he had after being tased
3   could have played a role in his developing subdural
4   hematoma, but whether -- if he was struck by someone
5   else, if that exacerbated or also caused it, I
6   wouldn't be able to tell.
7       Q.   Okay.  In general, would it be fair to
8   say that the more violent or significant the blow, the
9   more likely it would be to cause a subdural hematoma?
10      A.   Not in this particular case.
11      Q.   Okay.  And why not?
12      A.   Because he's an older gentleman, and he
13  had some cerebral atrophy, so that would make you more
14  likely -- not more likely, but it would be easier for
15  you to get a subdural hematoma with the last violent
16  hit, and also he was also on Coumadin, so that would
17  make him more susceptible to bleeding, so that also
18  compounded the issue.
19      Q.   Is there any significance about the
20  location or locations of the hematomas that you found
21  which points you towards one or the other of the blows
22  which you've mentioned, one being the fall after being
23  tased versus a blow to the face subsequent to that?
24      A.   I'm sorry, can you repeat the question?

Page 12

1       Q.   Sure.  The evidence, we believe, is going
2   to be, as you know, is going to be conflicting about
3   the nature and severity of the impacts which
4   Mr. Barnhart experienced.  We believe that, first of
5   all, that he was -- we know he was tased and he went
6   to the ground.  Hypothetically assume this for the
7   purpose of my next question:  That when he fell, he
8   did not brace himself and instead landed face forward,
9   okay?
10      A.   Yes.
11      Q.   And then there's evidence that he was
12  struck subsequently by a police officer.
13      A.   Uh-huh.
14      Q.   The evidence on that is disputed as to
15  whether it's open-handed or closed-handed, whether
16  it's in the jaw or up on the head.  First of all, did
17  you find any evidence which would allow you to
18  determine where he had been struck by the police
19  officer, whether it was in the jaw, the head, the
20  forehead?  Did you find anything that would lead to
21  that conclusion?
22      A.   Not after so many medical interventions,
23  because there was a lot of subgaleal hematoma, but
24  that could have been from the reflection of the scalp

Keefe Reporting Company

Page 13

1   when they did the procedures to do the craniotomy. So
2   there was blood there already. If there wasn't any
3   medical intervention, maybe I would say that he was
4   hit somewhere else besides the fall that he had on his
5   right forehead, and if I had been given -- usually
6   when we do the autopsy, you try not to disturb the
7   face too much because they may want to have an open
8   casket funeral. So we try not to disturb the face too
9   much. So if I had that information at the time of the
10  autopsy, maybe I would have done a different approach
11  to reflect more, but I didn't see any -- I reflected
12  out to here (indicating), and I didn't see any
13  additional hemorrhage in that area, but that doesn't
14  mean it didn't occur, because sometimes you may not
15  bruise with every hit you receive.
16      Q.   Okay. And with the blow to the face, we
17  believe the evidence is going to show that it would
18  have been to Mr. Barnhart's left side of his face
19  administered by a right-handed person. Did you see
20  anything consistent with a left-sided impact which
21  would have contributed to Mr. Barnhart's death?
22      A.   Not from my report, no.
23      Q.   Okay. You mentioned a moment ago a
24  right-sided impact or hemorrhage. I forget which word

Page 14

1   you were using. Describe for me what you found on the
2   right side of Mr. Barnhart's anatomy.
3       A.   From the external injuries of the
4   injuries that he reported, the four by four speckled
5   contusion on the right, mid forehead, it was kind of a
6   pattern that kind of looked like if he had fell on
7   gravel or something. It could be consistent with
8   that.
9       Q.   Okay. And the locations of the subgaleal
10  hematomas you found, were they consistent with the
11  presentation of the hematoma on the forehead that you
12  just described?
13      A.   There was an associated subgaleal
14  hematoma on the right forehead area and also on the
15  right side of the skull, so it was kind of wrapping
16  around to the back.
17      Q.   Okay. Were all of the findings at least
18  with regard to the skull that you made, were they all
19  right-sided?
20      A.   Yes.
21      Q.   Were they all consistent with
22  presentations of somebody having fallen from their own
23  height unguarded onto ground?
24      A.   It's possible, yes.

Page 15

1       Q.   Anything else about those presentations
2   which would have led you to look elsewhere towards a
3   left-sided facial strike?
4       A.   Pardon me?
5       Q.   You told me that the findings you had
6   were all right-sided on the cranium, correct?
7       A.   Yes.
8       Q.   Anything about those which led you to
9   believe that the subsequent left-sided facial strike
10  would have played any part in causing these hematomas
11  and hemorrhages?
12      A.   I don't think I would be able to know
13  that, no.
14      Q.   Is it fair to say as you sit here today
15  that in your opinion, the fall after being tased is
16  the more likely cause of the gentleman's death than
17  the subsequent blow?
18      A.   No.
19      Q.   Okay. Why not?
20      A.   Because there's a lot of overlapping
21  things that occurred with him, because he has -- he
22  already had a preexisting condition where he was on
23  Coumadin. He also fell, so the fall had some role in
24  it. But then he also had the medical interventions,

Page 16

1   so there are a lot of things that kind of obscured
2   my -- not obscured my findings, but made it hard to
3   tease what happened apart. So I wouldn't -- it's not
4   like whether I could or could not do it, but with this
5   case, I wouldn't speak so definitively. I understand
6   there are several things that I can't separate.
7       Q.   Would it be fair to say that you can't
8   rule out the facial strike, but the findings are more
9   consistent with the history of having fallen from his
10  own height onto the ground?
11      A.   Not entirely.
12      Q.   Okay. Why not?
13      A.   Because, well, I guess from the
14  statement, it sounds like you -- I think I would only
15  be able to say that the fall did contribute, but
16  whether it was the only contributor, I would not be
17  able to say.
18      Q.   Okay. That's fair. So we can agree that
19  the fall after being tased was one of the contributing
20  factors to his death, correct?
21      A.   Yes.
22      Q.   Okay. As to whether or not the blow to
23  the face which we've described contributed, you simply
24  don't have enough information to say one way or the

Page 17

1  other as to whether it contributed; is that fair?
2      A.  Yes.
3      Q.  Would there be anything about any
4  preintervention radiograph which might be able to
5  assist you in making that determination if things were
6  taken before the craniotomy or some of the other
7  interventions?
8      A.  Well, the subdural hematoma when he was
9  admitted to Herrin Hospital was more right frontal,
10 but it started spreading to the parietal side of the
11 brain.
12     Q.  And you brought up a good point. When
13 you were doing your examination, I guess you had the
14 Herrin Hospital records available to you?
15     A.  Not at that time, but --
16     Q.  Before you did your report?
17     A.  Yes.
18     Q.  Okay. And then did you also have the
19 records from, I guess it was, St. Louis University?
20     A.  A couple of days after.
21     Q.  Okay. So you had all of those and then
22 reviewed those after doing the autopsy and before
23 drafting your report of examination?
24     A.  Yes.

Page 18

1      Q.  Okay.
2      A.  Before the report was finalized, yes.
3      Q.  I'm looking at the report date on here if
4  there was --
5      A.  What do you mean?
6      Q.  I just didn't know if there was a date it
7  was actually finalized is what I was looking for,
8  which I don't see.
9      A.  We may have to go into the system, but I
10 can't remember. It was a little while afterwards,
11 though.
12     Q.  Okay. These may be outside your area of
13 expertise, and if so, just please tell me so. You
14 mentioned that this gentleman had had significant --
15 you didn't say significant. I'll strike that. That
16 he had some other conditions going on. In fact, I
17 know he had a pacemaker implanted. He was on
18 Coumadin. He had some other issues that you had found
19 through your autopsy. Are you able to say whether the
20 conditions other than the cranial injuries would have
21 shortened this man's expected life span?
22         MR. BEASLEY: I would object that it's
23 clearly outside the scope of her area of expertise and
24 also calls for vast speculation. Subject to that, you

Page 19

1  may answer.
2      Q.  (By Mr. Pierce) He's made an objection
3  that the judge will rule on later, so you can go ahead
4  and answer the best you can if you have an answer. If
5  it's outside of your area, please just say so, but if
6  you have an opinion on that, please tell us.
7      A.  My opinion is that it would be
8  speculative at this point.
9          MR. PIERCE: Okay. I prefaced it by
10 saying that it might be outside your area, so that's
11 fine.
12         Gentleman, I'll pass it.
13
14              EXAMINATION
15            By Mr. McDonald
16     Q.  You've heard of one fall and one blow to
17 the head, one striking of the head, correct?
18     A.  Yes.
19     Q.  All right. Have you ever heard that
20 there was a second fall before the striking of the
21 head?
22     A.  Not from my recollection, no.
23     Q.  Assuming that this gentleman fell twice
24 before he was struck, is there any way for you to say

Page 20

1  which of those two falls was causative in the ultimate
2  subdural hematoma?
3      A.  The only external injury I could verify
4  on the head was the right forehead, the speckled
5  contusion. The others may not have external damage,
6  so I wouldn't be able to say if he fell again, because
7  sometimes, especially the head, sometimes you don't
8  have external bruise, but unless you could tell me he
9  fell on his left side of his head, then I could say
10 that that wasn't true, but on the right side,
11 everything was kind of -- after the craniotomy, what
12 was on the galea was a lot of old and new hemorrhage.
13 Well, older.
14     Q.  And the speckled appearance that you've
15 made mention of, is there any way for you to know if
16 that occurred in the first fall or the second fall?
17     A.  No.
18     Q.  We've heard, of course, that this
19 gentleman had a pacemaker and he was tased. In fact,
20 he was tased twice; you understand that?
21     A.  Uh-huh.
22     Q.  Do you have any opinion as to whether or
23 not that tasing somehow affected the pacemaker?
24     A.  According to -- well, according to the

Page 21

1 patient's Herrin Hospital -- I can't remember which
2 record it was, but he stated that after he was tased
3 twice, he felt the defibrillator go off.
4    Q. Assuming that's correct, and obviously
5 you just -- there's nothing that you looked at that
6 could tell you whether that was true or not, correct?
7    A. Yeah.
8    Q. But assuming it's correct, did that have
9 anything to do with the death of this gentleman in
10 terms of causation?
11    A. Sequela, yes, but not causation.
12    Q. What do you mean by that?
13    A. Because he had some cardiac issues
14 afterwards, and he had some respiratory issues that he
15 required being intubated, but what started it was
16 because of the subdural and the cranial trauma.
17    Q. Do you have an opinion as to whether or
18 not that tasing had anything to do with that
19 subsequent sequela?
20    A. Beyond it causing the unprotected fall,
21 no.
22    MR. MCDONALD: Okay. Well, that's the
23 other issue. Okay. Thank you.
24

Page 22

1    EXAMINATION
2    By Mr. Beasley
3    Q. Ma'am, I'm looking at your report here,
4 and there's also, looks like, a narrative report of
5 investigation, and at the bottom of that page it says,
6 "Tara Rick"?
7    A. Yes.
8    Q. Who is that?
9    A. She is an investigator for the City of
10 St. Louis Medical Examiner's Office.
11    Q. Okay. So she works here in the building?
12    A. Yes.
13    Q. All right. Did she -- did you have a
14 copy of this, I guess, her narrative report of
15 investigation -- there you go -- before you did the
16 examination?
17    A. I know I read it very early on, but I
18 can't remember if it was the day of. I know I got an
19 oral from our investigator, and also the Illinois
20 people were here as well, so I did get an oral
21 presentation, but I can't remember if I read it at the
22 time. It might have been a couple of days afterwards
23 or something on Monday since this is a Saturday.
24    Q. If you look at page 2 there, it notes

Page 23

1 that Chief Barnfield contacted her from the Buckner
2 Police Department. Were you aware -- did she make you
3 aware of that, that she had spoken with Chief
4 Barnfield?
5    A. I mean, I am only aware when I read it.
6 Sometimes she doesn't always tell me everything that
7 happens until later on we get everything back.
8    Q. Okay. Did you ever talk to Chief
9 Barnfield?
10    A. That name doesn't sound familiar, no.
11    Q. Now, it says that he faxed over copies of
12 the officers' reports. Did you get a copy of the
13 officers' reports?
14    A. Yes.
15    Q. Did either of the reports indicate to you
16 just by reading them that one of the officers hit
17 Mr. Barnhart while he was handcuffed?
18    A. There is a scanned copy of a police
19 report that I reviewed some time ago stating that. I
20 think I also talked to somebody over the phone about
21 the conflicting story of what he said, and also I read
22 some scanned documents where I think it was the
23 defendant in this case was giving his statement, like
24 it was a written statement, and I read that. That is

Page 24

1 all I read.
2    Q. Okay. So the written statement of Bill
3 McKinney, Officer McKinney?
4    A. I think so. I don't remember, but I was
5 aware of it.
6    Q. The Illinois State Police officer that
7 came here and spoke to you, was he present during the
8 examination?
9    A. Yes, the entire time.
10    Q. And he also told you before the
11 examination that according to the information he had
12 uncovered, that McKinney hit Barnhart while he was
13 handcuffed?
14    A. From what I remember, not at that time.
15 I spoke to him on the phone after, like maybe a couple
16 of weeks afterwards. It wasn't at the time of the
17 autopsy. At the time of the autopsy, it was just the
18 story of the tasing I had gotten.
19    Q. When we're dealing with -- the cause of
20 death is blunt head trauma, right?
21    A. Closed head trauma.
22    Q. Closed head trauma. And so any trauma to
23 the head would be noteworthy to try and determine the
24 cause of death, right?

Keefe Reporting Company

Page 25

```
 1      A.  Like how it occurred?
 2      Q.  Yes.
 3      A.  Yes.
 4      Q.  I mean, if he got hit 20 times with a
 5  baseball bat, you'd want to know that?
 6      A.  Yes.
 7      Q.  If he fell once onto a pillow, you'd want
 8  to know that, right?
 9      A.  Yes.
10      Q.  And so I'm wondering if you've ever seen
11  any of the Illinois State Police reports or interviews
12  of witnesses following this.
13      A.  I saw those after I had the case back,
14  after the histology and my report was typed up, when I
15  was reviewing after the fact, but not at the time of
16  the autopsy, no.
17      Q.  Did anyone ever tell you that, and this
18  is from Ralph Reed, who is a neighbor, "Reed stated
19  Officer McKinney and Officer Dale then picked up the
20  victim to his feet and started walking him back to the
21  road.  Reed stated the victim was handcuffed at the
22  time.  Reed stated that it appeared as the officers
23  were walking the victim back to the road, the victim
24  was tripped to the ground.  Reed stated that it
```

Page 26

```
 1  appeared the victim was rendered unconscious at that
 2  time because there was no movement"?  Did anybody ever
 3  tell you that?
 4      A.  I don't remember ever reading anything
 5  like that.  I remember hearing something maybe another
 6  fall while he was being taken somewhere and he fell or
 7  he was dropped or something.  I remember reading that.
 8      Q.  There you go.  Okay.  Maybe that's from
 9  McKinney when it says, "This RA asked McKinney if it
10  was fair to say that when McKinney got Barnhart Sr. to
11  the grassy area, McKinney was upset and dropped
12  Barnhart Sr. to the ground as a way to basically say,
13  'Piss on you.'  McKinney agreed with the statement."
14  Is that what you were referring to when you said
15  "dropped"?
16          MR. PIERCE:  I'm going to object because
17  that statement doesn't say anything about the nature
18  or extent of the blow or how he was dropped;
19  therefore, it's an improper hypothetical, so subject
20  to that.
21      A.  I don't remember reading that.  That
22  whole statement I don't remember reading before.  I
23  remember reading something about being taken somewhere
24  and dropped.  I remember reading that, but that
```

Page 27

```
 1  doesn't jog my memory hearing that statement.
 2      Q.  If the evidence is that they picked him
 3  up, took him over, and threw him on the ground while
 4  he was handcuffed, he had wouldn't have anything to
 5  break his fall, right?
 6          MR. PIERCE:  Object to speculation.
 7      Q.  (By Mr. Beasley)  If he's handcuffed,
 8  does he have anything to break his fall?
 9      A.  No.
10      Q.  And if he has nothing to break his fall,
11  presumably, at least we can infer, that he would hit
12  his head, right?
13          MR. BLEYER:  Show my objection.
14  Speculation.
15      A.  I don't know if he would only hit his
16  head.  Depending on how he was released, he could have
17  fallen on his body as opposed to his head.  I don't
18  know.
19      Q.  (By Mr. Beasley)  Well, that's something
20  you would want to know about when you're trying to
21  make a determination.  I mean, the whole point of your
22  investigation is to determine how and why this man is
23  dead, right?
24      A.  Yes.
```

Page 28

```
 1      Q.  You'd want to know if he was thrown to
 2  the ground while handcuffed, wouldn't you?
 3      A.  Yes.
 4      Q.  But nobody ever shared that information
 5  with you that you're aware of?  At least it doesn't
 6  appear in your report?
 7      A.  I don't put those kind of information in
 8  my report, but I do use it in consideration of the
 9  manner of death.
10      Q.  Okay.  So we've got, at least that you're
11  aware of -- the trauma to his head, to Mr. Barnhart's
12  head, that you're aware of are two falls and a punch
13  or a hit?
14      A.  Yes.
15      Q.  Okay.  And as you sit here right now, you
16  can't tell us whether one --
17          (Inaudible speaking)
18          MR. BLEYER:  I'm talking to Jerry, not
19  you.
20          MR. BEASLEY:  Brother, I'm sitting here
21  asking questions.
22          MR. BLEYER:  I'm talking to Jerry, not
23  you.
24      Q.  (By Mr. Beasley)  As you sit here right
```

7 (Pages 25 to 28)

Keefe Reporting Company

Page 29

1  now, out of those three, you can't say this was the
2  cause -- any one of the three is the cause, right?
3      A.  Yes.
4      Q.  You can simply say that he died as a
5  result of trauma caused by a closed head injury?
6      A.  Yes.
7      Q.  Now, the injuries that you found in your
8  examination, they would be consistent with any one of
9  those three incidents, right?
10     A.  It's possible.
11     Q.  As far as the -- I think we called it --
12 or you called it a speckled contusion?
13     A.  Yes.
14     Q.  You relate that to some type of fall on
15 gravel, right?
16     A.  Well, gravel or irregular surface, yes.
17     Q.  Now, I think based on all the interviews
18 I've seen, I don't know that it's entirely clear when
19 he was tased, where he fell. Was it your
20 understanding -- do you have a better understanding as
21 to where he fell or on what surface he fell?
22     A.  They had asked him about where -- the
23 neighborhood he was in. I remember asking someone or
24 reading somewhere. I think I spoke to the

Page 30

1  investigator at the time from Illinois, and he was
2  describing some part was grass and another part was
3  gravel. So when I saw the speckled contusion, I was
4  like, okay, that kind of started matching up with what
5  was on his body.
6      Q.  Obviously a fist is not gravel, right?
7      A.  Right.
8      Q.  And a hand is not gravel. So is it your
9  opinion that at least one of the two falls caused that
10 speckled contusion?
11     A.  Yes.
12     Q.  But you don't know which fall it was,
13 whether it was the fall as a result of a taser or a
14 fall as a result of being either dropped or thrown to
15 the ground?
16     A.  Yes.
17         (A discussion was held off the record.)
18         MR. BEASLEY:  I think that's all the
19 questions I have, ma'am. Thank you.
20
21              EXAMINATION
22           By Mr. Bleyer
23     Q.  Doctor, you mentioned that you talked to
24 an investigator. As far as persons from Illinois that

Page 31

1  you actually spoke with, is the only person you spoke
2  to was this investigator from the Illinois State
3  Police as far as --
4      A.  I know I spoke to the guy that showed up.
5  I think I talked to him again, but I'm not entirely
6  sure. I'm horrible with names.
7      Q.  I'm not worried about the names because
8  Mr. Beasley asked you about some report about Chief
9  Barnhart [sic] sending something, and then they went
10 through what you saw or what was written, which then
11 concerned me. I just want to know, the only person
12 you spoke to from Illinois would be whoever showed up
13 at the time of the autopsy?
14     A.  Yes. I spoke to someone over the phone a
15 few weeks later. I think it was the same person, but
16 that was two years ago.
17     Q.  Did you speak to anyone that you know of
18 that was actually at the scene when the events took
19 place?
20     A.  No.
21     Q.  Did you speak with anyone from the
22 Village of Buckner, Illinois?
23     A.  No.
24         MR. BLEYER:  Just remember, if you lived

Page 32

1  there, you'd be home. That's all the questions I
2  have.
3
4              FURTHER EXAMINATION
5           By Mr. Pierce
6      Q.  Doctor, I just want to follow up on a
7  couple of questions Mr. Beasley asked you. With
8  regard to the nature and locations of the injuries
9  which you found, assume hypothetically that the blow
10 to the face, the punch, was an open -- described as an
11 open-handed slap up under the jaw as opposed to a
12 punch on anywhere else on the face or head. Would
13 that type of blow be consistent or inconsistent with
14 the right-sided hematoma and hemorrhage which you
15 found?
16         MR. BEASLEY:  I would object that it
17 mischaracterizes the evidence and also assumes fact
18 not in evidence. Subject to that.
19     Q.  (By Mr. Pierce)  You can go ahead and
20 answer. Doctor, it's a hypothetical question assuming
21 those facts.
22         MR. BLEYER:  She can read it back.
23         (The requested portion of the record was
24 read back by the reporter.)

Page 33

1  A.  I wouldn't be able to say definitively,
2  but with this man's previous medical history, it is
3  possible.
4  Q.  (By Mr. Pierce) Possible but not
5  probable?
6      MR. BEASLEY: Objection. Asked and
7  answered.
8  A.  I wouldn't go that far.
9  Q.  You can't say it's probable?
10 A.  Not with the information I have. I can't
11 say one way or the other.
12 Q.  I think the only fact -- the same
13 question with the additional fact that the slap was to
14 the left side up under the jaw as opposed to the right
15 side. Would that additional fact make any difference?
16     MR. BEASLEY: Same objection.
17 A.  No.
18 Q.  (By Mr. Pierce) Okay. Just
19 logistically, I'm looking at your report on the second
20 page under "injuries." You described that speckled
21 contusion. Am I correct that in that paragraph, that
22 the only external injury you are documenting is the
23 contusion on the right and mid forehead and the rest
24 of those findings are internal?

Page 34

1  A.  Yes.
2      MR. PIERCE: Okay. That's all I've got.
3  Thank you.
4      MR. BLEYER: Waive?
5      MR. PIERCE: Doctor, since you're fairly
6  new at depositions, you have a right to read through
7  the transcript after the court reporter types it up
8  into booklet form to make sure she took down
9  everything you said accurately. You can also just
10 rely on her to have done her job appropriately and
11 waive signature so you don't have to be bothered with
12 it again. None of us represent you. I can't tell you
13 what you should do. I don't know what the city's
14 practice is on that. Most witnesses do simply waive
15 signature so they don't have to be bothered with it
16 again, but that is your choice.
17     THE WITNESS: I think I want to review it
18 for myself just for edification.
19     MR. PIERCE: Okay.
20     THE WITNESS: I trust you.
21     MR. PIERCE: Sounds great. She'll make
22 arrangements with you on that. Thank you, Doctor.
23     (The deposition ended at 12:02 p.m.)
24     ***************

Page 35

JULIETTE SCANTLEBURY, M.D.

STATE OF _____ )
                        )
COUNTY OF _____ )

Subscribed and sworn to before me this ____ day of _____, 2015.

_____
NOTARY PUBLIC

My Commission Expires:
***************

(LCA)

Page 36

1  I, Lynn C. Allard, a Certified Court
2  Reporter for the State of Missouri, DO HEREBY CERTIFY
3  that pursuant to agreement between counsel, there
4  appeared before me on January 28, 2015, at the Office
5  of the Medical Examiner, 1300 Clark Avenue, St. Louis,
6  Missouri, JULIETTE SCANTLEBURY, M.D., who was first
7  duly sworn by me to tell the whole truth of all
8  knowledge, touching upon the matter in controversy
9  aforesaid so far as the witness should be interrogated
10 concerning the same; that the witness was examined and
11 said examination was taken down in shorthand by me and
12 afterwards transcribed upon the computer, then being
13 signed by the deponent, signature not having been
14 waived by agreement of counsel, and said deposition is
15 herewith returned this 29th day of January 2015.

17     Lynn C. Allard, CSR, CCR
       IL License #084-002828
18     MO License #507

Page 37

```
 1
        Keefe Reporting Company
 2      11 North 44th Street
        Belleville, Illinois 62226
 3
        January 30, 2015
 4
 5      Office of Medical Examiner
        Attn: Juliette Scantlebury, M.D.
 6      1300 Clark Avenue
        St. Louis, MO 63013
 7
 8      IN RE: Susan Barnhart, as Administrator of the Estate
        of Roy D. Barnhart, Deceased V. The Village of
 9      Buckner, Illinois, et al.; No. 13-772-SMY-DGW
10      Dear Dr. Scantlebury:
11      Enclosed herewith, please find a copy of your
        deposition transcript taken in the above-captioned
12      matter on January 28, 2015, along with the original
        signature page of same.
13
        Please read the deposition, note any corrections to be
14      made on the provided sheets, sign the original
        signature page, and have your signature notarized
15      where indicated. Following this, please return the
        original executed signature page and correction sheets
16      to me within 30 days, and I will forward same to all
        counsel of record. Thank you.
17
        Yours very truly,
18
        KEEFE REPORTING COMPANY
19
20
        Lynn C. Allard, CSR, CCR
21      IL License #084-002828
        MO License #507
22
        CC w/Enc: Mr. Charles A. Pierce, Esq.
23           Mr. Jarrod P. Beasley, Esq.
             Mr. Jerome E. McDonald, Esq.
24           Mr. Joseph A. Bleyer, Esq.
```